UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

FORT WORTH DIVISION

| | | |
|---|---|---|
| GENESEE COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | § § § | Civil Action No. 4:22-cv-00033 |
| | § | CLASS ACTION |
| Plaintiff, | § § | |
| vs. | § § | |
| FIRSTCASH HOLDINGS, INC., RICK L. WESSEL and R. DOUGLAS ORR, | § § § | |
| Defendants. | § § | |
| | § | DEMAND FOR JURY TRIAL |

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff Genesee County Employees' Retirement System ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings of FirstCash Holdings, Inc. ("FirstCash" or the "Company"), the Company's press releases, and analyst reports, media reports, and other publicly disclosed reports and information about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all persons who purchased shares of FirstCash common stock between February 1, 2018 and November 12, 2021, both dates inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "1934 Act") against FirstCash and certain of the Company's senior officers and directors.

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa.

3.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §27 of the 1934 Act because FirstCash is headquartered in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

4.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

5.      Plaintiff Genesee County Employees' Retirement System, as set forth in the certification attached hereto and incorporated by reference herein, purchased FirstCash common stock during the Class Period and suffered damages as a result.

6.      Defendant FirstCash is a Delaware corporation headquartered in Fort Worth, Texas. The Company owns and operates pawn stores in the United States and Latin America.  FirstCash common stock trades on the NASDAQ under the ticker symbol "FCFS."

7.      Defendant Rick L. Wessel ("Wessel") was at all relevant times the Chief Executive Officer ("CEO") and Vice Chairman of FirstCash.

8.      Defendant R. Douglas Orr ("Orr") was at all relevant times Chief Financial Officer ("CFO") and Executive Vice President of FirstCash.

9.      The defendants referenced above in ¶¶7-8 are collectively referred to herein as the "Individual Defendants."  The Individual Defendants, together with FirstCash, are referred to herein as "defendants."

10.     Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, acquisition plans, and present and future business prospects, as alleged herein.  In addition, the Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the

- 2 -

false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

11.      As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the 1934 Act and trade on the NASDAQ, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, services, markets, competition, acquisition plans, and present and future business prospects.  In addition, the Individual Defendants each had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded common shares would be based upon truthful and accurate information.  Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

12.      The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## BACKGROUND

13.      Based in Fort Worth, Texas, FirstCash operates pawn stores in the United States and Latin America.  Through its pawn stores, the Company provides non-recourse pawn loans and buys

merchandise from customers to allow them to meet short-term cash needs.  As of December 31, 2020, the Company operated over 2,700 pawn stores, with more than 1,000 located in the United States.  Formerly, FirstCash also offered domestic payday and installment loans, but ceased offering these services in June 2020.

14.     In September 2016, the Company, then known as First Cash Financial Services Inc., finalized its merger with pawnshop provider and payday lender Cash America International, Inc. ("Cash America").  Following the merger, the combined company changed its name to FirstCash Inc.  Similarly, following a December 2021 merger with lending company American First Finance, the Company again changed its name to FirstCash Holdings, Inc.

15.     Pawn stores, also known as "pawnshops," are neighborhood-based retail locations that buy and sell pre-owned consumer products such as jewelry, tools, appliances, sporting goods and musical instruments.  Pawn stores also provide quick and convenient sources for small secured consumer loans to unbanked, underbanked and credit-challenged customers.  When extending loans, FirstCash does not investigate the creditworthiness of the borrower, primarily relying on the marketability and sales value of pledged goods as the basis of its credit decisions.  The Company also does not engage in any post-default collection efforts, or take any legal action against defaulting customers, but rather, relies on the resale of the pawn collateral for recovery.

16.     FirstCash organizes its operations in two reportable segments: (i) the United States; and (ii) Latin America.  For the year ended December 31, 2020, 66% of FirstCash's total revenues were derived from the United States and 34% from Latin America.

17.     The Military Lending Act ("MLA") provides protections for active-duty service members and their dependents in connection with the extension of consumer credit.  Among other protections, the MLA limits the interest rates that may be charged on consumer loans to active-duty armed forces members and their covered dependents to no more than 36%.  Further, the MLA

prohibits lenders from requiring covered parties to submit to arbitration, as well as imposing other limitations.

