**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| IN RE FIRSTCASH HOLDINGS INC. SECURITIES LITIGATION | Civil Action No. 4:22-cv-00033-P <br><br> <u>CLASS ACTION</u> <br><br> <u>DEMAND FOR JURY TRIAL</u> |

**AMENDED COMPLAINT FOR VIOLATIONS**
**OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

**Page**

I.     NATURE OF THE ACTION ....................................................................... 2

II.    JURISDICTION AND VENUE ................................................................... 9

III.   PARTIES ...................................................................................................... 10

       A.     Lead Plaintiff .................................................................................. 10

       B.     Defendants ...................................................................................... 10

IV.    CONFIDENTIAL WITNESSES ............................................................... 12

V.     SUBSTANTIVE ALLEGATIONS ........................................................... 13

       A.     Company Background ..................................................................... 13

       B.     The Military Lending Act: 2006 Enactment and 2007 Initial Regulations .......... 15

       C.     The November 2013 Cash America Consent Order With CFPB ........................ 18

       D.     Congress Expands MLA's Scope to Encompass Pawn Transactions.................. 21

       E.     The Company's Purported Response to the 2015 Amendment to the MLA
              Expanding the Statute's Coverage ................................................. 24

              1.     Former Employees Confirm That Defendants Failed to Implement
                     Adequate Internal Controls and Audit Processes to Detect MLA
                     Violations .............................................................................. 24

              2.     Former Employees Confirm That Defendants Failed to Implement
                     Adequate MLA Training and Education Programs for FirstCash
                     Employees ............................................................................. 26

       F.     November 12, 2021: CFPB Files a Lawsuit Against FirstCash and Cash
              America West Revealing the Company's Continued Violation of the MLA ....... 29

       G.     Post-Class Period Commentary by CFPB Director on FirstCash
              Enforcement Action ........................................................................ 31

VI.    DEFENDANTS' MATERIAL MISSTATEMENTS AND OMISSIONS
       DURING THE CLASS PERIOD ............................................................... 31

       A.     Fourth Quarter and Full Year 2017 Financial Results: February 2017 ............. 32

       B.     First Quarter Fiscal 2018 Financial Results: April 2018 ..................... 37

C.     Second Quarter Fiscal 2018 Financial Results: July 2018.................................... 39

D.     Third Quarter Fiscal Year 2018 Financial Results: October 2018 ...................... 40

E.     FirstCash Analyst and Banker Day Presentation: November 6, 2018 ................. 42

F.     Fourth Quarter and Full Fiscal Year 2018 Financial Results: January - February 2019 ....................................................................................................... 43

G.     First Quarter Fiscal Year 2019 Financial Results: April - May 2019 .................. 47

H.     Second Quarter Fiscal Year 2019 Financial Results: July 2019 .......................... 48

I.     Third Quarter Fiscal Year 2019 Financial Results: October - November 2019 .......................................................................................................................... 50

J.     Fourth Quarter and Full Year Fiscal 2019 Financial Results: January - February 2020 ....................................................................................................... 52

K.     First Quarter Fiscal Year 2020 Financial Results: April - May 2020 .................. 55

L.     Second Quarter Fiscal Year 2020 Financial Results: July - August 2020 ........... 57

M.     Third Quarter Fiscal Year 2020 Financial Results: October - November 2020 .......................................................................................................................... 59

N.     Fourth Quarter and Full Year Fiscal 2020 Financial Results: January - February 2020 ....................................................................................................... 60

O.     First Quarter Fiscal 2021 Financial Results: April - May 2021 .......................... 65

P.     Second Quarter Fiscal 2021 Year Financial Results: July - August 2021 ........... 66

Q.     Third Quarter Fiscal Year 2021 Financial Results: October 2021 ...................... 68

R.     Defendants Omitted to Disclose the Known, Material Trends of Significant and Growing Legal and Regulatory Risks and Costs Related to Violations of the MLA and the 2013 Consent Order ............................................ 69

VII.     THE TRUTH IS REVEALED ........................................................................................ 70

VIII.     ADDITIONAL ALLEGATIONS OF SCIENTER ......................................................... 75

IX.     CONTROL PERSON ALLEGATIONS ........................................................................ 78

X.     LOSS CAUSATION ....................................................................................................... 79

XI.     INAPPICABILITY OF STATUTORY SAFE HARBOR .............................................. 80

XII.    PRESUMPTION OF RELIANCE ................................................................. 81

XIII.   CLASS ACTION ALLEGATIONS ........................................................... 84

XIV.    COUNTS ................................................................................................. 86

        COUNT I For Violations of Section 10(b) of the Exchange Act  and Rule 10b-5
            Against All Defendants ........................................................................ 86

        COUNT II For Violation of Section 20(a) of the 1934 Act  Against All
            Defendants ......................................................................................... 88

XV.     PRAYER FOR RELIEF ............................................................................ 88

XVI.    JURY TRIAL DEMAND ........................................................................... 89

**GLOSSARY OF TERMS AND ABBREVIATIONS
USED IN AMENDED COMPLAINT**

| Term | Definition |
|---|---|
| ANPR | Advanced Notice of Proposed Rulemaking |
| CFA | Consumer Federation of America |
| CFPB | Consumer Financial Protection Bureau |
| CID | Civil Investigative Demand |
| DoD | Department of Defense |
| MAPR | Military Annual Percentage Rate |
| MLA | Military Lending Act, 10 U.S.C. § 987 |
| MLA Database | A directory tool created by the Department of Defense to permit lenders to check the status of a prospective borrower as covered by the MLA or not.  The MLA Database is available at https://mla.dmdc.osd.mil/mla/#/home. |
| NPA | National Pawnbrokers' Association |
| NPR | Notice of Proposed Rulemaking |
| TILA | Truth in Lending Act, 15 U.S.C. § 1601 |

Lead Plaintiff Wayne County Employees' Retirement System ("Wayne County ERS" or "Lead Plaintiff"), individually and on behalf of all others similarly situated, by and through its counsel, brings this action against FirstCash Holdings, Inc.[1] ("FirstCash" or the "Company"), Rick L. Wessel, and R. Douglas Orr (together, "Defendants").  Lead Plaintiff alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which Lead Plaintiff alleges upon personal knowledge.  Lead Plaintiff's information and belief are based upon Co-Lead Counsel's investigation, which included review and analysis of, *inter alia*: (i) materials related to the lawsuit filed against FirstCash by the Consumer Financial Protection Bureau ("CFPB") on November 12, 2021, captioned *Consumer Financial Protection Bureau v. FirstCash Inc. et al.*, Case No. 4:21-cv-01251-P (N.D. Tex.); (ii) regulatory filings made by FirstCash with the United States Securities and Exchange Commission ("SEC"); (iii) securities analysts' reports and advisories about the Company; (iv) press releases and other public statements issued by the Company; (v) media reports about the Company; (vi) interviews with former employees of FirstCash, Cash America, and other persons with knowledge of the matters alleged herein;[2] and (vii) other publicly available information regarding the Company.  Co-Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only to Defendants or are exclusively within their custody or control.  Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

---

[1] In September 2016, FirstCash merged with Cash America International, Inc. ("Cash America").  Herein, the terms "FirstCash" and the "Company" encompass "Cash America."

[2] Confidential witnesses ("CWs") will be identified herein by number, *e.g.*, CW-1, CW-2, etc.  All CWs will be referred to in the masculine to protect their identities.

I.      **NATURE OF THE ACTION**

1.      This is a federal securities class action brought pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 ("Rule 10b-5") (17 C.F.R. § 240.10b-5) promulgated thereunder against FirstCash, its Chief Executive Officer ("CEO") Rick L. Wessel ("Wessel"), and its Chief Financial Officer ("CFO") R. Douglas Orr ("Orr") on behalf of all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of FirstCash during the period from February 1, 2018 through November 12, 2021, inclusive (the "Class Period"), and were damaged thereby.  The allegations of fraud detailed herein are confirmed and corroborated by regulatory investigations and several former employees of FirstCash and Cash America.  The fraud, orchestrated by FirstCash and its most senior executives, concealed from investors the Company's true financial condition and its illegal lending practices.

2.      Defendant FirstCash is an international operator of pawn stores, with locations throughout the United States, Central America, and South America.  FirstCash retail stores buy and sell a wide variety of jewelry, electronics, tools, appliances, sporting goods, musical instruments, and other merchandise and make small consumer pawn loans secured by personal property.  FirstCash operates nearly 1,100 pawn store locations in the United States.

3.      In a typical pawn transaction, a customer visits a local retail store to obtain a small dollar loan typically because he or she has insufficient credit to obtain the money from a traditional lending institution.  Pawn shops like FirstCash rely on unbanked and underbanked individuals to provide the bulk of their business.  A pawn shop customer offers a personal item – such as jewelry, tools, electronics, musical instruments, or other things of value – as collateral for the loan, which serves as payment for the loan in the event the customer is unable to timely repay both the loan itself and the fees associated with the loan.  This arrangement is known as a

non-recourse loan.  If the customer does not repay the loan, FirstCash seeks to recover the value

of the loan by re-selling the collateral.  Pawn loans typically have a thirty-to-sixty-day term.

Throughout the Class Period, the average FirstCash pawn loan was less than $200.

4.    Before the Class Period, in September 2016, FirstCash merged with Cash

America.  In addition to pawn services, Cash America also provided payday loans.

5.    Prior to the September 2016 merger with FirstCash, Cash America had entered

into a Consent Order with the CFPB in November 2013 (the "2013 Consent Order") regarding its

alleged violations of the Military Lending Act (the "MLA") (10 U.S.C. § 987) in its payday

lending business.  At the time of the 2013 Consent Order, the MLA, as first enacted in 2006,

prohibited lenders like Cash America from issuing loans to active-duty members of the military

or their dependents with a military annual percentage rate ("MAPR") in excess of 36%.  The

2013 Consent Order also imposed other obligations on Cash America, including active

monitoring and implementation of compliance and training programs for employees to prevent

further violations of the MLA.  The 2013 Consent Order also provided that the Order would

survive any corporate transaction by Cash America and required Cash America to provide a copy

of the Order and its terms to "any future Board members and executive officers, as well as to any

managers, employees, Service Providers, or other agents and representatives who will have

supervisory responsibilities related to the subject matter of the Order before they assume their

responsibilities."  *See* Consent Order, *In the Matter of: Cash America Int'l, Inc.*, No. 2013-

CFPB-0008, at ¶ 64 (Nov. 21, 2013) (ECF No. 1) (Attached as Exhibit A) (hereinafter "Ex. A").

6.    In 2015, Congress amended the MLA to encompass pawn loan transactions.  Put

simply, this meant that pawn operators like FirstCash and Cash America could not charge an

MAPR of more than 36% to active-duty members of the military or their dependents in

connection with a pawn loan.  This prohibition, as well as prohibitions against forcing customers into arbitration and requirements for certain mandatory disclosures, went into effect for pawn operators like FirstCash and Cash America on October 3, 2016.  When FirstCash and Cash America merged in 2016, the 2013 Consent Order's prohibition against further MLA violations transferred to FirstCash.  Pursuant to the 2013 Consent Order's terms, Cash America was required to provide a copy of the order to the Individual Defendants.  Ex. A. at ¶ 64.

7.      Following the September 2016 merger, FirstCash publicly touted the merger's success and credited its proprietary point of sale ("POS") software system, FirstPawn, as a primary contributor to the merger's success.  FirstCash claimed that FirstPawn allowed Cash America stores to adopt FirstCash's procedures, while ensuring that loans and other transactions were performed without running afoul of legal obligations.

8.      On February 1, 2018, the start of the Class Period, FirstCash publicly reported its full year 2017 results, representing the first full year of its operation following: (i) the Cash America merger; and (ii) the expansion of the MLA to cover pawn loans.  Notably, FirstCash did not deem the MLA expansion as a "significant regulatory change," instead choosing to claim on numerous occasions throughout the Class Period that there had been "***no significant negative regulatory changes [for pawn] in the last 25 years***."  From February 1, 2018 through the end of the Class Period, Defendants boasted to investors about the Company's record revenues.  At the same time, Defendants heralded FirstCash's ability to comply with rules and regulations governing its business, including the MLA, through its compliance and training programs, "proprietary computer information system that provides fully-integrated functionality to support . . . compliance and control systems" and its maintenance of "***a well-trained audit staff that***

*conducts regular store visits to test compliance of financial and operational controls*." For

example, during the Class Period, Defendants materially misrepresented to investors that:

      (a)    FirstCash "*utilizes a proprietary computer information system that*

provides fully-integrated functionality to support . . . *compliance and control systems*"

(2/20/18);

      (b)    FirstCash "*maintains a well-trained internal audit staff that conducts*

*regular store visits to test compliance of financial and operational controls*" (2/20/18; 2/5/19;

2/3/20);[3]

      (c)    The "*MLA Rule [] ha[s] prevented the Company from offering its pawn*

*services and its short-term unsecured credit products to members of the military or their*

*dependents* because none of the Company's products carry a military annual percentage rate of

36% or less" (2/20/18);

      (d)    "*[C]ompliance with the MLA Rule . . . is complex*" (2/5/19; 2/3/20);

      (e)    FirstCash runs "*employee-training programs that promote customer*

*service, productivity and professionalism*" (2/5/19; 2/3/20);

      (f)    FirstCash's FirstPawn "information systems *provide management with*

*the ability to continuously monitor store transactions and operating results*" (2/5/19; 2/3/20);

      (g)    FirstCash "*trains its employees through direct instruction and on-the-job*

*pawn and sales experience*" and that "*new employees are introduced to the business through*

*an orientation and training program that includes* on-the-job training in lending practices,

---

[3] The February 5, 2019 and February 3, 2020 iterations of this statement replaced "store visits" with "store audits."

5

layaways, merchandise valuation, ***regulatory compliance*** and general administration of store operations" (2/1/21);

        (h)      "***[T]he Company is focused on providing . . . extensive training***" (2/1/21);

        (i)      FirstCash manages "***robust consumer and corporate compliance programs***" (2/24/21; 5/4/21; 8/3/21);

        (j)      FirstCash has "***limited regulatory exposure***" (2/24/21); and

        (k)      FirstCash runs "specialized skill training programs in ***lending practices***, merchandise valuation ***and regulatory compliance***" (5/4/21; 8/3/21).

        9.      Defendants' Class Period misstatements and omissions, about the MLA and FirstCash's overall compliance with the law due to its proprietary information system, thorough training, and audit programs were materially misleading when made because Defendants failed to disclose the following known or recklessly disregarded adverse facts pertaining to the lending practices at FirstCash:

        (a)      that FirstCash made loans to active-duty members of the military or their dependents at usurious interest rates above 36% – and often exceeding 200% – in violation of the MLA and the 2013 Consent Order;

        (b)      that FirstCash made loans to active-duty members of the military or their dependents with forced arbitration provisions in violation of the MLA and the 2013 Consent Order;

        (c)      that FirstCash made loans to active-duty members of the military or their dependents without making the disclosures of information required by the MLA and therefore violated the MLA and the 2013 Consent Order;

(d)     that FirstCash failed to implement the remedial measures imposed by the 2013 Consent Order, including a compliance program that was tailored to FirstCash employees for various levels of the Company to prevent MLA violations, as required by the 2013 Consent Order;

(e)     that loans made by FirstCash in violation of the MLA and 2013 Consent Order were subject to cancellation pursuant to the explicit terms of the MLA;

(f)     that FirstCash either failed to train or insufficiently trained employees about the Company's legal obligations under the MLA;

(g)     that FirstCash did not implement a policy of requiring employees to check the MLA Database[4] to invoke the safe harbor protections of the MLA when originating loans, thereby waiving any protection from liability following the 2015 Amendments to the MLA;

(h)     that FirstCash's financial results throughout the Class Period were, in part, the product of the Company's violations of the MLA and the 2013 Consent Order;

(i)     that FirstCash's "proprietary" FirstPawn point of sale and loan management platform failed to stop loans from being originated on terms that violated the MLA and the 2013 Consent Order;

(j)     that FirstCash had material weaknesses in its internal controls that failed to prevent loans from being originated to active-duty military members and dependents of such members; and

---

[4] As discussed further below, the MLA Database is a directory tool created by the Department of Defense to permit lenders to check the status of a prospective borrower as covered by the MLA or not. The MLA Database is available at https://mla.dmdc.osd.mil/mla/#/home. Under the 2015 Amendments to the MLA, checking the MLA Database became the only means by which a lender could invoke the statute's safe harbor provision.

(k)      that as a result of the foregoing, FirstCash was exposed to a material undisclosed risk of legal, reputational and financial harm if the Company's violations of the MLA and the Order were uncovered.

10.      The truth regarding FirstCash's noncompliance with the MLA, its violation of the 2013 Consent Order, and the material weaknesses of its internal controls were revealed on November 12, 2021, when the CFPB filed a lawsuit against the Company alleging, based upon documents and certain data received from FirstCash, that FirstCash had originated <u>at least</u> 3,600 loans to 1,000 borrowers in violation of the MLA. The violations stemmed from origination loans with MAPRs in excess of 36%, with both forced arbitration clauses and inadequate disclosures of information prior to loan origination. On this news, FirstCash shares fell $7.50 per share, or approximately 8.7%, from a close on November 11, 2021 of $86.14 per share to a close on November 12, 2021 of $78.64 per share.