18.     In November 2013, Cash America entered into a Consent Order with the Consumer Financial Protection Bureau ("CFPB") for making loans to covered members of the military or their dependents in violation of the MLA, violations relating to debt collection, failure to prevent or timely detect problematic conduct due to inadequate internal compliance, and failure to maintain required records (the "Order").  In the Order, Cash America agreed to cease and desist from the violations and to implement a plan designed to ensure its future compliance with the terms of the Order.  The CFPB fined Cash America $5 million and ordered it to deposit $8 million into an account in order to provide redress to affected consumers.

19.     In 2015, the Department of Defense expanded the MLA to cover more credit products, including pawn loans.  Newly covered creditors, which included pawn brokers, had until October 3, 2016 to bring their operations into compliance with the new rules.

20.     In response to the expansion of the MLA, which prohibited the Company from issuing loans with interest rates higher than 36%, FirstCash claimed that it was "unable to offer any of its current credit products, including pawn loans, to members of the U.S. military or their dependents."  The Company also claimed throughout the Class Period that it employed robust systems, policies, and procedures to ensure its regulatory compliance and adherence to applicable laws, rules and regulations governing its business, including the MLA.

21.     Despite these assurances, unbeknownst to investors throughout the Class Period, FirstCash was engaged in widespread and systemic violations of the MLA and had made thousands of loans to active-duty service members and their dependents at usurious rates.  On November 12, 2021, the CFPB filed a lawsuit alleging that FirstCash and its subsidiary, Cash America West, Inc., had violated the MLA by charging higher than the allowable 36% annual percentage rate on over

3,600 pawn loans to more than 1,000 active-duty service members and their dependents.  The CFPB also alleged that FirstCash had violated the 2013 CFPB Order prohibiting future MLA violations, which remained in effect and applied to FirstCash following the September 2016 merger of the Company and First Cash America

22.     As a result of these revelations, the price FirstCash stock plummeted over $7 per share, or 8%, in a single day to close at $78.64 per share on November 12, 2021 on abnormally high trading volume.  The stock continued to fall in subsequent days as the market digested the news, dropping another $10 per share by November 18, 2021.

23.     As a result of defendants' scheme to defraud investors and their materially false and misleading statements issued during the Class Period, the price of FirstCash shares traded at artificially inflated prices.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

24.     The Class Period begins on February 1, 2018.  On that date, FirstCash issued a release which announced the Company's financial results for the fourth quarter and full year ended December 31, 2017.  The release stated that FirstCash had achieved "record revenue" for the year and that the Company's U.S. segment revenue for the quarter and the year from pawn loan fees was approximately $93 million and $380 million, respectively.  The release further stated that, as of December 31, 2017, the Company's U.S. pawn loans outstanding totaled $276.6 million.

25.     On February 20, 2018, FirstCash filed with the SEC on Form 10-K the Company's financial results for the fiscal year ended December 31, 2017, which was signed by defendants Wessel and Orr and included signed certifications attesting to its accuracy by these defendants (the "2017 Form 10-K").  For 2017, the 2017 Form 10-K stated FirstCash had generated more than $380 million in U.S. pawn loan fees.  According to the 2017 Form 10-K, "pawn loan fees are typically calculated as a percentage of the pawn loan amount based on the size and duration of the transaction

and generally range from 4% to 25% per month, as permitted by applicable law." The 2017 Form 10-K also stated that "[p]awn loan fees accounted for approximately 29% of the Company's revenue during fiscal 2017."