11.      On November 15, 2021, FirstCash's stock price continued to fall an additional $5.15 per share, to close at $73.49 per share, a decrease of 6.6%.

12.      Statements from former FirstCash and Cash America employees: (i) confirm that throughout the Class Period, the Company failed to implement adequate internal controls to ensure compliance with the MLA; (ii) reveal that the employee education programs were inadequate to prevent loans from being originated to active-duty military members and their dependents in violation of the MLA; and (iii) expose the propriety FirstPawn point of sale system was easily circumvented to approve applications for active-duty military members and their dependents in violation of the MLA. Indeed, these former employees confirm that:

(a)      FirstCash's management took only the minimum steps necessary to appear to be in compliance, without making much effort to actually enforce compliance (¶ 59);

(b)      FirstCash made little effort to prevent MLA-violating loans (¶¶ 64-66);

(c)      Military loan applications were not part of the audit process and were not a requirement on the company's audit checklist (¶ 60);

(d)      Many employees, including high-ranking compliance staff, did not know about the MLA Database for active-duty service members and their dependents (¶¶ 64, 67-69);

(e)      Burden of MLA compliance was pushed down primarily on short-term, hourly employees at the store level (¶¶ 67-69);

(f)      If customers identified as military members and still pushed for a pawn loan, employees could still make sure the loan was approved (¶ 65); and

(g)      Some employees described the loan application process as the "Don't tell – don't ask" (¶ 65).

13.     As a result of Defendants' material misstatements and omissions, the steep decline in the price of the Company's common stock and Lead Plaintiff's and other Class members' significant losses were foreseeable to Defendants.

## II.    JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

16.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). FirstCash maintains its headquarters in Fort Worth, Texas, which is within this District, conducts substantial business in this District, and many of the acts, conduct, and practices that constitute the violations of law complained of herein,

including the dissemination to the public of materially misleading information, occurred in and/or were issued from this District.

17.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.    PARTIES

### A.    Lead Plaintiff

18.    Lead Plaintiff Wayne County ERS is a public pension fund headquartered in Wayne County, Michigan.  Wayne County ERS was founded in 1851 to provide retirement, disability, and survivor benefit programs for active, deferred, and retired Wayne County employees, Wayne County Airport Authority employees and Wayne County 3rd Circuit Court employees.  Wayne County ERS is responsible for the retirement income of these employees and their beneficiaries.  Wayne County ERS represents approximately 7,850 participants and is a sophisticated institutional investor that had $1.6 billion in total pension assets under management as of March 31, 2022.  As stated in its previously filed Certification (ECF No. 25-1), Wayne County ERS purchased FirstCash common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this action.

### B.    Defendants

19.    Defendant FirstCash is a Delaware corporation headquartered in 1600 West 7th Street, Fort Worth, Texas.  The Company's common stock trades on the NASDAQ under ticker

symbol "FCFS."[5]  As of October 19, 2021, FirstCash had over 40.4 million shares of common stock outstanding.

20.     Defendant Wessel was at all relevant times CEO and Vice Chairman of FirstCash's Board of Directors.

21.     Defendant Orr was at all relevant times CFO and Executive Vice President of FirstCash.

22.     Defendants Wessel and Orr are collectively referred to herein as the "Individual Defendants" and, together with the Company, are collectively referred to herein as the "Defendants."  The Individual Defendants made, or caused to be made, material misstatements and omissions that either artificially inflated the price of FirstCash common stock or kept it at an artificially inflated price during the Class Period.

23.     The Individual Defendants, because of their positions within FirstCash, possessed the power and authority to control the contents of the Company's reports to the SEC, shareholder letters, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  Each of the Individual Defendants was provided with copies of and/or contributed to the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions, and their access to material non-public information available to them but not to the public, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations and

---

[5] FirstCash stock traded on the NYSE until October 5, 2018.  Thereafter, it traded on the NASDAQ.

omissions being made were then materially misleading.  The Individual Defendants are liable for the misleading statements and material omissions pleaded herein.

24.    Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, acquisition plans, and present and future business prospects, as alleged herein.  In addition, the Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the misleading statements and information alleged herein, were aware of, or recklessly disregarded, the misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

## IV.    CONFIDENTIAL WITNESSES

25.    As part of its investigation into the facts underlying this Action, counsel for Lead Plaintiff interviewed former employees of FirstCash and Cash America and other persons with knowledge of the matters alleged herein.

26.    CW-1 is a former Cash America employee who joined FirstCash when it acquired Cash America and stayed at FirstCash through the end of the Class Period.  CW-1 worked as a District Manager in the Midwest and reported to someone who reported directly to Vice President Jane Silver-Bagford.  As a District Manager, CW-1 was responsible for hiring and training employees, along with conducting profit and loss analysis, conducting and responding to audits, enforcing company policies and generally supervising the stores and employees in his territory.  At the time CW-1 left the Company, he was managing ten locations and between 40 to 50 employees.

27.    CW-2 is a former Cash America employee who worked as a District Manager in the Seattle, Washington area from 1998 until 2019.  CW-2 personally conducted audits on all

stores in his area of responsibility. CW-2's audits related to state and local regulations, proper documentation and inventory status of items located in the store.

28.     CW-3 is a former Cash America employee who worked as an Assistant Manager and Shop Manager at Cash America from May 2017 to March 2020 in Haltom City, Texas. CW-3 managed a Cash America outlet and personally handled loan transactions for customers, including for members of the military.

29.     CW-4 is a former Cash America employee who was an Assistant Regional Manager in Everett, Washington, from February 2020 to January 2021. CW-4 traveled to several Cash America stores in the Everett, Washington-area, including the stores located at 1905 Broadway and 12025 Highway 99.

30.     CW-5 is a former Cash America and FirstCash employee, who started working for Cash America in February 2003 and left FirstCash in August 2018. CW-5's position at the time of his departure was Regional Director of Operations. He reported to Gene Bennett, Division Vice President, who reported to Brent Stuart, the President and Chief Operating Officer for FirstCash. CW-5 oversaw operations for approximately twenty-four store locations in and around Las Vegas, Nevada, Phoenix, Arizona, and Yuma, Arizona with a total of approximately 250 employees. CW-5 oversaw the pawn and retail sales operations for these locations and supervised their budgets, sales performance, and loan balances. CW-5 also made sure employees followed the Company's policies and procedures. Eight district managers reported to CW-5.

## V.     SUBSTANTIVE ALLEGATIONS

### A.  Company Background

31.     Based in Fort Worth, Texas, FirstCash operates pawn stores in the United States and Latin America. Through its pawn stores, the Company provides non-recourse pawn loans and buys merchandise from customers to allow them to meet short-term cash needs. As of

March 31, 2022, the Company operated over 2,800 pawn stores, with nearly 1,100 located in the United States.  Formerly, FirstCash also offered domestic payday and installment loans, but ceased offering these services in June 2020.

32.     In September 2016, the Company, then known as First Cash Financial Services Inc., finalized its merger with pawnshop provider and payday lender Cash America.  Following the merger, the combined Company changed its legal name to FirstCash Inc., though Cash America retail locations continued operating under that brand name as a subsidiary of the Company.  After the 2016 merger, Defendant Wessel continued as CEO of FirstCash while senior Cash America executive T. Brent Stuart assumed the role of President and Chief Operating Officer ("COO") at FirstCash.  Then, following a December 2021 merger with lending company American First Finance Inc., the Company changed its legal name again and is now known as FirstCash Holdings, Inc.

33.     Pawn stores, also known as "pawnshops," are neighborhood-based retail locations that buy and sell pre-owned consumer products such as jewelry, tools, appliances, sporting goods, and musical instruments.  Pawn stores also provide quick and convenient sources for small, secured consumer loans to unbanked, underbanked, and credit-challenged customers.  When extending loans, FirstCash does not investigate the creditworthiness of the borrower.  Instead, FirstCash primarily relies on the marketability and sales value of pledged goods as the basis of its credit decisions.  The Company also does not engage in any post-default collection efforts, or take any legal action against defaulting customers; rather, FirstCash relies on the resale of the pawn collateral for recovery.

34.     FirstCash organizes its operations in two reportable segments: (i) the United

States; and (ii) Latin America.  For the year ended December 31, 2021, approximately 65% of

FirstCash's total revenues were derived from the United States and 35% from Latin America.

### B.  The Military Lending Act: 2006 Enactment and 2007 Initial Regulations

35.     On August 9, 2006, the Department of Defense ("DoD" or the "Department")

submitted a report to Congress entitled *Report On Predatory Lending Practices Directed at*

*Members of the Armed Forces and Their Dependents* (the "2006 Report") regarding lending

practices that it concluded "undermine[] military readiness, harm[] the morale of troops and their

families, and add[] to the cost of fielding an all-volunteer fighting force."  The 2006 Report

concluded, that "[p]redatory lending practices are prevalent and target military personnel" by

their "proximity and prevalence around military installations" and "affinity marketing

techniques, particularly on-line."  The 2006 Report also noted that predatory lenders and

products have several characteristics in common, including, "seek[ing] out young and financially

inexperienced borrowers," "market[ing] to the military through their ubiquitous presence around

military installations and/or through the use of terms to affiliate themselves with the military,"

and "featur[ing] high fees/interest rates . . .  [and] pack[ing] excessive charges into the product."

The 2006 Report recommended that Congress pass various "protections against predatory

lending to Service members."

36.     In response to the 2006 Report from the DoD that included three prohibited

actions by lenders at issue in this Action, Congress enacted the MLA (10 U.S.C. § 987).  First,

the MLA prohibits extensions of "consumer credit" to covered members of the Military and their

dependents that "impose an annual percentage rate of interest greater than 36 percent." 10 U.S.C.

§ 987(a)-(b).  Second, the MLA includes certain mandatory loan disclosures of information,

orally or in writing, to be made to a "covered member or a dependent of a covered member"

including "[a] statement of the annual percentage rate of interest applicable to the extension of credit," "[a]ny disclosures required under the Truth in Lending Act", and "[a] clear description of the payment obligations of the member or dependent."  10 U.S.C. § 987(c)(1)(A)-(C).  Third, the MLA provides that "[i]t shall be unlawful for any creditor to extend consumer credit to a covered member or a dependent of such a member with respect to which . . .  the creditor requires the borrower to submit to arbitration. . . ."  10 U.S.C. § 987(e)(3).

37.    Among other penalties, a lender who violates the MLA risks having any contract voided (10 U.S.C. § 987(f)(3)) and is subject to civil liability, including actual damages, punitive damages and costs (10 U.S.C. § 987(f)(5)).

38.    In enacting the MLA, Congress directed the Secretary of Defense to prescribe various regulations to "carry out" the MLA.  10 U.S.C. § 987(h)(1).  Congress directed the Secretary of Defense to establish rules regarding "[d]isclosures required of any creditor that extends consumer credit to a covered member or dependent of such a member," "[t]he method for calculating the applicable annual percentage rate of interest on such obligations," "[a] maximum allowable amount of all fees, and the type of fees, associated with any such extension of credit . . . ," "[d]efinitions of 'creditor' . . . [and] 'consumer credit,'" and "other criteria or limitations as the Secretary of Defense determines appropriate."  10 U.S.C. § 987(h)(2)(A)-(E).

39.    The DoD first adopted regulations to implement the MLA in 2007 (the "2007 Rule").  Among other things, the 2007 Rule defined the types of "consumer credit" transactions covered by the MLA, explained the types of costs included in determining whether the MAPR exceeded 36 percent, and provided a method that lenders could use to identify covered borrowers.  The 2007 Rule defined "consumer credit" to include only three types of short-term

loans: (1) payday loans; (2) vehicle title loans; and (3) tax refund anticipation loans.  Thus, under the 2007 Rule, the MLA did not apply to pawn transactions.

40.     The 2007 Rule stated that MAPR includes, among other components, "interest, fees, credit service charges, [and] credit renewal charges," to the extent these costs were "required to be paid as a condition of the credit."

41.     Finally, the 2007 Rule provided a method for the "identification of [a] covered borrower."  First, the 2007 Rule offered a self-certification option, which provided a safe harbor from liability for a lender.  Under this approach, lenders who obtained a certification from a borrower that the borrower was not a covered Service member, or the dependent thereof, were protected by a "safe harbor" from liability under the MLA ("Self–Certification Safe Harbor").[6] Additionally, the DoD provided two "optional verification procedures" for lenders whereby: (1) a lender could "but [was] not required to, verify the status of an applicant as a covered borrower by requesting the applicant to provide a current (previous month) military leave and earning statement, or a military identification card"; or (2) the lender could, "but [was] not required to, verify the status of an applicant as a covered borrower by accessing the information available at http://www.dmdc.osd.mil/mla/owa/home" (the "MLA Database"), which required the service member's full name, Social Security number, and date of birth.  These two optional verification procedures were available to the lender but did not provide a safe harbor from liability under the MLA.

---

[6] The Self–Certification statement states, in relevant part, that "I AM NOT a regular or reserve member of the Army, Navy, Marine Corps, Air Force, or Coast Guard, serving on active duty under a call or order that does not specify a period of 30 days or fewer (or a dependent of such a member)."

## C. The November 2013 Cash America Consent Order With CFPB

42.     On November 21, 2013, the CFPB issued the 2013 Consent Order between itself and Cash America, in which Cash America acknowledged, among other wrongdoing,[7] "making loans to covered members of the military or their dependents in violation of the Military Lending Act." Ex. A, at p. 1. The 2013 Consent Order covered conduct during the period from January 1, 2008 through November 30, 2012. *Id.* at ¶ 3. The 2013 Consent Order stated that the CFPB had provided an Exam Letter to Cash America on July 11, 2012, informing Cash America that the CFPB was conducting an examination of the company. *Id.* at ¶¶ 9-10. During September 2012, the examination included on-site portions at Cash America's headquarters in Fort Worth, Texas, and at the offices of Cash America subsidiary Enova International, Inc. ("Enova") in Chicago, Illinois. *Id.* at ¶¶ 11-12.

43.     Regarding the MLA violations specifically, the CFPB found that all loans originated by Enova had MAPRs exceeding 36% and that Enova made 362 payday loans to active-duty military members and or their dependents prior to December 14, 2012. *Id.* at ¶¶ 33-34. The 2013 Consent Order stated that Enova employees were "insufficiently trained with respect to MLA compliance" and "as a result have allowed additional loans to be originated to spouses of active-duty military members." *Id.* at ¶ 35.

44.     In the 2013 Consent Order, Cash America agreed to cease and desist from the violations, including any violation of the MLA. *Id.* at ¶ 40. Cash America also agreed to submit

---

[7] In addition to the MLA violations, the CFPB also found that Cash America was engaged in unfair and deceptive practices in its Ohio debt collection operation run through its subsidiary Cashland Financial Services, Inc. The CFPB also found that both Cash America and its subsidiary engaged in conduct during the examination that the CFPB deemed "unlawful" for, among other reasons, failing to provide documents, materials and information the CFPB requested. *See* Ex. A at ¶¶ 21-31.

a compliance plan for the CFPB's approval outlining how Cash America would comply with the

terms of the 2013 Consent Order when "lending to military members and their spouses or

dependents, including, but not limited to, compliance with the MLA." *Id.* at ¶ 41-c.

Additionally, the 2013 Consent Order directed that the compliance plan must include, among

other components, "ongoing education and training in Federal consumer financial laws and the

MLA for all appropriate employees, Board members, and other affiliated individuals, with

training tailored to each individual's responsibilities and duties." *Id.* at ¶ 42-f.  The 2013

Consent Order further required that "[t]raining activities shall be documented and the training

program must be reviewed and updated at least annually to ensure that appropriate personnel are

provided with the most relevant and pertinent information." *Id.*

  45. In the 2013 Consent Order, the CFPB levied two monetary penalties against Cash

America, totaling $13 million. *Id.* at ¶¶ 48, 52.  First, the CFPB ordered Cash America to

deposit $8 million into a segregated deposit account to provide continued redress to affected

consumers. *Id.* at ¶ 48.  Second, the CFPB imposed a $5 million civil penalty against Cash

America to be paid directly to the agency. *Id.* at ¶ 52.

  46. Additionally, in contemplation of any corporate transaction or change, Paragraph

59 of the 2013 Consent Order ("Paragraph 59") required that Cash America notify the CFPB of

"any change in [Cash America] that may affect obligations arising under this Order, including,

but not limited to…. [a] merger, or other action that would result in the emergence of a successor

company." *Id.* at ¶ 59.  Further, the 2013 Consent Order required that, for a period of three years

from November 12, 2013, Cash America must "deliver a copy of this Order to any business

entity resulting from any change in structure as set forth in Paragraph 59, any future Board

members and executive officers, as well as to any managers, employees, Service Providers, or

other agents and representatives that will have supervisory responsibilities related to the subject matter of the Order before they assume their responsibilities." *Id.* at ¶ 64. Given that the merger between FirstCash and Cash America was finalized prior to the three-year anniversary of the 2013 Consent Order, Cash America was required to give a copy of the 2013 Consent Order to Defendants.