26.     The 2017 Form 10-K stated that FirstCash was subject to extensive rules and regulations governing the Company's business. For example, the 2017 Form 10-K stated that "the Company's products and services are subject to extensive regulation and supervision under various federal, state and local laws, ordinances and regulations in both the U.S. and Latin America." However, the 2017 Form 10-K stated that the Company was in compliance with this regulatory regime and employed rigorous policies, procedures and controls to ensure this compliance. For example, the 2017 Form 10-K stated that FirstCash "utilizes a proprietary computer information system that provides fully-integrated functionality to support . . . compliance and control systems." The 2017 Form 10-K also stated that FirstCash "maintains a well-trained internal audit staff that conducts regular store visits to test compliance of financial and operational controls." The 2017 Form 10-K continued: "Management believes the current operating and financial controls and systems are adequate for the Company's existing store base and can accommodate reasonably foreseeable growth in the near term."

27.     Moreover, the 2017 Form 10-K stated that the new MLA rules (the "MLA Rule"), which had gone into effect in October 2016, "prevented the Company from offering its pawn services and its short-term unsecured credit products to members of the military or their dependents because none of the Company's products carry a military annual percentage rate of 36% or less." Further, the 2017 Form 10-K stated that "[u]nder the MLA Rule, the Company is unable to offer any of its current credit products, including pawn loans, to members of the U.S. military or their dependents." The 2017 Form 10-K further stated that FirstCash "does not believe that active members of the U.S. military or their dependents comprise a significant percentage of the historical

customer base in most locations." The 2017 Form 10-K further represented that the Company was operating in "compliance with the MLA Rule," which had resulted in "compliance risks and related costs and limits the potential customer base of the Company." Similarly, the 2017 Form 10-K stated that the "Company likely remains subject to certain obligations of the [CFPB] Consent Order, including ensuring compliance with federal consumer financial laws and consumer compliance management system."

28.    On January 31, 2019, FirstCash issued a release which announced the Company's financial results for the fourth quarter and full year ended December 31, 2018. The release stated that the Company's U.S. segment revenue for the quarter and the year from pawn loan fees was approximately $95 million and $373 million, respectively. The release further stated that, as of December 31, 2018, the Company's U.S. pawn loans outstanding totaled $271.6 million. In the release, defendant Wessel stated that "'2018 was another outstanding year for FirstCash . . . [and] [t]he fourth quarter results produced strong profitability and growth metrics in both the U.S. and Latin America, highlighted by increasing year-over-year pawn fees and retail margins in the U.S.'" and sequential improvements in Latin America.

29.    On February 5, 2019, FirstCash filed with the SEC on Form 10-K the Company's financial results for the fiscal year ended December 31, 2018, which was signed by defendants Wessel and Orr and included signed certifications attesting to its accuracy by these defendants (the "2018 Form 10-K"). For 2018, the 2018 Form 10-K stated FirstCash had achieved more than $373 million in U.S. pawn loan fees. According to the 2018 Form 10-K, "pawn loan fees are typically calculated as a percentage of the pawn loan amount based on the size, duration and type of collateral of the pawn loan and generally range from 4% to 25% per month, as permitted by applicable law." The 2018 Form 10-K also stated that "[p]awn loan fees accounted for approximately 30% of the Company's revenue during fiscal 2018."

30.     The 2018 Form 10-K stated that FirstCash was subject to extensive rules and regulations governing the Company's business.  For example, the 2018 Form 10-K stated that "[t]he Company's products and services are subject to extensive regulation and supervision under various federal, state and local laws, ordinances and regulations in both the U.S. and Latin America." However, the 2018 Form 10-K stated that the Company was in compliance with this regulatory regime and employed rigorous policies, procedures and controls to ensure this compliance.  For example, the 2018 Form 10-K stated that FirstCash "utilizes a proprietary computer information system that provides fully-integrated functionality to support … compliance and control systems." The 2018 Form 10-K also stated that FirstCash "maintains a well-trained internal audit staff that conducts regular store visits to test compliance of financial and operational controls."  The 2018 Form 10-K continued: "Management believes the current operating and financial controls and systems are adequate for the Company's existing store base and can accommodate reasonably foreseeable growth in the near term."