47. Further, in the November 18, 2013 Stipulation and Consent to the Issuance of a Consent Order (the "2013 Stipulation"), signed by then-President and CEO of Cash America Daniel R. Feehan, Cash America agreed that "[t]he terms and provision of this Stipulation and [the 2013 Consent Order] shall be binding upon, and inure to the benefit of, the parties hereto *and their successors in interest*." *See* Stipulation and Consent to the Issuance of a Consent Order, *In the Matter of: Cash America Int'l, Inc.*, No. 2013-CFPB-0008, at ¶ 7 (Nov. 21, 2013) (ECF No. 2) (Attached as Exhibit B). Thus, taken together, the 2013 Consent Order and 2013 Stipulation make clear that Cash America's obligations pursuant to the 2013 Consent Order transferred to FirstCash at the time of the merger.

48. Finally, the 2013 Consent Order stated that "the practices alleged in this Order may be utilized by the Bureau in future enforcement actions against Respondent, including, without limitation, to establish a pattern or practice of violations or the continuation of a pattern or practice of violations or to calculate the amount of any penalty." *Id.* at ¶ 71. The 2013 Order would "remain effective and enforceable" until "any provisions of this Order shall have been amended, suspended, waived, or terminated in writing by the Bureau of its designated agent." *Id.* at ¶ 73. To this day, the CFPB has not provided any writing terminating any provision of the 2013 Consent Order, or, at least not has not made any such writing public.

**D.        Congress Expands MLA's Scope to Encompass Pawn Transactions**

49.    On June 17, 2013, the DoD issued an Advanced Notice of Proposed Rulemaking ("ANPR") "regarding enhancement of the protections that apply to consumer credit extended to members of the armed forces and their dependents."  The ANPR contained an excerpt from the Conference Report on a bill entitled National Defense Authorization Act for Fiscal Year 2013, which stated that "[t]he conferees recognize the progress the Department of Defense has made since consumer protections for military members and their dependents against predatory lending were enacted in the [MLA]."  The conferees noted that "[a] recent report by the Consumer Federation of America, *The Military Lending Act Five Years Later*, found that 'the law has been largely effective in curbing predatory . . . lending to covered borrowers.'"  However, it noted that the report also "found that many predatory lenders have modified their products to avoid coverage by the Department's rules implementing" the MLA.  The Conference Report suggested that the Department "review its regulations implementing [the MLA] to address changes in the industry and the evolution of lending products."

50.    On August 1, 2013, the Consumer Federation of America ("CFA"), whose study on the MLA the Conference Report had cited, submitted a public comment in response to the ANPR.  The CFA comment suggested that the definition of "consumer credit" in the MLA should be expanded to apply to all consumer credit regulated under the Truth in Lending Act ("TILA").  15 U.S.C. § 1601 *et seq.*  The CFA attached its paper, *The Military Lending Act Five Years Later*, to the comment.  The CFA paper found that the MLA had been "largely successful in curbing abusive lending" to the extent it took the form of the "three specific products" covered by the 2007 Rule, but that the "restrictive definitions of 'consumer credit' in [the Department's] rules left loopholes to be exploited."  It concluded that the definition of "covered credit" should

be expanded to close these loopholes.  The CFA Report also stated that "[c]ounselors knew of cases where prohibited loans were still obtained," in part as a result of "falsified applications."

51.     Just over one year later, September 29, 2014, the DoD issued a Notice of Proposed Rulemaking ("NPR") regarding amendments to the 2007 Rule implementing the MLA. The NPR contained two noteworthy proposals.  First, acknowledging the concerns with the "extremely narrow definition of 'consumer credit'" in the 2007 Rule, the DoD proposed to amend its "existing regulation primarily for the purpose of extending the protections of the MLA to a broader range of . . . credit products."  The NPR continued, "[m]ore specifically, the Department propose[d] to amend its regulation so that, in general, consumer credit covered under the MLA would be defined consistently with credit that for decades has been subject to the protections under the TILA, namely: Credit offered or extended to a covered borrower primarily for personal, family, or household purposes, and that is (i) subject to a finance charge or (ii) payable by a written agreement in more than four installments."  This proposed definition of "consumer credit" brought pawn loans within the scope of the MLA for the first time.

52.     The second noteworthy proposal in the September 2014 NPR was the DoD's proposed revision to the Self-Certification Safe Harbor for the MLA.  The Department stated that it had "become aware of misuses of the covered borrower identification statement whereby a Service member (or covered dependent) falsely declares that he or she is not a covered borrower," or "unwittingly incorrectly complete[s] the statement" and stated that it believed the regulation should be revised to "relieve a Service member or his or dependent from making any statement regarding his or her status as a covered borrower."  Said another way, under the NPR's proposed revision to the Safe Harbor, lenders would no longer be able to rely upon a customer's declaration as to his or her status as an active-duty member of the military or a dependent of such

22

member.  Instead, the NPR shifted the burden of verifying a consumer's status to lenders through a proposed "conclusive mechanism" to determine whether an applicant was a covered borrower under the MLA.  According to the NPR, "[i]f a creditor conducts a covered borrower check" through the MLA Database, the creditor "would be free from liability under the MLA" even if "that consumer, in fact, [was] a covered borrower."  Under the NPR, the lender was required to earn the right to the safe harbor as opposed to relying upon an applicant to provide protection from liability for potentially violative loan originations.

53.    During the Public Comment period on the NPR, on November 24, 2014, the National Pawnbrokers' Association ("NPA") submitted a comment arguing that the definition of "consumer credit" for purposes of the MLA should not be expanded to include pawn loans.  The NPA contended that pawn loans were different and less harmful to active-duty military members than other high-cost lending transactions because they are "non-recourse," involve no credit check or reporting, are simple to understand, and are already heavily regulated at the state and local level.  The NPA also argued that certain "pass-through fees" and taxes involved in a pawn transaction related storage charges, appraisal fees, and insurance charges should not be included in the calculation of the MAPR.

54.    On July 22, 2015, the DoD issued the final version of the Proposed Rule ("2015 Final Rule").  The 2015 Final Rule adopted the NPR's expanded definition of "consumer credit" to include, among other transactions, pawn loans, determined that fixed fees should be included in the MAPR calculation with narrow exceptions, and replaced the Self-Certification Safe Harbor with the revised safe harbor the DoD had proposed based on lenders conducting covered-borrower checks through the MLA Database.  Under the 2015 Final Rule, newly covered

creditors, such as pawnbrokers like Cash America and FirstCash, had until October 3, 2016 to bring their operations into compliance with the new MLA regulations.

### E.    The Company's Purported Response to the 2015 Amendment to the MLA Expanding the Statute's Coverage

55.    In response to the expansion of the MLA, which prohibited the Company from issuing loans with MAPR higher than 36%, making loans with forced arbitration provisions, or originating loans without making specific disclosures, FirstCash publicly stated that it was "unable to offer any of its current credit products, including pawn loans, to members of the U.S. military or their dependents . . . *because none of the Company's [ ] products carry a military annual percentage rate of 36% or less*."

56.    Following the adoption of the updated MLA Rule that brought pawn lending into the scope of the statute's authority, the Company claimed that "*compliance with the MLA Rule … is complex*."  However, the Company also publicly claimed throughout the Class Period that it employed robust systems, policies, and procedures to ensure its regulatory compliance and adherence to applicable laws, rules, and regulations governing its business — including the MLA.

### 1.    Former Employees Confirm That Defendants Failed to Implement Adequate Internal Controls and Audit Processes to Detect MLA Violations

57.    As detailed above, the MLA's bright-line compliance test focuses on whether a loan violating the statute's terms has been issued to an active-duty military member or such member's dependent.  According to several former employees of FirstCash and Cash America, Defendants did not emphasize compliance, implemented inadequate compliance and audit functions, and failed to properly educate employees about MLA rules and compliance.  These

former employees also stated that Defendants overstated the utility of the Company's proprietary POS system, which purportedly played an important role in the Company's compliance regime.

58.     According to CW-1, who worked at Cash America prior to the merger with FirstCash and stayed at the Company throughout the Class Period, the Company's culture changed for the worse after the acquisition.

59.     CW-1 reported that FirstCash's management took only the minimum steps necessary to appear to be in compliance and made little effort to actually enforce compliance, and that FirstCash did not make much of an effort to prevent MLA-violating loans.  CW-1 stated it was obvious that compliance with the MLA, or other issues under the CFPB's oversight, were not high on the list of the Company's priorities compared to his past work experience at other similar businesses.  Based on his observation as a manager of ten stores with up to 50 employees, CW-1 said that FirstCash's field auditors who visited the store locations did not focus on MLA compliance but that the auditors' focus was on inventory, accounting, and related controls.

60.     CW-2, a veteran employee of Cash America for over two decades, personally conducted audits on all the stores in his area of responsibility and confirmed CW-1's observation that the field auditors did not focus on MLA compliance.  CW-2 said that military loan applications were not part of the audit process and were not a requirement on the Company's audit checklist.  CW-2 said he reviewed the results and never observed any violations of the MLA.

61.     CW-1 stated that FirstCash's Compliance and Legal departments were "almost wiped out" due to a mass resignation in approximately the fourth quarter of 2021 or first quarter of 2022.  CW-1 said that whenever he tried to communicate with Compliance or Legal during that time, he was informed that those employees were no longer there.  Indeed, the resignations

CW-1 references encompassed the highest levels of FirstCash's compliance and legal functions. According to a September 23, 2021 Form 8-K filed by the Company with the SEC and signed by Defendant Orr, Anna M. Alvarado ("Alvarado"), FirstCash's then-General Counsel, stated that she intended "to resign her position as General Counsel of the Company effective as of October 8, 2021 in order to assume a senior leadership role at another publicly traded company in the financial services industry." Alvarado's resignation came during the CFPB investigation, discussed further below, into the Company's lending practices, shortly before the CFPB issued its second CID requesting documents and information on September 30, 2021.

> **2.    Former Employees Confirm That Defendants Failed to Implement Adequate MLA Training and Education Programs for FirstCash Employees**

62.    Given that FirstCash publicly declared it did not offer any products that complied with the 36% MAPR maximum, a prospective borrower's status as active-duty military is the only criterion that the Company needed to verify in order to ensure its compliance with the MLA. To make this determination, Congress permitted lenders to protect themselves from liability by checking a purpose-made database from the DoD, *i.e.*, the MLA Database. Running a prospective borrower's information through the database serves as the new safe harbor under the 2015 amendment to the MLA. Indeed, according to guidance for compliance with the MLA on the National Pawnbrokers' Association website, "The burden to identify covered borrowers is on the pawnbroker – not the customer. If a customer checks a box saying they are not active-duty military or a dependent, when in fact they are a 'covered borrower,' their statement will not protect you from violating the MLA."

63.    The MLA Database does not require a subscription or any other form of payment to access. Rather, it is a publicly available tool that lenders may avail themselves of – and are

strongly encouraged to do so under the safe harbor rules of the 2015 MLA amendment – by entering a prospective borrower's full name, date of birth, and social security number.

64.     Despite the readily accessible and easy-to-use MLA Database, former employees who worked at FirstCash outlets during the Class Period report that they were not even made aware of the MLA Database or that it provided liability protection for any potential MLA violations.  In fact, some of these former employees stated the MLA was never even raised to them as an issue to consider when processing a loan application.  For example, CW-4, an assistant regional manager, stated he never received any training or instructions, and he was not aware of any databases to check for military service.  Similarly, CW-3, a former assistant manager and shop manager who personally handled loan transactions, including for members of the military, stated that he never received any training or directives, and he was not aware of any internal or external databases to check for military service.  During his more than twenty years with the Company, CW-2 supervised several stores near military bases and does not ever recall denying any loans for active military personnel.

65.     As a result of Defendants' failure to implement adequate training and education programs for FirstCash employees for the Company's obligations under MLA, employees often did not check the MLA Database to ensure loans were being made to eligible customers.  CW-2 stated that the employees were not required to check any internal or external databases for military status and if the applicant did not identify as an active military employee no additional information was required.  Similarly, CW-4 stated that, to his knowledge and based on his experiences and observations, if an individual did not disclose that he or she was military and presented a local identification, his or her information was not checked through any databases or system and that person could receive a loan.  CW-3 corroborated both CW-2 and CW-4's

accounts, stating that at CW-3's stores if an individual did not disclose that they were actively in the military or military dependent their information was not checked through any databases or system. CW-3 described his view of the process as "[i]f they don't tell, don't ask." In a similar vein, CW-2 conceded that the application process, in his opinion, was something akin to, "[d]on't tell – don't ask."

66.     The fact that not all former employees knew why the MLA was relevant to their work, especially those at the retail locations responsible for processing loan applications, not only exposes Defendants' failure to implement proper training and education programs but also reveals the Company's ineffective internal controls.

67.     For example, CW-5 recalled that when FirstCash acquired Cash America, the Company provided some basic training or instructions to employees regarding the MLA. However, CW-5 added that management's communications on this issue were vague and did not provide real guidance. Indeed, CW-1 recalled that it was not until sometime in 2020 that he received a memo from "Corporate Communications" explaining how the Company's POS software would prompt a series of four questions pertaining to military service at the start of each loan transaction. CW-1 recalled that the memo explained MLA and its restrictions generally and instructed employees to watch an online training course about MLA. CW-1 characterized the focus of the training as simply checking off the boxes and getting it done. CW-1 stated that employees were instructed to ask customers applying for loans if they were active military or a dependent of active military and directed to input those answers into the POS system by checking boxes before the transaction could continue. This means that, before 2020, the POS system did not prompt users to ask these four questions about a customer's military service.

68.    CW-5 also recalled attending meetings regarding MLA-related procedures in the new POS system, including prompts for questions when processing pawn loans.  Specifically, CW-5 recalled that management provided some training and communications at the store level to new employees to familiarize them with the new system and related compliance requirements, but, in CW-5's view, those communications failed to make the MLA requirements clear.

69.    Accounts from former employees confirm that management's MLA trainings and instructions for the POS system were woefully inadequate.  CW-1 stated that on more than one occasion, he had to tell his employees not to simply check "no" in the POS system for the MLA-related questions in order to skip over them, but rather to actually ask the customer the required questions.  CW-3 confirmed that if an active military member insisted on a personal loan (*i.e.*, after showing a military ID), he would process the loan application and check no in the internal database application for active military.

**F.    November 12, 2021: CFPB Files a Lawsuit Against FirstCash and Cash America West Revealing the Company's Continued Violation of the MLA**

70.    During the trading day on November 12, 2021, the CFPB filed a lawsuit in the United States District Court for the Northern District of Texas – a lawsuit that is currently pending before this Court.  *See* Case No. 4:21-CV-01251-P (N.D. Tex.), ECF No. 1.  The CFPB's publicly filed complaint alleged that both FirstCash and its subsidiary, Cash America West, Inc., violated the MLA by charging higher than the allowable 36% annual percentage rate on more than 3,600 pawn loans to more than 1,000 active-duty service members and their dependents.  The CFPB also alleged that FirstCash had violated the 2013 Consent Order prohibiting future MLA violations, which remained in effect and applied to FirstCash following the September 2016 merger of the Company and Cash America.

71.    The CFPB lawsuit was part of an investigation into FirstCash that included service of two Civil Investigative Demands ("CIDs") by the agency on the Company on May 26, 2021 and September 30, 2021.  In a joint status report filed in the CFPB lawsuit and submitted to the Court on April 7, 2022, Defendants claim their responses to the CIDs "included materials relating to [FirstCash's] policies and procedures for complying with the MLA, documents used in pawn transactions, and data from pawn transactions nationwide since they first became subject to MLA and its implementing regulations in October 2016."  *See* Case No. 4:21-cv-01251-P (N.D. Tex.), ECF No. 34 at 3 (emphasis added).  Even after this production of data representing 3.1 million pawn transactions, which the Company claims represents 10% of its transactions nationwide, the CFPB found enough evidence to file the enforcement action against FirstCash for violating the MLA on November 12, 2021.  *See id.*; Case No. 4:21-CV-01251-P (N.D. Tex.), ECF No. 1 at ¶¶ 12-13.  In the enforcement action complaint, the CFPB stated that "[o]n information and belief, between October 3, 2016, and the present, FirstCash has, together with its wholly owned subsidiaries, made additional pawn loans under similar terms to covered borrowers from stores in [Arizona, Nevada, Utah, and Washington] and other states."  Case No. 4:21-CV-01251-P (N.D. Tex.), ECF No. 1 at ¶ 14 (emphasis added).

72.    On Friday, November 12, 2021, in reaction to the news of the CFPB lawsuit, the price of FirstCash's stock fell $7.50 per share, or more than 8.7%, from a close of $86.14 on November 11, 2021, to close at $78.64 on November 12, 2021, on usually heavy trading volume. As the market continued to digest the news, the stock's slide continued on Monday, November 15, 2021, falling an additional $5.15 per share, or 6.6%, to close at $73.49 per share, on even heavier trading volume than on November 12, 2021.

73.    On this news, analysts at Janney Montgomery Scott LLC ("Janney") lowered their fair value estimate for FirstCash stock, stating, "We think this is part of a larger drag-net by the CFPB to catch any violation of the MLA."