31.     Moreover, the 2018 Form 10-K stated that the MLA Rule "expanded the scope of the credit products covered by the MLA to include overdraft lines of credit, pawn loans, or vehicle and certain unsecured installment loan products to the extent any such products have a military annual percentage rate greater than 36%."  The 2018 Form 10-K further represented that the Company was operating in "compliance with the MLA Rule," which had resulted in "compliance risks and related costs and limits the potential customer base of the Company."

32.     On January 29, 2020, FirstCash issued a release which announced the Company's financial results for the fourth quarter and full year ended December 31, 2019.  The release stated that the Company's U.S. segment revenue for the quarter and the year from pawn loan fees was approximately $96 million and $379 million, respectively.  The release further stated that, as of December 31, 2019, the Company's U.S. pawn loans outstanding totaled $268.8 million.  In the

release, defendant Wessel stated that "'FirstCash completed another successful year . . . highlighted by strong earnings growth from our core pawn operations.'"

33.     On February 3, 2020, FirstCash filed with the SEC on Form 10-K the Company's financial results for the fiscal year ended December 31, 2019, which was signed by defendants Wessel and Orr and included signed certifications attesting to its accuracy by these defendants (the "2019 Form 10-K").  For 2019, the 2019 Form 10-K stated FirstCash had achieved more than $379 million in U.S. pawn loan fees.  According to the 2019 Form 10-K, "pawn loan fees are typically calculated as a percentage of the pawn loan amount based on the size, duration and type of collateral of the pawn loan and generally range from 4% to 25% per month, as permitted by applicable law."  The 2019 Form 10-K also stated that "[p]awn loan fees accounted for approximately 30% of the Company's revenue during 2019."

34.     The 2019 Form 10-K stated that FirstCash was subject to extensive rules and regulations governing the Company's business.  For example, the 2019 Form 10-K stated that "[t]he Company's products and services are subject to extensive regulation and supervision under various federal, state and local laws, ordinances and regulations in both the U.S. and Latin America."  However, the 2019 Form 10-K stated that the Company was in compliance with this regulatory regime and employed rigorous policies, procedures and controls to ensure this compliance.  For example, the 2019 Form 10-K stated that FirstCash "utilizes a proprietary computer information system that provides fully-integrated functionality to support . . . compliance and control systems."  The 2019 Form 10-K also stated that FirstCash "maintains a well-trained internal audit staff that conducts regular store visits to test compliance of financial and operational controls."  The 2019 Form 10-K continued: "Management believes the current operating and financial controls and systems are adequate for the Company's existing store base and can accommodate reasonably foreseeable growth in the near term."

35.     Moreover, the 2019 Form 10-K stated that the MLA Rule "expanded the scope of the credit products covered by the MLA to include overdraft lines of credit, pawn loans, or vehicle and certain unsecured installment loan products to the extent any such products have a military annual percentage rate greater than 36%."  The 2019 Form 10-K further represented that the Company was operating in "compliance with the MLA Rule," which had resulted in "compliance risks and related costs and limits the potential customer base of the Company."

36.     On January 28, 2021, FirstCash issued a release which announced the Company's financial results for the fourth quarter and full year ended December 31, 2020.  The release stated that the Company's U.S. segment revenue for the quarter and the year from pawn loan fees was approximately $74 million and $310 million, respectively.  The release further stated that, as of December 31, 2018, the Company's U.S. pawn loans outstanding totaled $220.4 million.

37.     On February 1, 2021, FirstCash filed with the SEC on Form 10-K the Company's financial results for the fiscal year ended December 31, 2020, which was signed by defendants Wessel and Orr and included signed certifications attesting to its accuracy by these defendants (the "2020 Form 10-K").  The 2020 Form 10-K stated FirstCash had achieved more than $310 million in U.S. pawn loan fees.  According to the 2020 Form 10-K, "pawn loan fees are typically calculated as a percentage of the pawn loan amount based on the size, duration and type of collateral of the pawn loan and generally range from 4% to 25% per month, as permitted by applicable law."  The 2020 Form 10-K also stated that "[p]awn loan fees accounted for approximately 28% of the Company's revenue during 2020."