**G.    Post-Class Period Commentary by CFPB Director on FirstCash Enforcement Action**

74.    CFPB Director Rohit Chopra testified in Congress on April 26, 2022 before the U.S. Senate Committee on Banking, Housing, and Urban Affairs and on April 27, 2022 before the U.S. House of Representatives Committee on Financial Services.  In his oral and written testimony, Chopra emphasized that CFPB "enforcement resources" are "focusing on repeat offenders and large players engaged in large-scale harm."  Written Testimony of CFPB Director Rohit Chopra, U.S. Senate Committee on Banking, Housing, and Urban Affairs (Apr. 26, 2022) (emphasis added).  Chopra highlighted the FirstCash enforcement action as the first example of the CFPB's enforcement focus.  Chopra testified, "[I]n recent months, we have filed lawsuits against two very large firms, FirstCash and TransUnion, that violated law enforcement orders and other consumer financial protection laws."  *Id.* (emphasis added).  Chopra continued, "In both cases, the entities willingly consented to an order and w[]ere on clear notice of their obligations."  *Id.* (emphasis added).

**VI.    DEFENDANTS' MATERIAL MISSTATEMENTS AND OMISSIONS DURING THE CLASS PERIOD**

75.    Lead Plaintiff alleges that the statements highlighted in ***bold and italics*** within this section were materially misleading because, among other reasons, the statements omitted material information of which Defendants were either aware, or were severely reckless in not knowing.  As alleged herein, such statements artificially inflated, or artificially maintained, the price of FirstCash's publicly traded common stock and operated as a fraud and deceit on all persons and entities who or which purchased or otherwise acquired that common stock during

31

the Class Period.  Because Defendants chose to speak on the issues described below, they were obligated to not mislead investors or withhold material information that would otherwise make those statements misleading.  As described below, Defendants publicly created an impression of a state of affairs at FirstCash that differed in a material way from the one that actually existed.

76.    On February 1, 2018, the beginning of the Class Period, FirstCash reported record revenue, net income, and earnings per share for the fourth quarter and full year ended December 31, 2017.  While Defendants publicly touted these results, they misled investors about the Company's compliance with federal laws, particularly the MLA, by failing to disclose that FirstCash's weak and ineffective internal controls permitted loans to be issued to active-duty military personnel and their dependents at interest rates exceeding 36% MAPR in violation of the 2013 Consent Order and the MLA.  Defendants concealed from investors that they, through their actions (or inaction), exposed the Company to serious regulatory risk and uncertainty.

### A.    Fourth Quarter and Full Year 2017 Financial Results: February 2017

77.    The Class Period begins on February 1, 2018. On that date, FirstCash filed a Form 8-K with the SEC, signed by Defendant Orr, attaching a press release announcing the Company's financial results for the fourth quarter and full year ended December 31, 2017.  Fiscal Year 2017 was the first full year that FirstCash was required to comply with the new MLA regulations pertaining to pawn loans and the first full year of the Company's operations following the Cash America merger in September 2016.  The press release stated that FirstCash had achieved "***record revenue, net income and earnings per share***" for the year and that ***the Company's U.S. segment revenue for the quarter and the year from pawn loan fees was approximately $93 million and $380 million***, respectively. The release further stated that, as of December 31, 2017, ***the Company's U.S. pawn loans outstanding totaled $276.6 million***.

78.     In the press release, Defendant Wessel declared, "Our full year and fourth quarter results were outstanding," and, "We exceeded our fourth quarter and full year earnings forecast even without the fourth quarter benefit of the Tax [Cut and Jobs] Act."  The press release highlighted that "[n]et income for the fourth quarter of 2017 increased 85% compared to the fourth quarter of 2016" and "[f]or the full year of 2017, net income increased 139%."  Additionally, the Company claimed that "[c]ash flow from operating activities for 2017 totaled $220 million, compared to $97 million in 2016."

79.     Regarding FirstCash's 2016 merger with Cash America, Wessel stated the fourth quarter and full year 2017 results "include the results of operations for Cash America" and claimed that FirstCash "continues to realize significant cost synergies from the [m]erger" including "consolidated administrative expenses."  Notably, Wessel reported that "*as of year end [2017], all Cash America stores have been converted to the proprietary FirstPawn point of sale and loan management platform*."  Wessel deemed the conversion of Cash America stores to FirstPawn an "important integration marker" that "*will lead to further efficiencies and improved operating metrics over time*."  Wessel also stated that "[t]he adjusted earnings per share guidance for 2018 calls for over 20% growth at the upper part of the range, reflecting increased store-level earnings from pawn operations."

80.     On February 13, 2018, FirstCash filed with the SEC on Form 8-K the Company's investor presentation for February 2018.  Defendant Orr signed the February 13, 2018 Form 8-K.  In the February 2018 investor presentation, Defendants claimed that there was a "*Stable Regulatory Climate for Pawn*" because "Pawn loans are different from traditional consumer loan products and not subject to the CFPB Small Dollar Loan rules because they … do not involve credit checks, collection activities, ACH transactions or negative credit reporting."

Defendants further asserted that "*[r]egulations [for pawn loans] are primarily at the state level in the U.S*." and that there had been "*no significant negative regulatory changes in the last 25 years*."

81.    The February 2018 investor presentation singled out FirstCash's "*limited exposure to CFPB rules for payday lending*" and explicitly noted that "*traditional pawn loans are excluded from the scope of the new CFPB rules*" slated to go into effect in July 2019.  The February 2018 presentation was silent as to the Company's exposure to liability under the expanded MLA and the 2013 Consent Order.

82.    On February 20, 2018, FirstCash filed with the SEC on Form 10-K the Company's financial results for the fiscal year ended December 31, 2017, which were signed by Defendants Wessel and Orr and included signed certifications attesting to the accuracy of those financials by the Individual Defendants (the "2017 Form 10-K").  The 2017 Form 10-K stated that "[p]awn stores [] provide a quick and convenient source of small consumer loans to unbanked, under-banked and credit-challenged consumers."  In addition, the 2017 Form 10-K claimed that the "operation of pawn stores is governed primarily by state laws."  Further, Defendants assured investors that "*[t]he Company maintains a well-trained internal audit staff that conducts regular store visits to test compliance of financial and operational controls*."

83.    The 2017 Form 10-K stated that FirstCash had generated more than *$380 million in U.S. pawn loan fees in fiscal year 2017*.  According to the 2017 Form 10-K, "pawn loan fees are typically calculated as a percentage of the pawn loan amount based on the size and duration of the transaction and generally range from 4% to 25% per month, as permitted by applicable law."  The 2017 Form 10-K also stated that "*[p]awn loan fees accounted for approximately 29% of the Company's revenue during fiscal 2017*."

84.     The 2017 Form 10-K also reported that FirstCash "is subject to significant regulation of its pawn, consumer loan and general business operations in all of the jurisdictions in which it operates."  For example, the 2017 Form 10-K stated that "[m]any statutes and regulations prescribe, among other things, the general terms of the Company's pawn and consumer loan agreements, including maximum service fees and/or interest rates that may be charged and collected and mandatory consumer disclosures."  However, the 2017 Form 10-K stated that the Company was in compliance with this regulatory regime and employed rigorous policies, procedures and controls to ensure this compliance.  For example, the 2017 Form 10-K stated that FirstCash "*utilizes a proprietary computer information system that provides fully integrated functionality to support . . . compliance and control systems*."  The 2017 Form 10-K also reported that FirstCash "*maintains a well-trained internal audit staff that conducts regular store visits to test compliance of financial and operational controls*."  The 2017 Form 10-K continued: "Management believes the current operating and financial controls and systems are adequate for the Company's existing store base and can accommodate reasonably foreseeable growth in the near term."

85.     Specifically with respect to the MLA, Defendants claimed in the 2017 Form 10-K that the "*MLA Rule [] ha[s] prevented the Company from offering its pawn services and its short-term unsecured credit products to members of the military or their dependents because none of the Company's products carry a military annual percentage rate of 36% or less*."  The Company then repeated, "Under the MLA Rule, *the Company is unable to offer any of its current credit products, including pawn loans, to members of the U.S. military or their dependents*."  Defendants added, "*compliance with the MLA Rule . . . is complex*."  Similarly, and related to the MLA, the 2017 Form 10-K stated that the "Company likely remains subject to

certain obligations of the [CFPB] Consent Order, including ensuring compliance with federal consumer financial laws and consumer compliance management system."

86.    Defendants' statements referenced in ¶¶ 77, 79-85 above were materially misleading when made in that Defendants failed to disclose the following adverse facts pertaining to the lending practices at FirstCash, which were known to or recklessly disregarded by Defendants:

(a)    that FirstCash made loans to active-duty members of the military or their dependents at usurious interest rates above 36% – and often exceeding 200% – in violation of the MLA and the 2013 Consent Order;

(b)    that FirstCash made loans to active-duty members of the military or their dependents with forced arbitration provisions in violation of the MLA and the 2013 Consent Order;

(c)    that FirstCash made loans to active-duty members of the military or their dependents without making the disclosures of information required by the MLA and therefore violated the MLA and the 2013 Consent Order;

(d)    that Defendants failed to implement at FirstCash the remedial measures imposed by the 2013 Consent Order, including a compliance program that was tailored to employees for various levels of the Company to prevent MLA violations, as required by the 2013 Consent Order;

(e)    that loans made by FirstCash in violation of the MLA and 2013 Consent Order were subject to cancellation pursuant to the explicit terms of the MLA;

(f)    that FirstCash either failed to train or insufficiently trained employees about the Company's legal obligations under the MLA;

(g)     that FirstCash did not implement a policy of requiring employees to check the MLA Database to invoke the safe harbor protections of the MLA when originating loans, thereby waiving any protection from liability following the 2015 Amendments to the MLA;

(h)     that FirstCash's financial results throughout the Class Period were, in part, the product of the Company's violations of the MLA and the 2013 Consent Order;

(i)     that FirstCash's "proprietary FirstPawn point of sale and loan management platform" failed to stop loans from being originated on terms that violated the MLA and the 2013 Consent Order;

(j)     that FirstCash had material weaknesses in its internal controls that failed to prevent loans from being originated to active-duty military members and dependents of such members; and

(k)     that as a result of the foregoing, FirstCash was exposed to a material undisclosed risk of legal, reputational and financial harm if the Company's violations of the MLA and the Order were uncovered.

**B.     First Quarter Fiscal 2018 Financial Results: April 2018**

87.     On April 26, 2018, FirstCash filed a Form 8-K with the SEC, signed by Defendant Orr, attaching a press release announcing the Company's financial results for the first quarter of 2018 for the three-month period ending March 31, 2018.  The press release stated that FirstCash had achieved "record revenue, net income and earnings per share" for the year and that *the Company's U.S. segment revenue for the quarter from pawn loan fees was approximately $96.2 million*.  The release further stated that, as of March 31, 2018, *the Company's U.S. pawn loans outstanding totaled $237 million*.

88.     In the press release, Defendant Wessel declared, "FirstCash is off to a great start in 2018 . . . [due in part to] *rapidly improving U.S. profitability metrics*."  Wessel continued,

"We believe the combination of an improving U.S. operating environment, continued merger integration progress and the strength of our free cash flows will drive both near and long-term earnings growth."  Wessel also added, "***In the U.S., the operating environment for pawn lending continues to improve***" and declared, "***[W]e remain committed to pawn-focused earnings growth strategies*** in both Latin America and the U.S."

89.    On April 30, 2018, FirstCash filed its First Quarter 2018 Form 10-Q ("Q1 2018 Form 10-Q"), signed by Defendant Orr, which contained information concerning the Company's current financial condition for the first quarter ended April 30, 2018, and repeated and reiterated the financial metrics provided in the April 26, 2018 press release and Form 8-K.

90.    On May 2, 2018, FirstCash filed with the SEC on Form 8-K the Company's investor presentation for May 2018.  Defendant Orr signed the May 2, 2018 Form 8-K. In the May 2018 investor presentation, Defendants represented that among the "[a]ttractive industry dynamics" for pawn operators was a "***[s]table regulatory environment***." Indeed, Defendants claimed in the presentation that there was a "Stable Regulatory Climate for Pawn" because "Pawn loans are different from traditional consumer loan products and not subject to the CFPB Small Dollar Loan rules because they … do not involve credit checks, collection activities, ACH transactions or negative credit reporting." Defendants further asserted that "***[r]egulations [for pawn loans] are primarily at the state level in the U.S***." and that there had been "***no significant negative regulatory changes in the last 25 years.***"

91.    The May 2018 investor presentation singled out FirstCash's "***limited exposure to CFPB rules for payday lending***" and explicitly noted that "traditional pawn loans are excluded from the scope of the new CFPB rules" slated to go into effect in July 2019.  The May 2018

presentation was silent as to the Company's exposure under the expanded MLA and the 2013 Consent Order.

92.    Defendants' statements referenced in ¶¶ 87-88, 90-91 were materially misleading when made for the same reasons set forth in ¶ 86.

### C.    Second Quarter Fiscal 2018 Financial Results: July 2018

93.    On July 26, 2018, FirstCash filed a Form 8-K with the SEC, signed by Defendant Orr, attaching a press release announcing the Company's financial results for the second quarter of 2018 for the three and six-month periods ending June 30, 2018.  The press release stated that FirstCash achieved "record revenue, net income and earnings per share" for the year and that ***the Company's U.S. segment revenue for the quarter from pawn loan fees was approximately $87.8 million***.  The release further stated that, as of June 30, 2018, ***the Company's U.S. pawn loans outstanding totaled $268 million***.

94.    In the press release, Defendant Wessel declared, "Our record second quarter results reflect continued and substantial earnings growth in our core pawn operations."  Wessel continued, "FirstCash's strong earnings results for the first half of 2018, and the second quarter in particular, continue to reflect a number of positive catalysts."  Wessel identified several catalysts in the U.S. market, including "strong sequential retail margin expansion, improving inventory turn ratios and an increased segment profitability, all of which are the direct result of ***our efforts to integrate all of the U.S. stores on a common set of operating best practices, underpinned by the integration of our technology platform*** and compensation plans that help drive store profitability metrics."  Wessel also emphasized FirstCash's "***further focus on growing core pawn operations***."

95.    On July 31, 2018, FirstCash filed with the SEC on Form 8-K the Company's investor presentation for August 2018.  Defendant Orr signed the July 31, 2018 Form 8-K.  In the

August 2018 investor presentation, Defendants represented that among the "[a]ttractive industry dynamics" for pawn operators was a "*[s]table regulatory environment*."  Indeed, Defendants claimed that there was a "Stable Regulatory Climate for Pawn" because "Pawn loans are different from traditional consumer loan products and not subject to the CFPB Small Dollar Loan rules because they . . . do not involve credit checks, collection activities, ACH transactions or negative credit reporting."  Defendants further asserted that "*[r]egulations [for pawn loans] are primarily at the state level in the U.S.*" and that there had been "*no significant negative regulatory changes in the last 25 years*."

96.     Additionally, in the August 2018 investor presentation, Defendants stated that *pawn represented 96% of all of FirstCash's revenue over the preceding twelve-month period*. The August 2018 investor presentation also noted that "retail margins improved sequentially to 37% for the quarter . . . driven by legacy Cash America utilization of the FirstPawn IT platform and new compensation plans focused on improving key profitability metrics."  The same language was included in the Company's September 2018 investor presentation, which FirstCash filed with the SEC on Form 8-K on September 11, 2018, signed by Defendant Orr.

97.     On August 1, 2018, FirstCash filed its Second Quarter 2018 Form 10-Q ("Q2 2018 Form 10-Q"), signed by Defendant Orr, which contained information concerning the Company's current financial condition for the second quarter ended June 30, 2018 and repeated and reiterated the financial metrics provided in the July 26, 2018 press release and Form 8-K.

98.     Defendants' statements referenced in ¶¶ 93-96 were materially misleading when made for the same reasons set forth in ¶ 86.

### D.    Third Quarter Fiscal Year 2018 Financial Results: October 2018

99.     On October 25, 2018, FirstCash filed a Form 8-K with the SEC, signed by Defendant Orr, attaching a press release announcing the Company's financial results for the third

quarter of 2018 for the three and nine-month periods ending September 30, 2018.  The press release stated that FirstCash achieved "record revenue, net income and earnings per share" for the year and that *the Company's U.S. segment revenue for the quarter from pawn loan fees was approximately $93.3 million*.  The release further stated that, as of September 30, 2018, *the Company's U.S. pawn loans outstanding totaled nearly $279 million*.

100.    In the press release, Defendant Wessel declared, "FirstCash posted another quarter of strong earnings growth driven by revenue growth in Latin America and *continued margin improvement in the U.S.*"  Wessel continued, "Our 2018 earnings momentum continued as the Company posted its third consecutive quarter of more than 30% growth in adjusted earnings per share . . .  In the U.S., *we continued to grow margins and segment profitability from pawn operations*."

101.    On October 29, 2018, FirstCash filed with the SEC on Form 8-K the Company's investor presentation for November 2018.  Defendant Orr signed the October 29, 2018 Form 8-K.  In the November 2018 investor presentation, Defendants represented that among the "[a]ttractive industry dynamics" for pawn operators was a "*[s]table regulatory environment*."  Indeed, Defendants claimed that there was a "Stable Regulatory Climate for Pawn" because "Pawn loans are different from traditional consumer loan products and not subject to the CFPB Small Dollar Loan rules because they . . . do not involve credit checks, collection activities, ACH transactions or negative credit reporting."  Defendants further asserted that "*[r]egulations [for pawn loans] are primarily at the state level in the U.S.*" and that there had been "*no significant negative regulatory changes in the last 25 years*."

102.    Additionally, in the investor presentation for November 2018, Defendants stated that *pawn represented 97% of all of FirstCash's revenue over the preceding twelve month*

*period*.  The September 2018 investor presentation noted that "retail margins remained strong . . . [at] 37% compared to 33% in the prior-year quarter . . . driven by legacy Cash America utilization of the FirstPawn IT platform and new compensation plans focused on improving key profitability metrics."