38.     The 2020 Form 10-K stated that FirstCash was subject to extensive rules and regulations governing the Company's business.  For example, the 2020 Form 10-K stated that "[t]he Company's products and services are subject to extensive regulation and supervision under various federal, state and local laws, ordinances and regulations in both the U.S. and Latin America."

However, the 2020 Form 10-K stated that the Company was in compliance with this regulatory regime and employed rigorous policies, procedures and controls to ensure this compliance. For example, the 2020 Form 10-K stated that FirstCash "utilizes a proprietary computer information system that provides fully-integrated functionality to support … compliance and control systems." The 2020 Form 10-K also stated that FirstCash "maintains a well-trained audit and loss prevention staff which conducts regular store visits to . . . test compliance with regulatory, financial and operational controls." The 2020 Form 10-K continued: "Management believes the current operating and financial controls and systems are adequate for the Company's existing store base and can accommodate reasonably foreseeable growth in the near term."

39.     Moreover, the 2020 Form 10-K stated that the MLA Rule "expanded the scope of the credit products covered by the MLA to include overdraft lines of credit, pawn loans, or vehicle and certain unsecured installment loan products to the extent any such products have a military annual percentage rate greater than 36%." The 2020 Form 10-K further represented that the Company was operating in "compliance with the MLA Rule," which had resulted in "compliance risks and related costs and limits the potential customer base of the Company."

40.     Defendants' statements referenced in ¶¶24-39 above were materially false and misleading when made because they misrepresented and failed to disclose the adverse facts about FirstCash's business, operations and prospects, which were known to defendants or recklessly disregarded by them, as follows:

(a)     that FirstCash had made more than 3,600 loans to over 1,000 active-duty members of the military and their families at usurious interest rates above 36% – and often exceeding 200% – in violation of the MLA and the Order;

(b)     that FirstCash had failed to implement the remedial measures imposed by the Order;

(c)    that FirstCash's financial results were, in substantial part, the product of the Company's violations of the MLA and the Order; and

(d)    that as a result of the foregoing, FirstCash was exposed to a material undisclosed risk of legal, reputational and financial harm if the Company's violations of the MLA and the Order were ever publicly disclosed.

41.    Furthermore, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303"), required defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."   Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and required each risk factor to "adequately describe[] the risk."  The failure of the Company's periodic SEC filings to disclose that the Company was engaged in widespread and systemic violations of the MLA and the Order violated Item 303, because these undisclosed facts were known to defendants and would (and did) have an unfavorable impact on the Company's sales, revenues and income from continuing operations.  This failure also violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant factors that made an investment in FirstCash securities speculative or risky.  Indeed, the boilerplate discussions of potential risks provided by defendants during the Class Period were themselves materially misleading, because they discussed potential future contingencies regarding regulatory noncompliance that "*may*" or "*could*" occur, but failed to disclose the Company's active violations of the MLA and the Order that had ***already*** occurred and the likely adverse repercussions to the Company and its business as a result of this misconduct.

42.     Then, on November 12, 2021, the CFPB announced that it had filed a complaint against FirstCash for violations of the MLA and the Order.  The CFPB complaint alleged that "between June 2017 and May 2021 (the only period for which the Bureau currently has Defendants' transactional data), [FirstCash and its subsidiary Cash America West, Inc.] together made over 3,600 pawn loans to more than 1,000 covered borrowers in Arizona, Nevada, Utah, and Washington."  The CFPB found that, in all of the loans at issue, FirstCash imposed interest rates over 36%, with rates frequently exceeding 200%.  Additionally, the CFPB found that the Company's usurious loan practices had been ongoing since at least October 2016 in violation of the Order.  A CFPB release describing the agency's action against FirstCash stated the Company had "cheated" and "gouged" military families and "robbed them of their rights to go to court," stating in pertinent part as follows:

> The Consumer Financial Protection Bureau (CFPB) today filed a lawsuit in a Texas federal district court against FirstCash, Inc. and Cash America West, Inc.  ***The CFPB alleges that the two companies violated the Military Lending Act (MLA) by charging higher than the allowable 36% annual percentage rate on pawn loans to active-duty servicemembers and their dependents.  The CFPB also alleges that FirstCash violated a 2013 CFPB order against its predecessor company prohibiting MLA violations***.  The CFPB is seeking an injunction, redress for affected borrowers, and a civil money penalty.
>
> "***FirstCash is a repeat offender and cheated military families over and over again***," said CFPB Director Rohit Chopra.  "***FirstCash and Cash America West gouged military families and robbed them of their rights to go to court***."
>
> FirstCash, Inc. is a non-bank corporation operating out of Fort Worth, Texas. FirstCash and its wholly owned subsidiaries operate more than 1,000 pawnshops throughout the U.S. FirstCash is a publicly traded firm with a current market capitalization of about $3.5 billion.  Cash America West, Inc. is a wholly owned subsidiary of FirstCash that operates pawn stores in Arizona, Nevada, Utah, and Washington.
>
> ***The CFPB alleges that between June 2017 and May 2021, FirstCash and Cash America West violated the MLA by making more than 3,600 pawn loans from their Arizona, Nevada, Utah, and Washington stores with an annual percentage rate above the 36% allowed by the MLA.  The unlawful loans had APRs that frequently exceeded 200%. The CFPB also alleges that the loan contracts violated the MLA by requiring borrowers to sign away their ability to sue and by failing to make all required loan disclosures.  These 3,600 loans are from only a limited period for which the Bureau currently has transactional data, and the stores from***

*which they originated make up only about 10% of FirstCash's nationwide pawn-loan operations.  Accordingly, the CFPB alleges that since October 3, 2016, FirstCash has, together with Cash America West and other wholly owned subsidiaries, made additional pawn loans in violation of the MLA from stores in these and other states*.

In 2013, the Bureau ordered Cash America International, Inc. to halt its misconduct against military families, prohibiting Cash America and its successors from violating the MLA  FirstCash is a successor to Cash America and therefore subject to the 2013 order.  *The Bureau alleges that FirstCash's violations of the MLA violated the Bureau's 2013 order*.

43.     As a result of this news, the price of FirstCash common stock dropped from $85.84 per share when the market closed on November 11, 2021, to $78.64 per share when the market closed on November 12, 2021, an 8% decline on unusually heavy volume of nearly 500,000 shares traded.  As the market continued to digest the news in the days that followed, the price of FirstCash common stock continued to decline, falling to a low of just $61.76 per share by December 13, 2021, a 28% decline from the November 11, 2021 share price.

44.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of FirstCash common stock, plaintiff and other Class members (defined below) have suffered significant losses and damages.

## CLASS ACTION ALLEGATIONS

45.     Plaintiff brings this action as a class action on behalf of a class consisting of all persons who purchased FirstCash common stock during the Class Period (the "Class").  Excluded from the Class are defendants and their families, the officers, directors and affiliates of the defendants, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

46.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, FirstCash common stock was actively traded on the

NASDAQ.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by FirstCash or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

47.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

48.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

49.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether defendants' statements during the Class Period were materially false and misleading;

(b)    whether defendants acted with scienter in issuing materially false and misleading statements during the Class Period; and

(c)    the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

50.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## ADDITIONAL SCIENTER ALLEGATIONS

51.     As alleged herein, defendants acted with scienter in that defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding FirstCash, and their control over and/or receipt and/or modification of FirstCash's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

52.     Defendants knew and/or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.  The scheme was perpetrated over a five-year period and involved the issuance of thousands of usurious loans to more than 1,000 active-duty military personnel and members of their family.  The broad scope of the fraud, and the fact that the Company was a repeat offender and subject to the CFPB Order which mandated compliance with the MLA, further bolsters an already compelling inference of scienter.

53.     The Individual Defendants, because of their positions with FirstCash, controlled the contents of FirstCash's public statements during the Class Period.  The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading

prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or

cause it to be corrected.  Because of their positions and access to material non-public information,

the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had

not been disclosed to and were being concealed from the public and that the positive representations

that were being made were false and misleading.  As a result, each of the defendants is responsible

for the accuracy of FirstCash's corporate statements and is, therefore, responsible, and liable for the

representations contained therein.