103.    On October 31, 2018, FirstCash filed its Third Quarter 2018 Form 10-Q ("Q3 2018 Form 10-Q"), signed by Defendant Orr, which contained information concerning the Company's current financial condition for the third quarter ended September 30, 2018 and repeated and reiterated the financial metrics provided in the October 25, 2018 press release and Form 8-K.

104.    Defendants' statements referenced in ¶¶ 99-102 were materially misleading when made for the same reasons set forth in ¶ 86.

**E.    FirstCash Analyst and Banker Day Presentation: November 6, 2018**

105.    On November 6, 2018, FirstCash filed with the SEC on Form 8-K the Company's November 2018 Analyst and Banker Day presentation.  Defendant Orr signed the November 6, 2018 Form 8-K.  In the November 2018 Analyst and Banker Day presentation, Defendants claimed that there was a "***Stable Regulatory Climate for Pawn***" because "Pawn loans are different from traditional consumer loan products and not subject to the CFPB Small Dollar Loan rules because they . . . do not involve credit checks, collection activities, ACH transactions or negative credit reporting."  Defendants further asserted that "***[r]egulations [for pawn loans] are primarily at the state level in the U.S.***" and that there had been "***no significant negative regulatory changes in the last 25 years***."

106.    Defendants' statements referenced in ¶ 105 were materially misleading when made for the same reasons set forth in ¶ 86.

**F.    Fourth Quarter and Full Fiscal Year 2018 Financial Results: January - February 2019**

107.    On January 31, 2019, FirstCash filed a Form 8-K with the SEC, signed by Defendant Orr, attaching a press release announcing the Company's financial results for the fourth quarter and full year ended December 31, 2018. The release stated that *the Company's U.S. segment revenue for the quarter and the year from pawn loan fees was approximately $95 million and $373 million*, respectively. The release further stated that, as of December 31, 2018, *the Company's U.S. pawn loans outstanding totaled $272 million*.  The release went on to note that "[d]espite the slight decline in pawn loans outstanding, *total pawn fees increased 3% and same-store pawn revenues increased 2%* in the fourth quarter compared to the prior-year quarter as *pawn yields improved by 4%* quarter-over-quarter."

108.    In the press release, Defendant Wessel stated that "2018 was another outstanding year for FirstCash . . . [and] [t]he fourth quarter results produced strong profitability and growth metrics in both the U.S. and Latin America, highlighted by *increasing year-over-year pawn fees and retail margins in the U.S.*"  Wessel continued, "*[W]e again reported solid growth in segment profitability, driven primarily by the 3% growth in pawn fees* and continued retail margin expansion."  Wessel then added, "*Pawn fees grew 3%* on a lower pawn receivable balance, *a result of increased yields on a higher quality pawn loan portfolio*."  Wessel credited "[m]uch of these improvements" to "the legacy Cash America stores" converting to the "*FirstPawn IT platform* and the implementation of the integrated compensation plans put in place in 2018 to drive greater store efficiencies."  Wessel then concluded by stating, "[W]e start 2019 better than ever with a dominant market position, a strong growth platform and potential to drive additional margin expansion."

109.     On February 5, 2019, FirstCash filed with the SEC on Form 10-K, the Company's financial results for the fiscal year ended December 31, 2018, which were signed by Defendants Wessel and Orr and included signed certifications attesting to the accuracy of those financials by the Individual Defendants (the "2018 Form 10-K").  The 2018 Form 10-K also noted that "[p]awn stores [] provide a quick and convenient source of small consumer loans to unbanked, under-banked and credit-challenged consumers."  In addition, the 2018 Form 10-K claimed that the "operation of pawn stores is governed primarily by state laws."

110.     The 2018 Form 10-K touted FirstCash's "*employee-training programs that promote customer service, productivity and professionalism*" and the Company's "*proprietary computer information system that provides fully-integrated functionality to support* point-of-sale retail operations, real-time merchandise valuations, loan-to-value calculations, inventory management, customer recordkeeping, loan management, *compliance and control systems* and employee compensation."  The 2018 Form 10-K also represented that "[t]he information systems *provide management with the ability to continuously monitor store transactions and operating results*."  Further, Defendants assured investors that "*[t]he Company maintains a well-trained internal audit staff that conducts regular store audits to test compliance of financial and operational controls*."

111.     The 2018 Form 10-K stated that *FirstCash had achieved more than $373 million in U.S. pawn loan fees in 2018*. According to the 2018 Form 10-K, "pawn loan fees are typically calculated as a percentage of the pawn loan amount based on the size, duration and type of collateral of the pawn loan and generally range from 4% to 25% per month, as permitted by applicable law." The 2018 Form 10-K also stated that "*[p]awn loan fees accounted for approximately 30% of the Company's revenue during fiscal 2018*."

112.    The 2018 Form 10-K also stated that FirstCash "is subject to significant regulation of its pawn, consumer loan and general business operations in all of the jurisdictions in which it operates."  For example, the 2018 Form 10-K stated that "[m]any statutes and regulations prescribe, among other things, the general terms of the Company's pawn and consumer loan agreements, including maximum service fees and/or interest rates that may be charged and collected and mandatory consumer disclosures."  However, the 2018 Form 10-K stated that the Company was in compliance with this regulatory regime and employed rigorous policies, procedures, and controls to ensure this compliance.  For example, the 2018 Form 10-K stated that FirstCash "*utilizes a proprietary computer information system that provides fully integrated functionality to support . . . compliance and control systems*."  The 2018 Form 10-K also stated that FirstCash "*maintains a well-trained internal audit staff that conducts regular store audits to test compliance of financial and operational controls*."  The 2018 Form 10-K continued: "Management believes the current operating and financial controls and systems are adequate for the Company's existing store base and can accommodate reasonably foreseeable growth in the near term."

113.    Specifically with respect to the MLA, Defendants claimed in the 2018 Form 10-K that the 2015 expansion of the "*MLA Rule . . . expanded the scope of the credit products covered by the MLA to include . . . pawn loans [or] certain unsecured installment loan products to the extent any such products have a military annual percentage rate great than 36%*."  Defendants added, "*[C]ompliance with the MLA Rule… is complex*."

114.    Unlike the 2017 Form 10-K, the 2018 Form 10-K omitted any mention of whether the Company offered any of its products to military members or their dependents and omitted mention of the obligations FirstCash had under the 2013 Consent Order.

115.    On February 11, 2019, FirstCash filed with the SEC on Form 8-K the Company's investor presentation for February 2019.  Defendant Orr signed the February 11, 2019 Form 8-K. In the February 2019 investor presentation, Defendants represented that among the "[a]ttractive industry dynamics" for pawn operators was a "*[s]table regulatory environment*."  Indeed, Defendants claimed that there was a "Stable Regulatory Climate for Pawn" because "Pawn loans are different from traditional consumer loan products and not subject to the CFPB Small Dollar Loan rules because they . . .  do not involve credit checks, collection activities, ACH transactions or negative credit reporting."  Defendants further asserted that "*[r]egulations [for pawn loans] are primarily at the state level in the U.S.*" and that there had been "*no significant negative regulatory changes in the last 25 years*."

116.    Additionally, In the February 2019 investor presentation, Defendants stated that *pawn represented 97% of all of FirstCash's revenue over the preceding twelve-month period*. The February 2019 investor presentation noted "retail margin improvements . . . of 37% compared to 34% in the prior-year quarter… driven by legacy Cash America utilization of the FirstPawn IT platform and new compensation plans, implemented in Q1-2018, focused on improving key profitability metrics."

117.    Defendants' statements referenced in ¶¶ 107-108, 110-13, and 115-16 were materially misleading when made for the same reasons set forth in ¶ 86.

118.    Further, Defendants' statements referenced in ¶¶ 113 and 115, were materially misleading when made because Defendants omitted any reference to the obligations imposed on FirstCash by the 2013 Consent Order following its merger with Cash America in September 2016.

### G.    First Quarter Fiscal Year 2019 Financial Results: April - May 2019

119.    On April 24, 2019, FirstCash filed a Form 8-K with the SEC, signed by Defendant Orr, attaching a press release announcing the Company's financial results for the first quarter of 2019 for the three-month period ending March 31, 2019.  The press release stated that FirstCash "reported strong first quarter performance driven by record revenue growth in Latin America and continued improvements in U.S. operating margins" and that *the Company's U.S. segment revenue for the quarter from pawn loan fees was approximately $97.8 million*.  The release further stated that, as of March 31, 2019, *the Company's U.S. pawn loans outstanding totaled $234 million*.

120.    In the press release, Defendant Wessel declared, "As expected, our U.S. operating results continue to improve [], highlighted by growth in segment earnings despite expected declines in non-core consumer lending earnings."  Wessel continued, "This marks the second sequential quarter we have posted *an increase in same-store pawn fees*."  Wessel explained that "*[this increase in same-store pawn fees] is driven primarily by improving the quality of our pawn receivable portfolio* and optimizing loan-to-value ratios, which has resulted in higher cash yields from the performing loans."  Wessel then concluded, "[W]e remain extremely optimistic about . . . further opportunities to improve margins."

121.    On May 3, 2019, FirstCash filed its First Quarter 2019 Form 10-Q ("Q1 2019 Form 10-Q"), signed by Defendant Orr, which contained information concerning the Company's current financial condition for the first quarter ended March 31, 2019, and repeated and reiterated the financial metrics provided in the April 24, 2019 press release and Form 8-K.

122.    On May 6, 2019, FirstCash filed with the SEC on Form 8-K the Company's investor presentation for May 2019.  Defendant Orr signed the May 6, 2019 Form 8-K. In the May 2019 investor presentation, Defendants told investors that among the "[a]ttractive industry

47

dynamics" for pawn operators was a "*[s]table regulatory environment*."  Indeed, Defendants

represented that there was a "Stable Regulatory Climate for Pawn" because "Pawn loans are

different from traditional consumer loan products and not subject to the CFPB Small Dollar Loan

rules because they . . . do not involve credit checks, collection activities, ACH transactions or

negative credit reporting."  Defendants further asserted that "*[r]egulations [for pawn loans] are*

*primarily at the state level in the U.S.*" and that there had been "*no significant negative*

*regulatory changes in the last 25 years*."

  123. Additionally, in the May 2019 investor presentation, Defendants stated that *pawn*

*represented 97% of all of FirstCash's revenue over the preceding twelve-month period*.  In the

May 2019 investor presentation, the Company also highlighted "retail margins improvements"

"of 37% compared to 35% in the prior-year quarter . . . driven by optimizing loan-to-value ratios

and reduced aged inventory levels in the legacy Cash America stores."  The May 2019

presentation also highlighted "improving pawn lending" as "pawn fees increase on improved

yields … up 2% compared to Q1-2018" and "improved by 3% compared to the prior-year

quarter."  The preceding language also appeared in the Company's June 2019 investor

presentation, which FirstCash filed with the SEC on Form 8-K on June 11, 2019, signed by

Defendant Orr.

  124. Defendants' statements referenced in ¶¶ 119-120 and 122-23 were materially

misleading when made for the same reasons set forth in ¶ 86.

  **H.** **Second Quarter Fiscal Year 2019 Financial Results: July 2019**

  125. On July 24, 2019, FirstCash filed a Form 8-K with the SEC, signed by Defendant

Orr, attaching a press release announcing the Company's financial results for the second quarter

of 2019 for the three and six-month periods ending June 30, 2019.  The press release stated that

FirstCash announced "record revenues and earnings per share" and that *the Company's U.S.*

*segment revenue for the quarter from pawn loan fees was approximately $90.1 million*.  The release further stated that, as of June 30, 2019, *the Company's U.S. pawn loans outstanding totaled $262 million*.

126.    In the press release, Defendant Wessel stated, "Our second quarter results saw strong revenue, earnings, and margin growth from core pawn operations."  Wessel added, "[W]e begin the second half of 2019 with good momentum in our core pawn operations."  Wessel declared that the "record" "earnings growth was driven by … continued margin improvements in the core pawn business in the U.S."

127.    On July 29, 2019, FirstCash filed its Second Quarter 2019 Form 10-Q ("Q2 2019 Form 10-Q"), signed by Defendant Orr, which contained information concerning the Company's current financial condition for the second quarter ended June 30, 2019, and repeated and reiterated the financial metrics provided in the July 24, 2019 press release and Form 8-K.

128.    On July 30, 2019, FirstCash filed with the SEC on Form 8-K the Company's investor presentation from July 2019.  Defendant Orr signed the July 30, 2019 Form 8-K. In the July 2019 investor presentation, Defendants represented that among the "[a]ttractive industry dynamics" for pawn operators was a "*[s]table regulatory environment*."  Indeed, Defendants claimed that there was a "Stable Regulatory Climate for Pawn" because "Pawn loans are different from traditional consumer loan products and not subject to the CFPB Small Dollar Loan rules because they . . . do not involve credit checks, collection activities, ACH transactions or negative credit reporting." Defendants further asserted that "*[r]egulations [for pawn loans] are primarily at the state level in the U.S.*" and that there had been "*no significant negative regulatory changes in the last 25 years*."

129.     Additionally, in the July 2019 investor presentation, Defendants stated that ***pawn represented 98% of all of FirstCash's revenue over the preceding twelve-month period***.  In the July 2019 presentation, Defendants also reported that, "U.S. segment pre-tax operating income up YTD . . . driven primarily by improved retail margins, pawn loan yields and operating expense reductions."  Regarding "retail margin improvements," the presentation highlighted a "Q2 margin of 38% compared to 37% in the prior-year quarter" and that "retail gross profit dollars increased 5% in Q2."  The July 2019 presentation also highlighted "improving pawn lending" as "pawn fees increase on improved yields" "up 3% compared to Q2-2018" and "improved by 4% quarter-over-quarter." The preceding language also appeared in the Company's August 2019 investor presentation, which FirstCash filed with the SEC on Form 8-K on August 21, 2019, signed by Defendant Orr.

130.     Defendants' statements referenced in ¶¶ 125 and 128-29 were materially misleading when made for the same reasons set forth in ¶ 86.

### I.     Third Quarter Fiscal Year 2019 Financial Results: October - November 2019

131.     On October 23, 2019, FirstCash filed a Form 8-K with the SEC, signed by Defendant Orr, attaching a press release announcing the Company's financial results for the third quarter of 2019 for the three and nine-month periods ending September 30, 2019.  The press release stated that FirstCash announced "***record revenues and earnings per share***" and that ***the Company's U.S. segment revenue for the quarter from pawn loan fees was approximately $95.1 million***.  The release further stated that, as of September 30, 2019, ***the Company's U.S. pawn loans outstanding totaled $271 million***.

132.     In the press release, Defendant Wessel stated, "***We had outstanding third quarter results driven by the strength of revenue growth and earnings from core pawn operations***." Wessel continued, "***U.S. results continued to realize growth in retail sales and margins, pawn***

*fees and segment income from pawn operations*." Wessel stated that "*the segment contribution*

*from pawn operations increased 8%*, which is an impressive number for our very mature U.S.

store base."

133.    On October 28, 2019, FirstCash filed its Third Quarter 2019 Form 10-Q ("Q3

2019 Form 10-Q"), signed by Defendant Orr, which contained information concerning the

Company's current financial condition for the third quarter ended September 30, 2019, and

repeated and reiterated the financial metrics provided in the October 23, 2019 press release and

Form 8-K.

134.    On November 12, 2019, FirstCash filed with the SEC on Form 8-K the

Company's investor presentation from November 2019. Defendant Orr signed the November 12,

2019 Form 8-K. In the November 2019 investor presentation, Defendants told investors that

among the "[a]ttractive industry dynamics" for pawn operators was a "*[s]table regulatory*

*environment*." Indeed, Defendants claimed that there was a "Stable Regulatory Climate for

Pawn" because "Pawn loans are different from traditional consumer loan products and not

subject to the CFPB Small Dollar Loan rules because they . . . do not involve credit checks,

collection activities, ACH transactions or negative credit reporting." Defendants further asserted

that "*[r]egulations [for pawn loans] are primarily at the state level in the U.S.*" and that there

had been "*no significant negative regulatory changes in the last 25 years*."

135.    Additionally, in the November 2019 investor presentation, Defendants stated that

*pawn represented 98% of all of FirstCash's revenue over the preceding twelve month period*.

In the November 2019 presentation, the Company noted "U.S. segment pre-tax operating income

up YTD . . . driven primarily by improved retail margins, pawn loan yields and operating

expense reductions." Regarding "retail margin improvements," the presentation highlighted a

"YTP-Sep. 2019 margin of 38% compared to 37% in the prior-year period" and that "retail gross profit dollars increased 8% in Q3." The November 2019 presentation also highlighted a "pawn fees increase on improved yields" "up 2% compared to Q3-2018" and "improved by 5% quarter-over-quarter."

136.    Defendants' statements referenced in ¶¶ 131-132 and 134-35 were materially misleading when made for the same reasons set forth in ¶ 86.