54.     The scienter of defendants is further underscored by the certifications mandated by

the Sarbanes-Oxley Act of 2002 of defendants Wessel and Orr filed during the Class Period, which

acknowledged their responsibility to investors for establishing and maintaining controls to ensure

that material information about FirstCash was made known to them and that the Company's

disclosure-related controls were operating effectively.

**LOSS CAUSATION**

55.     During the Class Period, as detailed herein, defendants engaged in a scheme to

deceive the market and a course of conduct that artificially inflated the price of FirstCash common

stock and operated as a fraud or deceit on Class Period purchasers of FirstCash common stock by

failing to disclose and misrepresenting the adverse facts detailed herein.  When defendants' prior

misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the

price of FirstCash common stock declined significantly as the prior artificial inflation came out of

the stock's price.

56.     As a result of their purchases of FirstCash common stock during the Class Period,

plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal

securities laws.  Defendants' false and misleading statements had the intended effect and caused

FirstCash common stock to trade at artificially inflated levels throughout the Class Period, trading as high as $106.25 per share on July 24, 2019.

57.     By concealing from investors the adverse facts detailed herein, defendants presented a misleading picture of FirstCash's business, risks and future financial prospects.  When the truth about the Company was revealed to the market, the price of FirstCash common stock fell significantly, dropping to below $70 per share by November 17, 2021, removing the inflation therefrom and causing economic loss to investors who had purchased FirstCash common stock during the Class Period.

58.     The decline in the price of FirstCash common stock after the corrective disclosures came to light was a direct result of the nature and extent of defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price decline in FirstCash common stock negates any inference that the losses suffered by plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct.

59.     The economic loss, *i.e.*, damages, suffered by plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the price of FirstCash common stock and the subsequent significant declines in the value of FirstCash common stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

### APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

60.     At all relevant times, the market for FirstCash common stock was an efficient market for the following reasons, among others:

(a)     FirstCash common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient, national stock market;

(b)     as a regulated issuer, FirstCash filed periodic public reports with the SEC;

(c)     FirstCash regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     FirstCash was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

61.     As a result of the foregoing, the market for FirstCash common stock promptly digested current information regarding FirstCash from all publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all purchasers of FirstCash common stock during the Class Period suffered similar injury through their purchases of FirstCash common stock at artificially inflated prices and a presumption of reliance applies.

62.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on defendants' material misstatements and/or omissions.  Because this action involves defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

**NO SAFE HARBOR**

63.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this complaint.  Many of the specific statements pled herein were not identified as "forward-looking statements" when made.   To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of FirstCash who knew that those statements were false when made.

**COUNT I**

**For Violation of §10(b) of the 1934 Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

64.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

65.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

66.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)      made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of FirstCash common stock during the Class Period.

67.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for FirstCash common stock.  Plaintiff and the Class would not have purchased FirstCash common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

68.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of FirstCash common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

69.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

70.     The Individual Defendants acted as controlling persons of FirstCash within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of FirstCash stock, the Individual Defendants had the power and authority to cause FirstCash to engage in the wrongful conduct complained of herein.  FirstCash controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

- 22 -

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.      Designating plaintiff as Lead Plaintiff and declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative Class members to exclude themselves by requesting exclusion through noticed procedures.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  January 14, 2022                    KENDALL LAW GROUP, PLLC
                                            JOE KENDALL
                                            (Texas Bar No. 11260700)


                                                    s/ JOE KENDALL
                                            _____
                                                    JOE KENDALL

                                            3811 Turtle Creek Blvd., Suite 1450
                                            Dallas, TX  75219
                                            Telephone:  214/744-3000
                                            214/744-3015 (fax)

- 23 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
VICKI MULTER DIAMOND
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
BRIAN E. COCHRAN
200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone:  312/674-4674
312/674-4676 (fax)

VANOVERBEKE, MICHAUD & TIMMONY,
P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

Attorneys for Plaintiff