### J.    Fourth Quarter and Full Year Fiscal 2019 Financial Results: January - February 2020

137.    On January 29, 2020, FirstCash filed a Form 8-K with the SEC, signed by Defendant Orr, attaching a press release announcing the Company's financial results for the fourth quarter and full year ended December 31, 2019. The press release stated that ***the Company's U.S. segment revenue for the quarter and the year from pawn loan fees was approximately $96 million and $379 million***, respectively. The press release further stated that, as of December 31, 2019, ***the Company's U.S. pawn loans outstanding totaled $268.8 million***.

138.    In the release, Defendant Wessel stated that "FirstCash completed another successful year . . . highlighted by strong earnings growth from our core pawn operations." Wessel continued, "Our U.S. results in the fourth quarter continued to reflect stable demand and improving margins for core pawn products, as we posted a 5% increase in retail gross profit with 39% retail margins, which are the highest margins achieved by the Company since the merger with Cash America in 2016." Wessel added that "[p]awn lending metrics improved as well, with a 2% increase in the effective pawn yield and solid sequential improvement in same-store pawn receivable balances during the fourth quarter." In the press release, Wessel also remarked upon FirstCash's growth over the preceding ten years, stating, "Our market cap has grown over the

past decade from less than $700 million to over $3.4 billion" and noting that the Company

"delivered a total shareholder return of 282% over the past ten years."

139.    On February 3, 2020, FirstCash filed with the SEC on Form 10-K the Company's

financial results for the fiscal year ended December 31, 2019, which were signed by Defendants

Wessel and Orr and included signed certifications attesting to the accuracy of those financials by

the Individual Defendants (the "2019 Form 10-K").  The 2019 Form 10-K stated that "[p]awn

stores [] provide a quick and convenient source of small secured consumer loans to unbanked,

under-banked and credit-challenged customers."  In addition, the 2019 Form 10-K claimed that

the "operation of pawn stores is governed primarily by state laws."

140.    The 2019 Form 10-K touted FirstCash's "***employee-training programs that***

***promote customer service, productivity and professionalism***" and the Company's "***proprietary***

***computer information system that provides fully-integrated functionality to support*** point-of-

sale retail operations, real-time merchandise valuations, loan-to-value calculations, inventory

management, customer recordkeeping, loan management, ***compliance and control systems*** and

employee compensation."  The 2019 Form 10-K claimed that "[t]he information system ***provides***

***management with the ability to continuously monitor store transactions and operating***

***results***."  Further, Defendants assured investors that "[t]he Company maintains a well-trained

internal audit staff that conducts regular store audits to test compliance of regulatory, financial

and operational controls."

141.    The 2019 Form 10-K stated FirstCash achieved ***more than $379 million in U.S.***

***pawn loan fees in 2019***. According to the 2019 Form 10-K, "pawn loan fees are typically

calculated as a percentage of the pawn loan amount based on the size, duration and type of

collateral of the pawn loan and generally range from 4% to 25% per month, as permitted by

applicable law." The 2019 Form 10-K also stated that "*[p]awn loan fees accounted for approximately 30% of the Company's revenue during 2019*."

142.    The 2019 Form 10-K stated that FirstCash "is subject to significant regulation of its pawn, consumer loan and general business operations in all of the jurisdictions in which it operates."  For example, the 2019 Form 10-K stated that "[m]any statutes and regulations prescribe, among other things, the general terms of the Company's pawn and consumer loan agreements, including maximum service fees and/or interest rates that may be charged and collected and mandatory consumer disclosures."  For example, the 2019 Form 10-K stated that FirstCash "*utilizes a proprietary computer information system that provides fully integrated functionality to support . . . compliance and control systems*."  The 2019 Form 10-K also stated that FirstCash "*maintains a well-trained internal audit staff that conducts regular store audits to test compliance of regulatory financial and operational controls*."

143.    The 2019 Form 10-K also reported: "Management believes the current operating and financial controls and systems are adequate for the Company's existing store base and can accommodate reasonably foreseeable growth in the near term."

144.    Specifically, with respect to the MLA, Defendants claimed in the 2018 Form 10-K that the 2015 expansion of the "*MLA Rule . . . expanded the scope of the credit products covered by the MLA to include . . . pawn loans [] or vehicle and certain unsecured installment loan products to the extent any such products have a military annual percentage rate great than 36%*."  Defendants added, "*compliance with the MLA Rule . . . is complex*."

145.    On February 11, 2020, FirstCash filed with the SEC on Form 8-K the Company's investor presentation for February 2020.  Defendant Orr signed the February 11, 2020 Form 8-K. In the February 2020 investor presentation, Defendants told investors that among the

"[a]ttractive industry dynamics" for pawn operators was a "*[s]table regulatory environment*."

Indeed, Defendants claimed that there was a "Stable Regulatory Climate for Pawn" because

"Pawn loans are different from traditional consumer loan products and not subject to the CFPB

Small Dollar Loan rules because they . . . do not involve credit checks, collection activities, ACH

transactions or negative credit reporting." Defendants further asserted that "*[r]egulations [for*

*pawn loans] are primarily at the state level in the U.S.*" and that there had been "*no significant*

*negative regulatory changes in the last 25 years*."

146. Additionally, in the February 2020 investor presentation, Defendants stated that

*pawn represented 99% of all of FirstCash's revenue over the preceding twelve-month period*.

The February 2020 investor presentation also reported "retail margins improvements" "of 38%

compared to 37% in the prior-year" due to "improved margin and top-line retail sales increased

gross profit" and that "pawn fees increase[d] on improved yields" up "by 2%."

147. Defendants' statements referenced in ¶¶ 137, 140-42, and 144-46 were materially

misleading when made for the same reasons set forth in ¶ 86

148. Further, Defendants' statements referenced in ¶¶ 144-45 were materially

misleading when made because Defendants omitted any reference to the obligations imposed on

FirstCash by the 2013 Consent Order following its merger with Cash America in September

2016.

### K.    First Quarter Fiscal Year 2020 Financial Results: April - May 2020

149. On April 22, 2020, FirstCash filed a Form 8-K with the SEC, signed by

Defendant Orr, attaching a press release announcing the Company's financial results for the first

quarter of 2020 for the three-month period ending March 31, 2020. The press release focused on

the COVID-19 pandemic, with Defendant Wessel stating, "Our first quarter earnings results were

better than expected" and "while COVID-19 has created challenging times, we believe FirstCash

is very well-positioned to continue meeting the needs of our customers and the communities in which we operate" and that ***the Company's U.S. segment revenue for the quarter from pawn loan fees was approximately $97.8 million***.  The release further stated that, as of March 31, 2020, ***the Company's U.S. pawn loans outstanding totaled $224 million***.  Defendant Wessel continued, "Pawnshops have historically served unbanked and underbanked consumers well in periods of economic uncertainty and credit contraction."  Wessel added, "[W]e expect strong future demand for pawn loans."

150.    On April 27, 2020, FirstCash filed its First Quarter 2020 Form 10-Q ("Q1 2020 Form 10-Q"), signed by Defendant Orr, which contained information concerning the Company's current financial condition for the first quarter ended March 31, 2020, and repeated and reiterated the financial metrics provided in the April 22, 2020 press release and Form 8-K.

151.    On May 6, 2020, FirstCash filed with the SEC on Form 8-K the Company's investor presentation for May 2020.  Defendant Orr signed the May 6, 2020 Form 8-K. In the May 2020 investor presentation, Defendants told investors that among the "[a]ttractive industry dynamics" for pawn operators was a "***[s]table regulatory environment***."  Indeed, Defendants represented that there was a "Stable Regulatory Climate for Pawn" because "Pawn loans are different from traditional consumer loan products and not subject to the CFPB Small Dollar Loan rules because they . . . do not involve credit checks, collection activities, ACH transactions or negative credit reporting."  Defendants further asserted that "***[r]egulations [for pawn loans] are primarily at the state level in the U.S.***" and that there had been "***no significant negative regulatory changes in the last 25 years***."

152.    Additionally, in the May 2020 investor presentation, Defendants stated that ***pawn represented 99% of all of FirstCash's revenue over the preceding twelve-month period***.  The

May 2020 investor presentation noted "retail margins improvements" "of 39% compared to 37% in the prior-year period driven by continued operating improvements in the Cash America stores." The May 2020 investor presentation omitted any discussion of the pawn loan fees that had been included in prior investor presentations.

153.    On June 23, 2020, FirstCash filed with the SEC on Form 8-K the Company's investor presentation for June 2020. Defendant Orr signed the June 23, 2020 Form 8-K. In the June 2020 presentation, in a section of the presentation added in response to the COVID-19 pandemic, Defendants told investors that "*pawn receivable growth*" would be among the "*key business drivers for the second half [of 2020]*" for the Company. The remainder of the June 2020 investor presentation contained the same language that had been in prior investor presentations, discussed above.

154.    Defendants' statements referenced in ¶¶ 149 and 151-53 were materially misleading when made for the same reasons set forth in ¶ 86.

### L.    Second Quarter Fiscal Year 2020 Financial Results: July - August 2020

155.    On July 22, 2020, FirstCash filed a Form 8-K with the SEC, signed by Defendant Orr, attaching a press release announcing the Company's financial results for the second quarter of 2020 for the three and six-month periods ending June 30, 2020. In the press release, Defendant Wessel stated that the Company's "second quarter results demonstrated the inherent diversification and uniqueness of the pawnshop business model, which generates *revenues from* both specialty retail operations and *small-dollar, non-recourse lending*."

156.    In the press release, Defendant Wessel also stated, "Pawnshops have historically served unbanked and underbanked consumers well in periods of economic uncertainty and tightening of available credit by other small dollar lenders." Wessel concluded by saying, "Combined with our scale *and other competitive advantages, we believe FirstCash is uniquely*

*positioned in these unusual and uncertain times*."  Notably, unlike prior earnings releases, the July 22, 2020 press release did not disclose the value of pawn loans outstanding at the end of the quarter.

157.    On July 27, 2020, FirstCash filed its Second Quarter 2020 Form 10-Q ("Q2 2020 Form 10-Q"), signed by Defendant Orr, which contained information concerning the Company's current financial condition for the second quarter ended June 30, 2020, and repeated and reiterated the financial metrics provided in the July 22, 2020 press release and Form 8-K.

158.    On August 3, 2020, FirstCash filed with the SEC on Form 8-K the Company's investor presentation for August 2020.  Defendant Orr signed the August 3, 2020 Form 8-K. In the August 2020 investor presentation, Defendants noted that "improved yields on pawn portfolio driven by lower forfeiture rates" during the second quarter of 2020 and declared that "pawn receivable growth" would be a "key business driver[] for the second half [of 2020]."

159.    As in previous presentations, in the August 2020 investor presentation, Defendants reported that among the "[a]ttractive industry dynamics" for pawn operators was a "*[s]table regulatory environment*."  Indeed, Defendants claimed that there was a "Stable Regulatory Climate for Pawn" because "Pawn loans are different from traditional consumer loan products and not subject to the CFPB Small Dollar Loan rules because they . . . do not involve credit checks, collection activities, ACH transactions or negative credit reporting."  Defendants further asserted that "*[r]egulations [for pawn loans] are primarily at the state level in the U.S.*" and that there had been "*no significant negative regulatory changes in the last 25 years*."

160.    Additionally, in the August 2020 investor presentation, Defendants represented that "*revenues from pawn operations increased 6%*" and the "*average monthly effective yield on pawn loans for the quarter was 15%, an improvement of 300 basis points compared to the*

58

*yield in the prior-year quarter*."  Further, the Company stated that "retail margin improvements" were "42% compared to 38% in the prior-year period."

161.    Defendants' statements referenced in ¶¶ 155-56 and 159-60 were materially misleading when made for the same reasons set forth in ¶ 86.

### M.    Third Quarter Fiscal Year 2020 Financial Results: October - November 2020

162.    On October 21, 2020, FirstCash filed a Form 8-K with the SEC, signed by Defendant Orr, attaching a press release announcing the Company's results for the third quarter of 2020 for the three and nine-month period ending September 30, 2020.  In the press release, Defendant Wessel said, "FirstCash's third quarter results reflected continued profitability and resiliency despite the sharp second quarter decline in pawn receivables related to the impacts of COVID-19.  *The Company saw steady recovery in pawn lending activity* and near-record levels of retail margins."  Defendant Wessel continued, stating, "*We are seeing a steady rebound in pawn activity, with U.S. originations thus far in October rapidly approaching more normalized levels*."

163.    In the press release, Defendants also reported that "*[p]awn loan originations began improving in May [2020] and continued to rebound throughout the third quarter and thus far into October*."  As in the prior quarter's earnings release in July 2020, the October 22, 2020 earnings press release did not include the total value of pawn loans outstanding, continuing a break from a practice the Company had previously engaged in during such reports since the beginning of the Class Period.

164.    On October 26, 2020, FirstCash filed its Third Quarter 2020 Form 10-Q ("Q3 2020 Form 10-Q"), signed by Defendant Orr, which contained information concerning the Company's current financial condition for the third quarter ended September 30, 2020, and

repeated and reiterated the financial metrics provided in the October 21, 2020 press release and Form 8-K.

165.    On November 5, 2020, FirstCash filed with the SEC on Form 8-K the Company's investor presentation for November 2020.  Defendant Orr signed the November 5, 2020 Form 8-K.  In the November 2020 investor presentation, Defendants told investors that among the "[a]ttractive industry dynamics" for pawn operators was a "*[s]table regulatory environment*."  Indeed, Defendants represented that there was a "Stable Regulatory Climate for Pawn" because "Pawn loans are different from traditional consumer loan products and not subject to the CFPB Small Dollar Loan rules because they … do not involve credit checks, collection activities, ACH transactions or negative credit reporting."  Defendants further asserted that "*[r]egulations [for pawn loans] are primarily at the state level in the U.S.*" and that there had been "*no significant negative regulatory changes in the last 25 years*."

166.    Additionally, in the November 2020 investor presentation, Defendants represented to investors that "*pawn balances [are] recovering*" as "*pawn loan originations began improving in May and continued to rebound throughout the third quarter and October*."  The November 2020 investor presentation also highlighted "*pawn yield improvements*" of an "*average monthly yield of 12% for Q3-2020, up approximately 30 basis points compared to the yield in the prior-year comparable quarter*."

167.    Defendants' statements referenced in ¶¶ 162-63 and 165-66 were materially misleading when made for the same reasons set forth in ¶ 86.

### N.    Fourth Quarter and Full Year Fiscal 2020 Financial Results: January - February 2020

168.    On January 28, 2021, FirstCash filed a Form 8-K with the SEC, signed by Defendant Orr, attaching a press release announcing the Company's financial results for the

fourth quarter and full year ended December 31, 2020.  The press release stated that ***the Company's U.S. segment revenue for the quarter and the year from pawn loan fees was approximately $74 million and $310 million***, respectively.  The press release further stated that, as of December 31, 2020, ***the Company's U.S. pawn loans outstanding totaled $220.4 million***.

169.    In the press release, Defendant Wessel declared, "Our fourth quarter operating results demonstrated the resiliency of our business model."  Wessel singled out "the ongoing recovery of pawn lending activity" as contributing to "operating profitability improv[ing] significantly."  The press released also stated that "***[p]awn loan demand increased sequentially in the fourth quarter with consolidated pawn loans up 14% compared to the third quarter, driving a similar sequential increase in pawn fees***."  Wessel also represented that, "[W]e focused on optimizing both store and corporate operating costs."  Wessel added, "We believe FirstCash's balance sheet and cash flows can support the expected further recovery in pawn loans."

170.    On February 1, 2021, FirstCash filed with the SEC on Form 10-K the Company's financial results for the fiscal year ended December 31, 2020, which were signed by Defendants Wessel and Orr and included signed certifications attesting to the accuracy of those financials by the Individual Defendants (the "2020 Form 10-K").  The 2020 Form 10-K also stated that ***FirstCash had achieved more than $310 million in U.S. pawn loan fees***.  According to the 2020 Form 10-K, "pawn loan fees are typically calculated as a percentage of the pawn loan amount based on the size, duration and type of collateral of the pawn loan and generally range from 4% to 25% per month, as permitted by applicable law." The 2020 Form 10-K also stated that "***[p]awn loan fees accounted for approximately 28% of the Company's revenue during 2020***."

61

171.    The 2020 Form 10-K touted FirstCash's "*employee-training programs that promote customer service, productivity and professionalism*."  The Company claimed in the 2020 Form 10-K that it "*trains its employees through direct instruction and on-the-job pawn and sales experience*" and that "*new employees are introduced to the business through an orientation and training program that includes on-the-job training in lending practices*, layaways, merchandise valuation, *regulatory compliance* and general administration of store operations."  As for "experienced employees," FirstCash stated in the 2020 Form 10-K that they conduct "*management training*," which "typically involves exposure to overall financial acumen, including revenue and margin generation, cost efficiency, *regulatory compliance*, recruitment, human resources management and asset and security control."  The Company stated in the 2020 Form 10-K that its "workforce is composed primarily of employees who work on an hourly basis, which have historically had high turnover rates."  Because "[t]hese high turnover rates can lead to increased training, retention and other costs and impair the overall customer service and efficiencies at the Company's stores[,]" FirstCash states in the 2020 Form 10-K that "*the Company is focused on providing*," among other things, "*extensive training*."

172.    The 2020 Form 10-K also touted the Company's "*proprietary computer information system that provides fully integrated functionality to support point-of-sale retail operations*, real-time merchandise valuations, loan-to-value calculations, inventory-management, *customer relationship management*, loan management, cash management, *compliance and control systems* and employee compensation."  The 2020 Form 10-K claimed that "*[t]he information system provides management with the ability to continuously monitor store transactions, assets, loans, and operating results*."  Iterations of the preceding statement in the

Company's prior Forms 10-K did not include "assets" and "loans" among the data the information system providing "management with the ability to continuously monitor."

173.    Further, in the 2020 Form 10-K, Defendants assured investors that "*[t]he Company maintains a well-trained audit and loss prevention staff which conducts regular store visits to verify assets, loans and collateral and test compliance with regulatory, financial and operational controls*." Similar to its expansion of the discussion regarding the information system, the 2020 Form 10-K's description of the audit and compliance staff was expanded as well. First, it added the discussion of the "loss prevention staff" in addition to the "well-trained audit" staff. Second, it added the discussion that this staff seeks to "verify assets, loans and collateral." Finally, the 2020 Form 10-K added the word "regulatory" to the list of controls the audit and loss prevention staff test during their store visits.

174.    The 2020 Form 10-K also noted that FirstCash was subject to extensive rules and regulations governing the Company's business. For example, the 2020 Form 10-K stated that "[t]he Company's products and services are subject to extensive regulation and supervision under various federal, state and local laws, ordinances and regulations in both the U.S. and Latin America." Further, the 2020 Form 10-K stated that "*[m]any statutes and regulations prescribe, among other things, the general terms of the Company's pawn [and consumer] loan agreements, including maximum service fees and/or interest rates that may be charged and collected and mandatory consumer disclosures*." However, the 2020 Form 10-K stated that the Company was in compliance with this regulatory regime and employed rigorous policies, procedures and controls to ensure this compliance. The 2020 Form 10-K continued, "Management believes the current operating and financial controls and systems are adequate for

the Company's existing store base and can accommodate reasonably foreseeable growth in the near term."

175.    Moreover, the 2020 Form 10-K stated that the MLA Rule "expanded the scope of the credit products covered by the MLA to include overdraft lines of credit, pawn loans, or vehicle and certain unsecured installment loan products to the extent any such products have a military annual percentage rate greater than 36%."  The 2020 Form 10-K further represented that the Company was operating in "*compliance with the MLA Rule*," which had resulted in "compliance risks and related costs and limits the potential customer base of the Company." FirstCash also stated, "*compliance with the MLA Rule . . . is complex*."

176.    On February 24, 2021, FirstCash filed with the SEC on Form 8-K the Company's investor presentation for February 2021.  Defendant Orr signed the February 24, 2021 Form 8-K. In the February 2021 investor presentation, under the banner of "ESG: Commitment to Social Responsibility" and for the first time in an investor presentation during the Class Period, FirstCash highlighted its "*employee-training programs that promote customer service, productivity and professionalism*."  Defendants also stated in the February 2021 investor presentation that FirstCash had "*specialized skill training programs in lending practices*, merchandise valuation *and regulatory compliance*."  On the same slide, Defendants heralded its "customer and employee protections" and told investors the Company administered "*robust consumer and corporate compliance programs*."

177.    Later in the February 2021 presentation, Defendants, for the first time in an investor presentation during the Class Period, touted FirstCash's "*limited regulatory exposure*." Defendants reiterated claims that there was a "Stable Regulatory Climate for Pawn" because "Pawn loans are different from traditional consumer loan products and not subject to the CFPB

64

Small Dollar Loan rules because they . . . do not involve credit checks, collection activities, ACH transactions or negative credit reporting." Defendants further asserted that "*[r]egulations [for pawn loans] are primarily at the state level in the U.S.*" and that there had been "*no significant negative regulatory changes in the last 25 years*."

178.    Defendants' statements referenced in ¶¶ 168-177 were materially misleading when made for the same reasons set forth in ¶ 86.

179.    Further, Defendants' statements referenced in ¶¶ 175 and 177 were materially misleading when made because Defendants omitted any reference to the obligations imposed on FirstCash by the 2013 Consent Order following its merger with Cash America in September 2016.

**O.    First Quarter Fiscal 2021 Financial Results: April - May 2021**

180.    On April 21, 2021, FirstCash filed a Form 8-K with the SEC, signed by Defendant Orr, attaching a press release announcing the Company's financial results for the first quarter of 2021 for the three-month period ending March 31, 2021. In the press release, Defendant Wessel said, "We are pleased to report strong first quarter earnings results and cash flows which exceeded our internal expectations. These rapidly improving results highlight the diversity of FirstCash's business model. . . . ." The press release also reported that *the Company earned nearly $190 million in revenue for its U.S. operations for the quarter ending March 31, 2021, including $76.3 million in pawn loan fees. The Company reported more than $265 million in pawn loans outstanding*.

181.    On April 26, 2021, FirstCash filed its First Quarter 2021 Form 10-Q ("Q1 2021 Form 10-Q"), signed by Defendant Orr, which contained information concerning the Company's current financial condition for the first quarter ended March 31, 2021, and repeated and reiterated the financial metrics provided in the April 21, 2021 press release and Form 8-K.

182.    On May 4, 2021, FirstCash filed with the SEC on Form 8-K the Company's investor presentation for May 2021.  Defendant Orr signed the May 4, 2021 Form 8-K. In the May 2021 investor presentation, Defendants again highlighted FirstCash's "employee-training programs that promote customer service, and professionalism."  As in the February 2021 investor presentation, the Company also stated in the May 2021 investor presentation that it had "*specialized skill training programs in lending practices*, merchandise valuation *and regulatory compliance*."  On the same slide, Defendants heralded its "customer and employee protections" and told investors the Company administered "*robust consumer and corporate compliance programs*."

183.    Notably, in the May 2021 presentation, FirstCash did not include the February 2021 investor presentation slide touting the Company's "limited regulatory exposure." However, Defendants repeated, as they did in other presentations to FirstCash investors during the Class Period, the Company's claims that there was a "*Stable Regulatory Climate for Pawn*" because "Pawn loans are different from traditional consumer loan products and not subject to the CFPB Small Dollar Loan rules because they . . . do not involve credit checks, collection activities, ACH transactions or negative credit reporting."  Defendants further asserted that "*[r]egulations [for pawn loans] are primarily at the state level in the U.S.*" and that there had been "*minimal regulatory changes over the last 25 years*."  Previously, the Company had claimed there had been "no significant regulatory changes over the last 25 years."

184.    Defendants' statements referenced in ¶¶ 180 and 182-83 were materially misleading when made for the same reasons set forth in ¶ 86.

**P.    Second Quarter Fiscal 2021 Year Financial Results: July - August 2021**

185.    On July 21, 2021, FirstCash filed a Form 8-K with the SEC, signed by Defendant Orr, attaching a press release announcing the Company's financial results for the second quarter

of 2021 for the three and six-month periods ending June 30, 2021.  In the press release, Defendant Wessel stated, "FirstCash posted strong second quarter earnings results driven by an accelerating recovery in pawn receivables. . . . ."  The Company reported that "[p]awn receivables were up 29% at June 30, 2021 compared to the prior year while same-store pawn receivables increased 24% at quarter end, reflecting further recovery in pawn balances."  The Company also reported that "pawn fees, which typically lag pawn receivables growth, were down only 7% in total for the second quarter, and 9% on a same-store basis, compared to the prior-year quarter."  The press release also reported that *the Company earned $209 million in revenue for its U.S. operations for the quarter ending June 30, 2021, including $66.9 million in pawn loan fees.  The Company reported more than $306 million in pawn loans outstanding.*

186.    In the press release, Defendant Wessel stated, "*The recovery in lending demand we experienced in the second quarter appears to be driven by the further reopening of the economy, waning stimulus programs and consumer price inflation*."  Wessel added, "*[L]ending originations in the U.S. have continued to improve in July and are now nearing normalized 2019 levels*."

187.    On July 23, 2021, FirstCash filed its Second Quarter 2021 Form 10-Q ("Q2 2021 Form 10-Q"), signed by Defendant Orr, which contained information concerning the Company's current financial condition for the second quarter ended June 30, 2021, and repeated and reiterated the financial metrics provided in the July 21, 2021 press release and Form 8-K.

188.    On August 3, 2021, FirstCash filed with the SEC on Form 8-K the Company's investor presentation for July 2021.  Defendant Orr signed the August 3, 2021 Form 8-K. In the July 2021 investor presentation, Defendants highlighted the Company's "employee-training programs that promote customer service and professionalism."  As in the May 2021 and

February 2021 investor presentations, Defendants also falsely represented that FirstCash had "**specialized skill training programs in lending practices**, merchandise valuation, **and regulatory compliance**."  On the same slide, Defendants also heralded the Company's "customer and employee protections" and told investors the Company administered "**robust consumer and corporate compliance programs**."

189.    As it did in other presentations to investors during the Class Period, Defendants repeated their claims of a "**Stable Regulatory Climate for Pawn**" because "Pawn loans are different from traditional consumer loan products and not subject to the CFPB Small Dollar Loan rules because they . . . do not involve credit checks, collection activities, ACH transactions or negative credit reporting."  Defendants further asserted that "**[r]egulations [for pawn loans] are primarily at the state level in the U.S.**" and that there had been "**minimal regulatory changes over the last 25 years**." The preceding language also appeared in the Company's September 2021 investor presentation, which FirstCash filed with the SEC on Form 8-K on September 7, 2021, signed by Defendant Orr.

190.    Defendants' statements referenced in ¶¶ 185-86 and 188-89 were materially misleading when made for the same reasons set forth in ¶ 86.  Moreover, Defendants knew, about but declined to disclose, that on May 26, 2021, the Company had received a Civil Investigative Demand from the CFPB, about potential violations of the MLA by the Company.

**Q.    Third Quarter Fiscal Year 2021 Financial Results: October 2021**

191.    On October 20, 2021, FirstCash filed a Form 8-K with the SEC, signed by Defendant Orr, attaching a press release announcing the Company's financial results for the third quarter of 2021 for the three and nine-month periods ending September 30, 2021.  In the press release, Defendant Wessel stated, "Revenue and earnings momentum continued to accelerate in the third quarter, driven by **29% growth in pawn receivables over this time last year**."  The

Company reported that "*[c]onsolidated pawn loans outstanding at quarter end increased 29% over the prior year*" and "*[t]otal pawn fees, which typically lag the grown in pawn receivables, increased 22% in the third quarter compared to the prior-year quarter*." In the United States, specifically, the Company reported a *29% increase in pawn receivables and a 16% increase in pawn fees*.

192.    In the press release, Wessel represented that, "*[P]awn origination activity appears to be fully recovered*, with same-store pawn loan originations over the past four weeks up 3% over the same pre-pandemic period in 2019 and same-store total customer funding (pawn loan originations plus buys) up 7% over the same period in 2019."

193.    On October 25, 2021, FirstCash filed its Third Quarter 2021 Form 10-Q ("Q3 2021 Form 10-Q"), signed by Defendant Orr, which contained information concerning the Company's current financial condition for the third quarter ended September 30, 2021, and repeated and reiterated the financial metrics provided in the October 20, 2021 press release and Form 8-K.

194.    Defendants' statements referenced in ¶¶ 191-92 were materially misleading when made for the same reasons set forth in ¶ 86. Moreover, Defendants knew about, but failed to disclose, that the Company had received two CIDs from the CFPB, on May 26, 2021, and September 30, 2021, about potential violations of the MLA by the Company.

**R.     Defendants Omitted to Disclose the Known, Material Trends of Significant and Growing Legal and Regulatory Risks and Costs Related to Violations of the MLA and the 2013 Consent Order**

195.    Throughout the Class Period, the Company's Forms 10-K and 10-Q were materially misleading because they failed to disclose the information required by Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"). Item 303 required Defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to

have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

196.    Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105 ("Item 105"), required, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and required each risk factor to "adequately describe[] the risk."

197.    The failure of the Company's periodic SEC filings to disclose that the Company was engaged in widespread and systemic violations of the MLA and the Order violated Item 303, because these undisclosed facts were known to Defendants and would (and did) have an unfavorable impact on the Company's sales, revenues and income from continuing operations. This failure also violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant factors that made an investment in FirstCash stock speculative or risky.

198.    Indeed, the boilerplate discussions of potential risks provided by Defendants during the Class Period were themselves materially misleading because they discussed potential future contingencies regarding regulatory noncompliance that "*may*" or "*could*" occur but failed to disclose the Company's known active violations of the MLA and the Order that had *already* occurred and the likely adverse repercussions to the Company and its business as a result of this misconduct.

## VII.    THE TRUTH IS REVEALED

199.    On November 12, 2021, the CFPB announced that, after at least six months of investigation and two CIDs under which the Company produced documents and data for certain states, the agency had filed a complaint against FirstCash for violations of the MLA and the 2013 Consent Order.  The CFPB complaint alleged that "between June 2017 and May 2021 (the only

period for which the Bureau currently has Defendants' transactional data), [FirstCash and its subsidiary Cash America West, Inc.] together made over 3,600 pawn loans to more than 1,000 covered borrowers from stores in Arizona, Nevada, Utah, and Washington." *See* Case No. 4:21-cv-01251-P (N.D. Tex. Nov. 12, 2021), ECF No. 1, at ¶ 12 (emphasis added).

200.    The CFPB concluded that, in all of the loans at issue, FirstCash imposed, on active-duty military members and or their dependents, interest rates of over 36%, with rates frequently exceeding 200%. Additionally, the CFPB found that the Company's usurious loan practices had been ongoing since at least October 2016 in violation of the Order. A CFPB release describing the agency's action against FirstCash stated the Company had "cheated" and "gouged" military families and "robbed them of their rights to go to court," stating in pertinent part as follows:

> The Consumer Financial Protection Bureau (CFPB) today filed a lawsuit in a Texas federal district court against FirstCash, Inc. and Cash America West, Inc. The CFPB alleges that the two companies violated the Military Lending Act (MLA) by charging higher than the allowable 36% annual percentage rate on pawn loans to active-duty servicemembers and their dependents. The CFPB also alleges that FirstCash violated a 2013 CFPB order against its predecessor company prohibiting MLA violations. The CFPB is seeking an injunction, redress for affected borrowers, and a civil money penalty.
>
> "FirstCash is a repeat offender and cheated military families over and over again," said CFPB Director Rohit Chopra. "FirstCash and Cash America West gouged military families and robbed them of their rights to go to court."
>
> FirstCash, Inc. is a non-bank corporation operating out of Fort Worth, Texas. FirstCash and its wholly owned subsidiaries operate more than 1,000 pawnshops throughout the U.S. FirstCash is a publicly traded firm with a current market capitalization of about $3.5 billion. Cash America West, Inc. is a wholly owned subsidiary of FirstCash that operates pawn stores in Arizona, Nevada, Utah, and Washington.

      The CFPB alleges that between June 2017 and May 2021, FirstCash and Cash America West violated the MLA by making more than 3,600 pawn loans from their Arizona, Nevada, Utah, and Washington stores with an annual percentage rate above the 36% allowed by the MLA. The unlawful loans had APRs that frequently exceeded 200%. The CFPB also alleges that the loan contracts violated the MLA by requiring borrowers to sign away their ability to sue and by failing to make all required loan disclosures. These 3,600 loans are from only a limited period for which the Bureau currently has transactional data, and the stores from which they originated make up only about 10% of FirstCash's nationwide pawn- loan operations. Accordingly, the CFPB alleges that since October 3, 2016, FirstCash has, together with Cash America West and other wholly owned subsidiaries, made additional pawn loans in violation of the MLA from stores in these and other states.

      In 2013, the Bureau ordered Cash America International, Inc. to halt its misconduct against military families, prohibiting Cash America and its successors from violating the MLA FirstCash is a successor to Cash America and therefore subject to the 2013 order. The Bureau alleges that FirstCash's violations of the MLA violated the Bureau's 2013 order.

201.    The CFPB complaint states that "[o]n information and belief, between October 3, 2016, and the present, FirstCash has, together with its wholly owned subsidiaries, made additional pawn loans under similar terms to covered borrowers from stores in these and other states." Further, the CFPB Complaint stated that "since the merger and at all times material to this Complaint, FirstCash has been a successor to Cash America and therefore subject to the 2013 Order."

202.    The four-count CFPB Complaint alleges: (i) violations of the MLA by FirstCash and Cash America West for exceeding the MLA's 36% military APR cap; (ii) violations of the MLA by FirstCash and Cash America West for requiring covered borrowers to submit to arbitration; (iii) violations of the MLA by FirstCash and Cash America West for failing to make disclosures to covered borrowers, specifically for failing to disclose the military APR applicable to extensions of credit to members of the military or their dependents; and (iv) violations of the

Consumer Financial Protection Act by First Cash for violating the CFPB's 2013 Order prohibiting MLA violations.

203.    In response to the CFPB's lawsuit, on November 12, 2021, the Company issued a press release, filed with the SEC on Form 8-K, signed by Defendant Orr, of only three brief sentences, stating: "FirstCash deeply respects members of our military and their families.  We believe the allegations by the CFPB are without merit.  We will seek to engage with the CFPB and respond to the allegations appropriately."

204.    The market reacted negatively to the news of the November 12, 2021 CFPB lawsuit against the Company.  For example, Janney published a report after "[t]he CFPB announced a lawsuit against [FirstCash] for allegedly making loans to military members in violation of the Military Lending Act (MLA).  We think this is part of a larger drag-net by the CFPB to catch any violation of the MLA."  Janney continued with a cautionary warning to investors, writing, "[T]he CFPB appears to be laying the groundwork for a larger investigation, as the loan applications they reviewed only cover a portion of [FirstCash's] footprint."

205.    Janney warned this "groundwork" could pave the way for "a larger investigation and possibly subpoenas and/or civil investigative demands."  Janney wrote that the CFPB investigation "will certainly create an overhang in [FirstCash's] stock" as it "trimm[ed]" its "multiple assumption to 18x (from 23x) based on this new risk."  Janney also slashed its fair value estimate for FirstCash stock from $99 to $78.

206.    In response to news of the November 12, 2021 CFPB lawsuit, the price of FirstCash common stock fell from $86.14 per share on November 11, 2021, to $78.64 per share on November 12, 2021, an 8.7% decline on unusually heavy trading volume of nearly 500,000 shares traded.

207.    As the market continued to digest the news in the days that followed, the price of FirstCash common stock continued to decline.

208.    For instance, following the closing of the market on Friday, November 12, 2021, *CBS News* published a report about the CFPB lawsuit titled "Lender charged 200% interest to military families for pawn loans, CFPB says."  In addition to published portions of the November 12, 2021 CFPB press release, *CBS News* wrote, "CFPB officials said in court documents that they warned Cash America in 2013 about overcharging on interest rates but the company kept doing it, even after a merger with FirstCash in 2016."

209.    Similarly, after trading hours, on November 12, 2021, the *Dallas Morning News* published an article titled "Consumer watchdog accuses pawn shop operator FirstCash of gouging military families."  The *Dallas Morning News* article also quoted portions of the November 12, 2021 CFPB press release, and specifically noted that, even though the stores at issue in the CFPB lawsuit "make up only about 10% of FirstCash's nationwide pawn-loan operations," "the CFPB also believes FirstCash stores in other states made loans with excessive interest rates."

210.    Then, on November 15, 2021, the Company issued another press release, filed with the SEC on a Form 8-K signed by Defendant Orr, announcing its intention to "vigorously defend itself against the allegations in this case" and denying the allegations as "originat[ing] from a single customer complaint from 2019" and claiming that the "CFPB has not provided the Company with any evidence or support for its allegations."  FirstCash also sought to downplay the CFPB's allegations that it was a repeat offender through the dishonest characterization that the fact that the 2013 Consent Order was due to conduct by a subsidiary of Cash America – Enova – that had been divested two years before the 2016 merger between FirstCash and Cash

America.  As outlined above, both the 2013 Consent Order and 2013 Stipulation make clear the Cash America's obligations under the 2013 Consent Order survived corporate transactions and pass on to Cash America's successors.

211.    As a result of the further reporting on the CFPB's lawsuit, the Company's November 15, 2021 press release, and the market's continued digestion of the news of FirstCash's illegal loans to military members and their families, FirstCash stock plunged a further $5.15 per share on Monday, November 15, 2021, on usually heavy trading volume of more than 737,000 shares, to close at $73.49 per share, down 6.6% from the prior trading day's close of $78.64 per share.  In total, over the two-day trading period from November 12, 2021 to November 15, 2021, FirstCash's stock plummeted more than 14% from $86.14 per share at the market's close on November 11, 2021, the day before the CFPB filed the enforcement action.

212.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of FirstCash common stock, Lead Plaintiff and other putative Class members (defined below) suffered significant losses and damages.

## VIII.    ADDITIONAL ALLEGATIONS OF SCIENTER

213.    As alleged herein, Defendants acted with scienter in that Defendants knew, or were severely reckless in not knowing, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially misleading.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding FirstCash, and their control over and/or receipt and/or modification of FirstCash's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

214.    Defendants knew and/or were severely reckless in not knowing the misleading nature of the information they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the severe recklessness of, personnel at the highest levels of the Company, including the Individual Defendants.  The scheme was perpetrated over a five-year period and involved the issuance of at least 3,600 usurious loans to more than 1,000 active-duty military personnel and members of their family.  The broad scope of the fraud, and the fact that the Company was a repeat offender and subject to the CFPB Order which mandated compliance with the MLA, further bolsters an already compelling inference of scienter.

215.    The Individual Defendants, because of their positions with FirstCash, controlled the contents of FirstCash's public statements during the Class Period.  The Individual Defendants were each provided with or had access to the information alleged herein to be misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.  Because of their positions and access to material non-public information, the Individual Defendants knew or were severely reckless in not knowing that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were misleading.  As a result, each of the Defendants is responsible for the accuracy of FirstCash's corporate statements and is, therefore, responsible, and liable for the representations contained therein.

216.    Defendants' scienter is further underscored by the certifications mandated by the Sarbanes-Oxley Act of 2002 of Defendants Wessel and Orr filed during the Class Period, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure

that material information about FirstCash was made known to them and that the Company's disclosure-related controls were operating effectively.

217.    The following allegations, taken together, support a strong inference of scienter:

(a)    Both before and after FirstCash's merger with Cash America, the 2013 Consent Order was in effect and prohibited Cash America, or any of its "successors," such as FirstCash, from committing further violations of the MLA;

(b)    Pursuant to the explicit terms of the 2013 Consent Order, Cash America was required to provide a copy of the Order to FirstCash and "any future Board members and executive officers, as well as to any managers, employees, Service Providers, or other agents and representatives that will have supervisory responsibilities related to the subject matter of the Order before they assume their responsibilities." 2013 Consent Order, at ¶ 64. Thus, Defendants knew or recklessly disregarded that continued conduct of the type at issue in the 2013 Consent Order could be used by the CFPB "to establish a pattern or practice of violations or the continuation of a pattern or practice of violations or to calculate the amount of any penalty." 2013 Consent Order, at ¶ 71.

(c)    Defendants had the ability to continuously monitor store transactions and operating results;

(d)    Defendants implemented inadequate employee training and education programs for MLA compliance; and

(e)    Statements by former employees of FirstCash and Cash America (¶¶ 25-30, 57-69) confirm that the Company: (i) failed to implement adequate internal controls to ensure no further violations of the MLA occurred by doing the bare minimum to appear in compliance with legal and regulatory obligations under the MLA while turning a blind eye to wrongdoing,

and (ii) provide factual support for a strong inference on Defendants' part regarding the misleading nature of their statements.

## IX.    CONTROL PERSON ALLEGATIONS

218.    Each of the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and had access to the adverse undisclosed information about the Company's business, operations, financial statements and present and future business prospects via access to internal corporate documents and systems. The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or were severely reckless in not knowing, the material misstatements contained therein and omissions therefrom, and were aware of their materially misleading nature. The Individual Defendants had direct oversight of the compliance program at the Company and had access to information regarding the Company's pawn loan activities, including the limitations imposed on the Company by the MLA and the 2013 Consent Order.

219.    The Individual Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. The Individual Defendants had access to and were provided with copies of the documents and statements alleged herein to be materially misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

78

220.    As senior officers and controlling persons of a publicly-held company whose common stock was, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the New York Stock Exchange until October 5, 2018, and on the NASDAQ at all times since October 5, 2018, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information.  The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

221.    In making the statements complained of herein, the Individual Defendants, who were senior officers and controlling persons of FirstCash, were acting on behalf of the Company in the regular course of business.  Therefore, each of the statements made by the Individual Defendants is attributable to the Company.

## X.    LOSS CAUSATION

222.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class.  Through the Class Period, FirstCash's stock price was artificially inflated and/or artificially maintained as a result of Defendants' materially misleading statements and omissions that created the false impression, among other things, that: (i) FirstCash was in compliance with the MLA; (ii) FirstCash employed well-trained audit staff to enforce the Company's policies and procedures; and (iii) FirstCash's point of sale (POS) system allowed management to continuously monitor loan transactions and originations.

223.    A single disclosure on November 12, 2021 revealed the misleading character of Defendants' statements and omissions.  On that date, the CFPB filed a lawsuit against FirstCash

79

and Cash America West for violating the MLA by issuing <u>at least 3,600</u> loans to active-duty military personnel and their dependents in excess of the MAPR of 36%. As a result of this disclosure, the Company's stock price fell over 8.7%, from $86.14 per share to $78.64 per share, on unusually heavy trading volume of nearly 500,000 shares.

224.    Over the ensuing trading days, as the market continued to learn more about the gravity of Defendants' fraud, FirstCash's stock price fell a further 6.6%, losing $5.15 per share on November 15, 2021 to close at $73.49 per share that day, on unusually heavy trading volume of more than 737,000 shares.

225.    In all, disclosure of the true facts concerning Defendants failure to comply with the MLA caused massive losses to investors, with FirstCash's stock falling over 14.6%, from $86.14 per share at the close of trading on November 11, 2021, to $73.49 per share at the close of trading on November 15, 2021. As a result of the stock price declines following the disclosure of the CFPB lawsuit against the Company, FirstCash's market capitalization declined by more than $511.4 million.

226.    It was entirely foreseeable that Defendants' material misstatements and omissions discussed herein would artificially inflate the price of FirstCash's common stock. It was also foreseeable to Defendants that the revelation of the truth that the Company was not complying the requirements of the MLA would cause the Company's stock price to fall as the artificial inflation caused by Defendants' misstatements and omissions was removed. Thus, the stock price declines described above were directly and proximately caused by Defendants' materially misleading statements.

## XI.    INAPPICABILITY OF STATUTORY SAFE HARBOR

227.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the alleged material misstatements and omissions pleaded

in this Complaint.  The statements alleged to be materially misleading herein all relate to then-existing facts and conditions.  To the extent certain statements alleged to be misleading are determined to be mixed statements of historical or present information and future information, such statements are not entitled to the safe harbor with respect to the part of the statement that refers to historical or present conditions.

228.    To the extent certain of the statements alleged to be misleading may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were not meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

229.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of the forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially misleading, or the forward-looking statement was authorized or approved by an executive officer of FirstCash who knew that the statement was misleading when made.

## XII.    PRESUMPTION OF RELIANCE

230.    Lead Plaintiff alleges that through the Class Period, Defendants omitted material information of which Defendants were aware or reckless in not knowing.  Such statements artificially inflated, or artificially maintained, the price of FirstCash public traded common stock and operated as a fraud or deceit on all persons or entities who purchased or otherwise acquired that common stock during the Class Period.  Because Defendants chose to speak on the issues described in Section VI above, they were obligated to not mislead investors or withhold material information.  To the extent that the Defendants concealed or improperly failed to disclose

81

material facts with respect to the risks detailed herein, Lead Plaintiff and the putative Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

231.    Lead Plaintiff and the putative Class are also entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory because, among other things:

(a)    Defendants made public representations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's common stock traded in an efficient market;

(d)    The omissions and misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)    Lead Plaintiff and other members of the putative Class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

232.    At all relevant times, the market for the Company's common stock was efficient for the following reasons, among others:

(a)    FirstCash common stock met the requirements for listing and was listed and actively traded on the NASDAQ,[8] a highly efficient and automated national stock market;

---

[8] As noted above, FirstCash stock traded on the NYSE until October 5, 2018. Thereafter, it traded on the NASDAQ.

(b)    As a regulated issuer, FirstCash filed periodic public reports with the SEC and NASDAQ;

(c)    FirstCash regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)    According to the Company's 2021 3Q Form 10-Q, as of October 25, 2021, there were more than 40.4 million shares of FirstCash common stock outstanding, demonstrating a very active market for FirstCash common stock;

(e)    FirstCash was followed by securities analysts employed by major brokerage firms including Barclays, Credit Suisse, Janney Capital Markets, Jefferies & Company, Inc., JMP Securities, Stephens, and Wedbush, which wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s), which were publicly available, and entered the public marketplace; and

(f)    Unexpected material news about FirstCash was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

233.    As a result of the foregoing, the market for FirstCash common stock promptly digested current information regarding FirstCash from all publicly available sources and reflected such information in the price of the Company's stock.  Under these circumstances, all persons or entities who purchase or otherwise acquired FirstCash common stock during the Class Period suffered similar injury through their purchases of FirstCash common stock at artificially inflated and/or artificially maintained prices and a presumption of reliance applies.

## XIII. CLASS ACTION ALLEGATIONS

234.    Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of FirstCash during the period from February 1, 2018 to November 12, 2021, inclusive, and were damaged thereby (the "Class"). Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of FirstCash during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) FirstCash's employee retirement and employee benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

235.    The members of the putative Class are so numerous that joinder of all members is impracticable.  The Company's stock is currently actively traded on the NASDAQ, and there were more than 40.4 million shares of FirstCash stock outstanding as of October 25, 2021. While the number of putative Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by FirstCash or its transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

236.    There is a well-defined community of interest in the questions of law and fact in this case.  Questions of law or fact are common to the members of the putative Class, which predominate over questions which may affect individual Class members, including:

(a)      Whether Defendants violated the Exchange Act;

(b)      Whether Defendants omitted and/or misrepresented material facts;

(c)      Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)      Whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(e)      Whether Defendants knew or recklessly disregarded that their statements and/or omissions were misleading;

(f)      Whether Defendants' conduct impacted the price of FirstCash's common stock;

(g)      Whether Defendants' conduct caused the members of the Class to sustain damages; and

(h)      The extent of damages sustained by putative Class members and the appropriate measure of damages.

237.    Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

238.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.  Lead Plaintiff has no interests which conflict with those of the Class.

239.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIV.  COUNTS

### COUNT I

**For Violations of Section 10(b) of the Exchange Act
and Rule 10b-5 Against All Defendants**

240.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

241.    This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC, on behalf of Lead Plaintiff, against Defendants FirstCash, Wessel, and Orr.

242.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) cause Lead Plaintiff and other members of the Class to purchase FirstCash common stock at artificially inflated/maintained prices.

243.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for FirstCash common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

244. Defendants, individually and in concert, directly or indirectly, by the use, means or instrumentalities of interstate commerce and/or the amils, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

245. During the Class Period, Defendants made the material misstatements and omissions specified above, which they knew, or were severely reckless in not knowing, were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

246. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or were severely reckless in not knowing, the true facts that were available to them. Defendants engaged in this misconduct to conceal FirstCash's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

247. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for FirstCash's common stock. Lead Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for FirstCash's common stock had been artificially inflated by Defendants' fraudulent course of conduct.

248. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

249.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange

Act and Rule 10b-5, promulgated thereunder.

## COUNT II

### For Violation of Section 20(a) of the 1934 Act
### Against All Defendants

250.    Lead Plaintiff repeats and realleges each and every allegation contained in the

foregoing paragraphs as if fully set forth herein.

251.    The Individual Defendants acted as controlling persons of FirstCash within the

meaning of Section 20(a) of the 1934 Act.  By reason of their positions with the Company, and

their ownership of FirstCash stock, the Individual Defendants had the power and authority to

cause FirstCash to engage in the wrongful conduct complained of herein.  FirstCash controlled

the Individual Defendants and all of its employees.  By reason of such conduct, Defendants are

liable pursuant to Section 20(a) of the 1934 Act.

## XV.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.    Declaring this action to be a class action properly maintained pursuant to Rule 23

of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Co-Lead Counsel;

B.    Awarding compensatory damages in favor of Lead Plaintiff and the other Class

members against all Defendants, jointly and severally, for all damages sustained as a result of

Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses

incurred in this action, including counsel fees and expert fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and

proper.

## XVI.  JURY TRIAL DEMAND

Lead Plaintiff hereby demands a trial by jury.

Dated:  May 4, 2022

LABATON SUCHAROW LLP

/s/ Christine M. Fox
CAROL C. VILLEGAS (*pro hac vice*)
(N.Y. Bar No. 4154324)
CHRISTINE M. FOX (*pro hac vice*)
(N.Y. Bar No. 2704641)
GUILLAUME BUELL
(Texas Bar No. 24080813)
JAMES M. FEE (*pro hac vice*)
(N.Y. Bar No. 5426168)
140 Broadway
New York, NY 10005
Telephone: 212/907-0700
212/818-0477 (fax)
cvillegas@labaton.com
cfox@labaton.com
gbuell@labaton.com
jfee@labaton.com

ROBBINS GELLER RUDMAN
    & DOWD LLP

/s/ Matthew I. Alpert
MATTHEW I. ALPERT (*pro hac vice*)
(Cal. Bar No. 238024)
HEATHER G. SCHLESIER (*pro hac vice*)
(Cal. Bar No. 322937)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
malpert@rgrdlaw.com
hschlesier@rgrdlaw.com

***Co-Lead Counsel for Lead Plaintiff Wayne County
Employees' Retirement System and the proposed
Class***

89

KENDALL LAW GROUP, PLLC
JOE KENDALL
(Texas Bar No. 11260700)
3811 Turtle Creek Blvd., Suite 1450
Dallas, TX 75219
Telephone: 214/744-3000
214/744-3015 (fax)

*Local Counsel for Lead Plaintiff Wayne County
Employees' Retirement System and the proposed
Class*

VANOVERBEKE, MICHAUD & TIMMONY,
P.C.
THOMAS C. MICHAUD (*pro hac vice*)
(Mich. Bar No. P46787)
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200 313/578-1201 (fax)

*Counsel for Lead Plaintiff Wayne County
Employees' Retirement System and the proposed
Class*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing was served upon its filing via this Court's CM/ECF system on this 4th day of May, 2022, to all counsel of record.

<u>/s/ Christine M. Fox</u>

CHRISTINE M. FOX (*pro hac vice*)