UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

FORT WORTH DIVISION

| | | |
|---|---|---|
| In re FIRSTCASH HOLDINGS, INC.<br>SECURITIES LITIGATION | §<br>§<br>§<br>§ | Civil Action No. 4:22-cv-00033-P<br><br>CLASS ACTION |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS**

4875-5452-8550.v1

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ....................................................................................................1

II.   STATEMENT OF FACTS ......................................................................................2

III.  ARGUMENT ..........................................................................................................4

    A.   The Complaint Pleads Actionable Misrepresentations and Omissions ...................5

        1.   Defendants Issued Misleading Statements About the Regulatory
             Environment in Which the Company Operated ...........................................6

        2.   FirstCash Did Not Have Adequate Internal Controls and Training.............8

        3.   FirstCash's Numerous MLA Violations Artificially Inflated
             FirstCash's Financial Performance ...........................................................11

        4.   Defendants' Item 303 Violations Are Actionable .....................................15

    B.   The Complaint Sufficiently Pleads Scienter for Each Defendant..........................15

    C.   The Amended Complaint Pleads Loss Causation....................................................23

    D.   Defendants' §20(a) Challenges Must Fail as a Matter of Law ..............................25

IV.   CONCLUSION.....................................................................................................25

## TABLE OF AUTHORITIES

**Page**

**CASES**

*ABC Arbitrage Plaintiffs Grp. v. Tchuruk,*
 291 F.3d 336 (5th Cir. 2002) ....................................................................................4, 12

*Abrams v. Baker Hughes Inc.*,
 292 F.3d 424 (5th Cir. 2002) ........................................................................................21

*Aldridge v. A.T. Cross Corp.*,
 284 F.3d 72 (1st Cir. 2002)...........................................................................................13

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009).........................................................................................................4

*Barrie v. Intervoice-Brite, Inc.*,
 397 F.3d 249 (5th Cir. 2005) .....................................................................................5, 10

*Brody v. Zix Corp.*,
 No. 3:04-CV1931-K, 2006 WL 2739352
 (N.D. Tex. Sept. 26, 2006)............................................................................................10

*Budde v. Glob. Power Equip. Grp., Inc.*,
 No. 3:15-cv-1679-M, 2017 WL 6621540
 (N.D. Tex. Dec. 27, 2017) .............................................................................................20

*Budde v. Glob. Power Equip. Grp., Inc.*,
 No. 3:15-cv-1679-M, 2018 WL 4623108
 (N.D. Tex. Sept. 26, 2018), *aff'd*, 775 F. App'x 770 (5th Cir. 2019).....................................20

*Carlton v. Cannon,*
 184 F. Supp. 3d 428 (S.D. Tex. 2016) ...........................................................................12

*City of Omaha Police & Fire Ret. Sys. v. LHC Grp., Inc.*,
 No. 6:12-1609, 2013 WL 1100819
 (W.D. La. Mar. 15, 2013) ...............................................................................19, 22, 24

*Crutchfield v. Match Grp., Inc.*,
 529 F. Supp. 3d 570 (N.D. Tex. 2021) ...........................................................................21

*ECA & Loc. 134 IBEW Joint Pension Tr. of Chi.
 v. JP Morgan Chase Co.*,
 553 F.3d 187 (2d Cir. 2009)...........................................................................................17

- ii -

**Page**

*Edwards v. McDermott Int'l, Inc.*,
No. 4:18-CV-4330, 2021 WL 1421609
(S.D. Tex. Apr. 14, 2021) ..................................................................................4, 10

*Elec. Workers Pension Fund, Loc. 103, I.B.E.W.*
*v. Six Flags Ent. Corp.*,
524 F. Supp. 3d 501 (N.D. Tex. 2021) ..................................................7, 14, 16, 21

*Fitzpatrick v. Uni-Pixel, Inc.*,
35 F. Supp. 3d 813 (S.D. Tex. 2014) ........................................................................10

*Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,
514 F. Supp. 3d 942 (S.D. Tex. 2021) ......................................................................21

*Gamboa v. Citizens, Inc.*,
No. A-17-CV-241-RP, 2018 WL 2107205
(W.D. Tex. May 7, 2018),
*report and recommendation adopted*,
No. 1:17-CV-241-RP, 2018 WL 2422764
(W.D. Tex. May 29, 2018)................................................................................16, 21

*Haack v. Max Internet Commc'ns, Inc.*,
No. 3:00-CV-1662-G, 2002 WL 511514
(N.D. Tex. Apr. 2, 2002)..........................................................................................22

*Hall v. Rent-A-Center*,
No. 4:16cv978, 2017 WL 6379334
(E.D. Tex. Dec. 14, 2017)................................................................................10, 21

*In re ArthroCare Corp. Sec. Litig.*,
726 F. Supp. 2d 696 (W.D. Tex. 2010)......................................................................18

*In re Best Buy Co., Inc. Sec. Litig.*,
No. Civ. 03-6193ADMAJB, 2005 WL 839099
(D. Minn. Apr. 12, 2005) ...........................................................................................9

*In re BP p.l.c. Sec. Litig.*,
852 F. Supp. 2d 767 (S.D. Tex. 2012) .........................................................................9

*In re BP p.l.c. Sec. Litig.*,
922 F. Supp. 2d 600 (S.D. Tex. 2013) .......................................................................23

*In re Capstead Mortg. Corp. Sec. Litig.*,
258 F. Supp. 2d 533 (N.D. Tex. 2003) ......................................................................14

4875-5452-8550.v1

**Page**

*In re Cobalt Int'l Energy, Inc.*,
    No. H-14-3428, 2016 WL 215476
    (S.D. Tex. Jan. 19, 2016) ...................................................................................4, 10

*In re Fleming Cos. Inc. Sec. & Derivative Litig.*,
    No. CIVA503MD1530TJW, 2004 WL 5278716
    (E.D. Tex. June 16, 2004) ........................................................................4, 13, 16, 21

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
    No. 17-341, 2020 WL 1479128
    (E.D. Pa. Mar. 25, 2020)............................................................................................17

*In re Key Energy Servs., Inc. Sec. Litig.*,
    166 F. Supp. 3d 822 (S.D. Tex. 2016) .......................................................................20

*In re LDK Solar Sec. Litig.*,
    584 F. Supp. 2d 1230 (N.D. Cal. 2008) .....................................................................13

*In re Paincare Holdings Sec. Litig.*,
    541 F. Supp. 2d 1283 (M.D. Fla. 2008) .....................................................................20

*In re SolarWinds Corp. Sec. Litig.*,
    No. 1:21-CV-138-RP, 2022 WL 958385
    (W.D. Tex. Mar. 30, 2022) ...........................................................................4, 9, 10, 19

*In re Synchrony Fin. Sec. Litig.*,
    988 F.3d 157 (2d Cir. 2021).......................................................................................12

*In re Tenet Healthcare Corp. Sec. Litig.*,
    No. 3:16-CV-2848-C, 2017 WL 11638941
    (N.D. Tex. Dec. 20, 2017) ............................................................................................8

*In re Universal Access, Inc., Sec. Litig.*,
    No. 9:02 CV 103, 2004 WL 7350317
    (E.D. Tex. Apr. 16, 2004) ..................................................................................4, 5, 10

*Jacobowitz v. Range Res. Corp.*,
    No. 4:21-cv-0751-P, 2022 WL 976003
    (N.D. Tex. Mar. 31, 2022) ...................................................................................13, 14

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ............................................................................. *passim*

*Magruder v. Halliburton Co.*,
    359 F. Supp. 3d 452 (N.D. Tex. 2018) ................................................................14, 24

4875-5452-8550.v1

**Page**

*Martin v. GNC Holdings, Inc.*,
No. 2:15-cv-01522, 2017 WL 3974002
(W.D. Pa. Sept. 8, 2017), *aff'd*, 757 F. App'x 151 (3d Cir. 2018) ..........................................25

*McNamara v. Bre-X Minerals Ltd.*,
197 F. Supp. 2d 622 (E.D. Tex. 2001).................................................................................6

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) ...........................................................................................17

*Meyer v. Greene*,
710 F.3d 1189 (11th Cir. 2013) .........................................................................................24

*Miss. Pub. Emps.' Ret. Sys. v. Boston Sci. Corp.*,
523 F.3d 75 (1st Cir. 2008)................................................................................................12

*Mizzaro v. Home Depot, Inc.*,
544 F.3d 1230 (11th Cir. 2008) .........................................................................................17

*Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*,
935 F.3d 424 (5th Cir. 2019) .............................................................................................22

*Nathenson v. Zonagen Inc.*,
267 F.3d 400 (5th Cir. 2001) .............................................................................................16

*Neiman v. Bulmahn*,
854 F.3d 741 (5th Cir. 2017) .............................................................................................17

*Omnicare, Inc. v. Laborers Dist. Council Constr.*
*Indus. Pension Fund*,
575 U.S. 175 (2015)..............................................................................................................7

*Oughtred v. E\*Trade Fin. Corp.*,
No. 08 Civ. 3295(SHS), 2011 WL 1210198
(S.D.N.Y. Mar. 31, 2011) ..................................................................................................20

*Pirraglia v. Novell, Inc.*,
339 F.3d 1182 (10th Cir. 2003) .........................................................................................16

*Plumbers Loc. #200 Pension Fund v. Wash. Post Co.*,
930 F. Supp. 2d 222 (D.D.C. 2013)...................................................................................17

*Pub. Emps. Ret. Sys. of Miss., P.R. Tchrs. Ret. Sys.*
*v. Amedisys, Inc.*,
769 F.3d 313 (5th Cir. 2014) .......................................................................................23, 24

**Page**

*Ramirez v. Exxon Mobil Corp.*,
    334 F. Supp. 3d 832 (N.D. Tex. 2018) ...............................................................15, 24

*Rougier v. Applied Optoelectronics, Inc.*,
    No. 4:17-CV-2399, 2019 WL 6111516
    (S.D. Tex. Mar. 28, 2019)..................................................................................16

*Sapssov v. Health Mgmt. Assocs., Inc.*,
    22 F. Supp. 3d 1210 (M.D. Fla. 2014)................................................................25

*Shen v. Exela Techs., Inc.*,
    No. 3:20-CV-0691-D, 2022 WL 198402
    (N.D. Tex. Jan. 21, 2022)....................................................................................5

*Smith v. Reg'l Transit Auth.*,
    756 F.3d 340 (5th Cir. 2014) ...............................................................................5

*Southland Sec. Corp. v. INSpire Ins. Sols. Inc.*,
    365 F.3d 353 (5th Cir. 2004) ......................................................................8, 9, 21

*Spitzberg v. Hous. Am. Energy Corp.*,
    758 F.3d 676 (5th Cir. 2014) .......................................................15, 16, 21, 23

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)..................................................................................15, 22

*Walker v. Rent-A-Ctr.*,
    No. 5:02-CV-3-DF, 2005 WL 8161388
    (E.D. Tex. July 25, 2005)....................................................................................15

## STATUTES, RULES AND REGULATIONS

Federal Rule of Civil Procedure
    Rule 8(a)(2)........................................................................................................23
    Rule 9(b) ...................................................................................................4, 5, 23
    Rule 12(b)(6).......................................................................................................4

15 U.S.C.
    §78j(b)...............................................................................................................2, 5
    §78t(a) ...........................................................................................................2, 5, 25
    §78u-4(b)(1).........................................................................................................4

4875-5452-8550.v1

**Page**

17 C.F.R.

§229.105 ............................................................................................................... 2, 15

§229.303(b)(2)(ii) ................................................................................................. 2, 15

§232.5 ............................................................................................... 11, 12, 15, 19

§240.10b-5 .................................................................................................................. 2

4875-5452-8550.v1

Lead Plaintiff Wayne County Employees' Retirement System ("Plaintiff") respectfully submits this memorandum of law in opposition to Defendants' Motion to Dismiss the Amended Class Action Complaint (ECFs 45-46) ("Motion" or "Mot.").[1]

## I.    INTRODUCTION

As alleged in the Complaint, for over five years, Defendants[2] committed widespread and systemic violations of the Military Lending Act ("MLA") by issuing several thousand loans to active-duty service members and their dependents at astronomical rates – often exceeding 200%, far above the 36% ceiling mandated by the MLA.  However, Defendants concealed this from investors. From February 1, 2018 through and including November 12, 2021 (the "Class Period"), Defendants presented investors with the façade that FirstCash was both complying with the "stable" regulatory environment it was subject to and raking in "outstanding" revenues.

The reality, however, was FirstCash suffered from glaringly ineffective internal controls and employee training which led to the issuance of over 3,600 loans to over 1,000 military families in violation of the MLA.  The Consumer Financial Protection Bureau ("CFPB") ultimately revealed to FirstCash's investors the truth of Defendants' longstanding MLA violations on November 12, 2021, detailing the five-year history of MLA violations in a complaint filed against the Company in this Court.  In response to the news, the market punished FirstCash's stock, as the stock price plummeted over 14.6% or $12.65 per share.  As of the filing of the Complaint, the CFPB's investigation discovered over 3,600 violations in just four of the 25 states in which FirstCash operated but

---

[1]    Unless otherwise noted: (i) capitalized terms have the same meanings as in the Amended Complaint for Violations of the Federal Securities Laws (ECF 42) ("Complaint"); (ii) citations to "¶" and "¶¶" are to paragraphs in the Complaint; (iii) all emphasis is added; and (iv) internal citations are omitted.

[2]    "Defendants" are FirstCash Holdings, Inc. ("FirstCash" or the "Company"), Rick L. Wessel ("Wessel"), and R. Douglas Orr ("Orr"), and the "Individual Defendants" are Wessel and Orr.

- 1 -

4875-5452-8550.v1

remained ongoing.[3]   Then, on June 17, 2022, the CFPB amended its complaint – with FirstCash's consent – to add 18 more Company subsidiaries as defendants, including three in FirstCash's largest market, Texas.  *See* Amended Complaint, *CFPB v. FirstCash, Inc.*, No. 4:21-cv-01251-P (N.D. Tex. June 17, 2022), ECF 49-1.  Here, the Complaint alleges that Defendants violated §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.[4]

## II.    STATEMENT OF FACTS

In 2006, Congress enacted the MLA to protect military members and their dependents from predatory lending practices by prohibiting the extension of "consumer credit" with an "annual percentage rate of interest greater than 36 percent."  ¶36.  The MLA also required certain payment obligation disclosures to be made to potential borrowers and it prohibited forced arbitration clauses. *Id.*  In 2015, the Department of Defense expanded the MLA's definition of "consumer credit" to include pawn loans and required lenders to conduct a "covered borrower check" in the newly formed MLA Database in order to avail themselves of the MLA's safe harbor protections.  ¶¶51-54.

In September 2016, FirstCash merged with Cash America International, Inc. ("Cash America").  ¶32.  Prior to the merger, Cash America issued MLA-violative payday loans to military personnel.  ¶42.  These violations resulted in a CFPB consent order requiring Cash America to cease and desist from MLA violations, to pay $13 million in penalties, and to establish a compliance plan to prevent future MLA violations, including sufficient training and education programs (the "2013

---

[3]   On March 19, 2022, Plaintiff sent a Freedom of Information Act ("FOIA") request to the CFPB. On March 29, 2022 and again on April 8, 2022, the CFPB informed Plaintiff that it would not provide responsive documents pursuant to exemptions 4, 5, and 7 because: (1) the CFPB's investigation was ongoing; (2) the responsive documents were protected work product; and (3) Defendants had marked responsive documents confidential.

[4]   The Complaint also alleges violations of Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303") and Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105").  ¶¶195-197.

4875-5452-8550.v1

Consent Order"). ¶¶44-45. At the time of the merger, Cash America was required to present the 2013 Consent Order to Defendants and its obligations transferred to FirstCash. ¶¶46-47. Defendants publicly recognized that they were beholden to the 2013 Consent Order. ¶85.

As of October 20, 2021, FirstCash operated stores in 25 U.S. states and the District of Columbia. ECF 47-1 at 746 of 783. Pawn loans constituted the vast majority of FirstCash's revenue throughout the Class Period, ranging from 96%-99%. *See, e.g.*, ¶¶96, 152. According to the CFPB, FirstCash engaged in illegally usurious loan practices beginning as early as October 2016. ¶200. CFPB Director Rohit Chopra ("Chopra") revealed that Defendants "gouged" over 1,000 military families and "robbed them of their rights to go to court" for at least 3,600 loans. *Id.* Chopra labeled Defendants "repeat offenders" who "engaged in large-scale harm" despite being "on clear notice of their obligations" under the 2013 Consent Order, to which they "willingly consented." ¶74.

Throughout the Class Period, Defendants misleadingly told investors that FirstCash complied with all relevant regulatory regimes, including the MLA, because of its "well-trained internal audit staff," "extensive" employee-training programs, and "proprietary computer information system." *See, e.g.*, ¶¶82-84, 110-112, 140-142, 171-176. Defendants also falsely allayed investors' concerns about the regulatory environment in which FirstCash operated, often describing it as "stable," with "no significant negative regulatory changes in the last 25 years," or even "continu[ing] to improve." *See, e.g.*, ¶¶80, 88, 177, 183. Furthermore, Defendants concealed from investors that the revenue numbers touted by them in SEC filings were inflated by the issuance of at least 3,600 allegedly MLA-violative loans, which were subject to immediate cancellation. *See, e.g.*, ¶¶37, 77-78, 83, 191-193.

On November 12, 2021, following an investigation that included two Civil Investigative Demands, the CFPB filed a complaint in this Court, initiating an enforcement action against FirstCash alleging violations of the MLA. ¶¶70-71. The market reacted sharply to the news,

- 3 -

Case 4:22-cv-00033-P    Document 52    Filed 07/13/22    Page 12 of 36    PageID 1151

causing FirstCash's stock price to plummet by $7.50 per share, or more than 8.7% that same day, and it dropped a further $5.15 per share, or 6.6% the next trading day.  ¶¶72, 225.

## III.    ARGUMENT

As courts in this Circuit observe, "[m]otions to dismiss under Rule 12(b)(6) 'are viewed with disfavor and are rarely granted.'" *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009); *see also In re SolarWinds Corp. Sec. Litig.*, No. 1:21-CV-138-RP, 2022 WL 958385, at \*3 (W.D. Tex. Mar. 30, 2022) (same).  "Furthermore, the PSLRA 'was not enacted to raise the pleading burdens under Rule 9(b) and §78u-4(b)(1) to such a level that facially valid claims, which are not brought for nuisance value or as leverage to obtain a favorable or inflated settlement, must be routinely dismissed on Rule 9(b) and 12(b)(6) motions.'" *Edwards v. McDermott Int'l, Inc.*, No. 4:18-CV-4330, 2021 WL 1421609, at \*8 (S.D. Tex. Apr. 14, 2021) (quoting *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 354 (5th Cir. 2002)); *see also In re Universal Access, Inc., Sec. Litig.*, No. 9:02 CV 103, 2004 WL 7350317, at \*15 (E.D. Tex. Apr. 16, 2004) ("The PSLRA is a mechanism for winnowing out suits that lack a requisite level of specificity.  It was not meant to grant business and management a free reign to create false impressions in the minds of shareholders and investors.").  Indeed, "the particularity rules should not be interpreted to require the pleading of facts which, because of the lack of discovery, are in defendants' exclusive possession."  *In re Fleming Cos. Inc. Sec. & Derivative Litig.*, No. CIVA503MD1530TJW, 2004 WL 5278716, at \*6 (E.D. Tex. June 16, 2004).  "[S]uch a requirement is impossible at the pleading stage."  *Id.*

At the pleading stage, a complaint need only contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Because the "complaint must be liberally construed in favor of the plaintiff, and all facts pleaded . . . taken as true," the Court need not, and should not, resolve any disputed fact issues.  *In re Cobalt Int'l Energy, Inc.*, No. H-14-3428, 2016 WL 215476, at \*2 (S.D. Tex. Jan. 19, 2016); *see*

- 4 -

4875-5452-8550.v1

*also Smith v. Reg'l Transit Auth.*, 756 F.3d 340, 347 (5th Cir. 2014) (finding that disputed questions of fact should not be resolved on a motion to dismiss for failure to state a claim); *Universal Access*, 2004 WL 7350317, at \*16 (arguments concerning "the reliability of witnesses and the truth or falsity of Plaintiffs' allegations . . . are ineffective at the pleading stage").

Here, Defendants challenge the Complaint's allegations of actionable misstatements, scienter, and loss causation. *See* Mot. at 5-25. Despite Defendants' attempt to have this Court review its allegations in isolation, as opposed to holistically and in their entire context, the Complaint satisfies the pleading requirements for stating a claim under §§10(b) and 20(a) of the Exchange Act because it: (1) identifies each misstatement with particularity; (2) provides a multitude of reasons why the statements were materially misleading; (3) demonstrates that Defendants were severely reckless in making the statements; (4) alleges a causal connection between the material misrepresentations and the loss; and (5) conclusively establishes that the Individual Defendants are control persons.[5]

## A. The Complaint Pleads Actionable Misrepresentations and Omissions

The Complaint satisfies Federal Rule of Civil Procedure 9(b) by specifying ""the statements contended to be fraudulent, . . . the speaker, . . . when and where the statements were made, and . . . why the statements were fraudulent."" *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 255-56 (5th Cir. 2005); *see also Shen v. Exela Techs., Inc.*, No. 3:20-CV-0691-D, 2022 WL 198402, at \*6 (N.D. Tex. Jan. 21, 2022) (finding the misstatements were pleaded with particularity when the statement was identified and the reason why it was misleading was provided); ¶¶75-198 (listing each alleged misstatement, its source, and providing the reasons why it was materially misleading). Because many of Defendants' statements were misleading by omission, they are "measured not by literal truth," but rather by their ability "to accurately inform rather than mislead prospective buyers."

---

[5]   Defendants do not substantively challenge the Complaint's control person allegations.

4875-5452-8550.v1

*Lormand*, 565 F.3d at 248; *see also McNamara v. Bre-X Minerals Ltd.*, 197 F. Supp. 2d 622, 687 (E.D. Tex. 2001) (a "'defendant may not deal in half-truths'"). Therefore, courts in the Fifth Circuit "'have long held under Rule 10b-5, a duty to speak the full truth arises when a defendant undertakes a duty to say anything.'" *Lormand*, 565 F.3d at 249.

Defendants' Motion groups the misstatements into three categories: (1) regulatory environment; (2) Company operations and training; and (3) financial performance. Each category is addressed, in turn, below.

### 1. Defendants Issued Misleading Statements About the Regulatory Environment in Which the Company Operated

Throughout the Class Period, Defendants materially misled investors about the regulatory environment in which they operated, often describing it as "stable," with "no significant negative regulatory changes in the last 25 years,"[6] or even "continu[ing] to improve." *See, e.g.*, ¶¶80, 88, 90, 115. In February 2021, Defendants went so far as to publicly tell investors that FirstCash had "limited regulatory exposure." ¶177. These statements were misleading in light of the expansion of the MLA – a significant federal regulation – to cover pawn loans, like those FirstCash offers. ¶54. By 2019, Defendants finally admitted that the expanded MLA covered products that FirstCash offered. ¶113. However, unlike prior years, Defendants removed any statement from its public filings as to whether or not the Company actually offered any of its products, including pawn loans, to military members or their dependents. ¶¶113-114, 144. These statements misleadingly omitted the known risks the expansion of the MLA presented, the probability of FirstCash's violations of the MLA, and the anticipated magnitude the MLA expansion's risk posed for the Company. *See Lormand*, 565 F.3d at 248 (finding "[t]he omission of a known risk, its probability of materialization, and its anticipated magnitude" were material to disclosures).

---

[6] Notably, starting in May 2021, Defendants updated this language in their relevant SEC filings to state "minimal regulatory changes over the last 25 years." ¶183.

- 6 -

Defendants also publicly declared FirstCash's "limited exposure to CFPB rules for payday lending"; however, Defendants omitted any mention of the Company's significant exposure under the expanded MLA and the 2013 Consent Order, *i.e.*, information material to the average FirstCash investor. ¶¶81, 90-91. These repeated, material omissions were misleading because Defendants touted FirstCash's limited exposure to certain regulations without informing investors of the Company's increased exposure to others. *See Lormand*, 565 F.3d at 248-49 ("Once the defendants engaged in public discussions concerning the benefits . . . they had a duty to disclose a 'mix of information' that is not misleading.").

In their Motion, Defendants wrongly claim that these are non-actionable opinion statements. Mot. at 10-11. The Supreme Court holds that an opinion can be misleading because a reasonable investor expects that a defendant's publicly expressed opinion "fairly aligns with the information in the issuer's possession at the time." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186, 188-89 (2015). Additionally, "literal accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another." *Id.* at 192. Even if considered opinions, investors were likely to be misled by Defendants' misstatements because Defendants knew, or disregarded with severe recklessness, that the MLA expansion had a significant negative impact on FirstCash's business and compliance abilities, yet their statements did not reflect that knowledge. The purported "extensive disclosures" Defendants' Motion cites to may have conveyed ***potential*** risks, but did not disclose that the Company knew, or disregarded with severe recklessness, that it was ***currently*** experiencing these drawbacks.[7]

---

[7]   *See, e.g.*, Mot. at 10 ("'***[i]f*** changes in regulations affecting the Company's pawn, credit services and consumer loan businesses create increased restrictions . . . such regulations ***could*** materially impair or reduce the Company's pawn . . . businesses'"); *id.* at 11 ("'The CFPB . . . ***could*** exercise its enforcement powers in ways that ***could*** have a material adverse effect on the Company's business and financial results.'"); *id.* ("'Any noncompliance with the Consent Order, continuing obligations

- 7 -

Finally, Defendants incorrectly label these misstatements as puffery and rely upon inapposite case law concerning compliance with ethical norms – an issue that is not relevant to this case. Mot. at 12 (citing *In re Tenet Healthcare Corp. Sec. Litig.*, No. 3:16-CV-2848-C, 2017 WL 11638941, at *4 (N.D. Tex. Dec. 20, 2017)). However, Defendants' misstatements concerning FirstCash's regulatory environment contain "'concrete factual or material misrepresentation[s]'" and are thus actionable. *Southland Sec. Corp. v. INSpire Ins. Sols. Inc.*, 365 F.3d 353, 372 (5th Cir. 2004). One such factual misrepresentation made by Defendants starting in 2018 was that there were "no significant negative regulatory changes in the last 25 years," when in fact the MLA was enacted in 2006 and expanded in 2015 to cover pawn loans like those FirstCash offers. Because 96%-99% of FirstCash's revenue came from pawn loans, Defendants' failure to publicly acknowledge the MLA as a significant regulatory change would mislead a reasonable investor as to the actual impact the MLA had on FirstCash's business.

### 2.    FirstCash Did Not Have Adequate Internal Controls and Training

Because Defendants recognized that none of the Company's products carried an "annual percentage rate of 36% or less," they publicly stated that FirstCash was "unable to offer any of its current credit products, including pawn loans, to members of the U.S. military or their dependents." ¶55. Yet, because of FirstCash's weak internal controls and ineffective training, the Company issued ***thousands*** of loans in excess of 36% to military personnel or their dependents in violation of both the MLA and the 2013 Consent Order. Defendants never disclosed these violations to FirstCash investors. Instead, Defendants chose to publicly, yet misleadingly, proclaim that the

---

or similar orders or agreements from other regulators ***could*** lead to further regulatory penalties and ***could*** have a material adverse effect on the Company's business.'").

4875-5452-8550.v1

Company complied with the regulatory regime it was subject to, including the MLA,[8] because of FirstCash's "well-trained internal audit staff," "extensive" employee-training programs, and "proprietary computer information system." *See, e.g.*, ¶¶110, 171-176. These specific statements of then-present fact cannot be categorized as simple puffery. *See SolarWinds*, 2022 WL 958385, at *8 (finding statements such as "'[e]mployees are provided with security training'" to be "specific statements of fact" not "corporate puffery"). In fact, one of the decisions Defendants' Motion relies on for its puffery argument (*see* Mot. at 13), held that statements concerning an allegedly company-wide safety program were ***not*** puffery when the company had a history of safety issues and knew the safety program was not actually used for the entire company. *See In re BP p.l.c. Sec. Litig.*, 852 F. Supp. 2d 767, 803-04 (S.D. Tex. 2012). Applying the *BP* reasoning here, Defendants' statements concerning the Company's regulatory compliance were material because FirstCash and its affiliates had a record of MLA violations and Defendants repeatedly touted their purported compliance efforts to investors. Yet, what made these public reassurances of MLA compliance materially misleading was that Defendants knew, or recklessly disregarded, that FirstCash did not have sufficient internal controls to prevent widespread MLA violations.[9] Thus, Defendants' claim of puffery falls flat.

The Complaint pleads a multitude of facts supporting its allegations that Defendants' statements and omissions materially mislead investors. Principally, FirstCash repeatedly violated the

---

[8]    Conspicuously absent from the Motion are any arguments concerning Defendants' false and misleading statements that the Company complied with the MLA. *See, e.g.*, ¶175. Defendants know these statements are likely to mislead investors and demonstrably false as evidenced by the over 3,600 MLA violations alleged by the CFPB to date.

[9]    The remaining cases cited by Defendants do not support their position. For example, *Southland* involved optimistic statements about the company's product and not specific representations about regulatory compliance, employee training, and internal controls. *See* 365 F.3d at 372. Additionally, the court in *In re Best Buy Co., Inc. Sec. Litig.*, No. Civ. 03-6193ADMAJB, 2005 WL 839099 (D. Minn. Apr. 12, 2005), did not discuss puffery and instead held that references to inadequate training without any evidence – not the case here – were not sufficiently particular for pleading falsity. *See id.* at *5.

4875-5452-8550.v1

MLA over a multi-year period, demonstrating the insufficiency of its employee training, computer systems, and the internal audits that Defendants misleadingly boasted about to investors in Class Period SEC filings.  Moreover, corroborating accounts from former FirstCash employees support the Complaint's allegations that the Company had insufficient training, education, and internal auditing procedures concerning MLA compliance.  ¶¶59-60, 64-69.  Courts in this Circuit regularly rely upon confidential witness ("CW") allegations to establish falsity and scienter at this stage where, as here, the complaint clearly lays out all of the CW's job titles and descriptions, time frame of employment, and what the witness knew in relation to the fraud.  *See Brody v. Zix Corp.*, No. 3:04-CV1931-K, 2006 WL 2739352, at \*4-\*5, \*7 (N.D. Tex. Sept. 26, 2006); *see also Barrie*, 397 F.3d at 259 (relying on CW allegations that supported falsity and scienter where the sources were "'identified through general descriptions in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements made on information and belief'"); *Universal Access*, 2004 WL 7350317, at \*6 (same); *Fitzpatrick v. Uni-Pixel, Inc.*, 35 F. Supp. 3d 813, 827-31 (S.D. Tex. 2014) (finding certain statements actionable largely based on a single CW's allegations); *Cobalt*, 2016 WL 215476, at \*3 (because the "basis for [CWs'] knowledge is set forth in the [c]omplaint" the allegations "based on knowledge obtained from these witnesses **will not be discounted**"); *Edwards*, 2021 WL 1421609, at \*9 (relying in part on allegations from CWs to establish falsity and scienter); *SolarWinds*, 2022 WL 958385, at \*7 (same); *Hall v. Rent-A-Center*, No. 4:16cv978, 2017 WL 6379334, at \*10 (E.D. Tex. Dec. 14, 2017) (same).

Defendants argue that the CWs admit to the existence of training and audits related to "'inventory, accounting, and related controls.'"  Mot. at 13.  However, Defendants' Motion fails to mention the CW statements that these trainings were vague, unclear, ineffective, and not enforced. ¶¶67-68.  Remarkably, employees admitted to continuing to process loans without verifying military

- 10 -

status, or even ignoring when a prospective borrower presented military ID. ¶¶67-69. The Motion also ignores the allegations that the audit checklist did not require the review of military loan applications. ¶60. Moreover, Defendants effectively admit that the computer system did not independently verify the military status of the borrower. *See* Mot. at 21 n.17. Instead, employees were forced to rely on representations of the prospective borrower and manually check a box if the borrower admitted military membership, which is insufficient for safe harbor protection under the 2015 amendment to the MLA. *Id.*; *see also* 32 C.F.R. §232.5.

Once Defendants chose to publicly speak about FirstCash's MLA compliance by publicly touting the Company's alleged training, education, computer systems, and audits, they were required to provide the whole truth to investors. *See Lormand*, 565 F.3d at 249 ("'under Rule 10b-5, a duty to speak the full truth arises when a defendant undertakes a duty to say anything'"). Defendants failed to do so, and instead, misled the market about the Company's compliance with the applicable regulations, including the MLA and the 2013 Consent Order.

### 3.    FirstCash's Numerous MLA Violations Artificially Inflated FirstCash's Financial Performance

At the start of the Class Period, Defendants publicly announced the Company's financial results for both the fourth quarter of 2017 and the entire fiscal year for 2017 – which was the first full year Defendants were subject to the new MLA regulations and the first full year after the merger with Cash America. ¶77. Defendants' press release touted "record revenue, net income and earnings per share" for the year, which defendant Wessel described as "outstanding." ¶¶77-78. Defendant Wessel also boasted to investors that "all Cash America stores have been converted to the proprietary FirstPawn point of sale and loan management platform" which would "lead to further efficiencies and improved operating metrics over time." ¶79. What Defendants failed to disclose was that FirstCash's ineffective internal controls led to thousands of loans to be issued to active-duty military personnel and their dependents at interest rates far exceeding the 36% annual percentage

- 11 -

rate ceiling allowed by the MLA and additionally "robbed [military borrowers] of their rights to go to court." ¶¶70-71, 199-202. Under the MLA, the offending loans were subject to immediate cancellation and the Company's revenues would suffer. ¶37. Defendants continuously touted the Company's financial results without disclosing that their "outstanding" results occurred, in large part, because of violations of the MLA and the 2013 Consent Order. *See, e.g.*, ¶¶37, 107-108, 111, 191-193 (touting revenue numbers, U.S. pawn loan fees, and outstanding pawn loans).

Defendants' Motion wrongly claims that there are no "particularized facts demonstrating that the Company violated the MLA." Mot. at 7. First, the plaintiffs "'need not allege all facts that may be related to their claims, since such a requirement is impossible at the pleading stage because, in nearly every securities fraud case, only the defendants know all the facts related to the alleged fraud.'" *Carlton v. Cannon*, 184 F. Supp. 3d 428, 474 (S.D. Tex. 2016) (quoting *Tchuruk*, 291 F.3d at 354); *see also In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 161 (2d Cir. 2021) ("[E]ven securities plaintiffs need not prove their entire case within the confines of the complaint."); *Miss. Pub. Emps.' Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 90 (1st Cir. 2008) (the PSLRA does not "'hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence'" and "'plaintiffs [cannot] be expected to plead fraud with complete insight'"). Second, the Complaint alleges that from at least October 2016 until May 2021 there were over 3,600 loans issued to over 1,000 military families with an annual percentage rate that far exceeded the 36% allowed by the MLA. ¶200. Additionally, the Complaint makes clear that Defendants did not have a policy of utilizing the MLA Database – which was free, publicly available, and easy to use – to complete required "covered borrower" checks. ¶¶62-64. Under the 2015 MLA expansion, checking the MLA Database was effectively the only means to qualify for safe harbor protection. ¶9 n.4; *see also* 32 C.F.R. §232.5. Thus, the Complaint pleads the MLA violations with particularity.

Defendants' own statements contradict their argument that these MLA violations are unconnected to the Company's financial statements. *See* Mot. at 8; *see also id.* at 11 ("'The CFPB . . . could exercise its enforcement powers in ways that could have a material adverse effect on the Company's business and financial results.'"). By statute, loans that violate the MLA are subject to immediate cancellation. ¶37. Therefore, as Defendants recognized, when the CFPB discovered and acted on FirstCash's MLA violations, the Company's business and financial results would be materially and adversely affected. Additionally, because none of their products carried an annual percentage rate below 36%, Defendants acknowledged that, absent these blatant violations, the MLA should have shrunk their consumer market. ¶85. Instead, Defendants extended at least 3,600 offending loans, inflating FirstCash's financial results by at least the dollar amount of those loans. At this pre-discovery stage of the litigation, only Defendants know the exact number and amount of the offending loans, but with the ongoing investigation by the CFPB and its recent amendment of the enforcement action complaint, it is likely to be far more than just 3,600 loans. ¶¶200-201.[10] Again, the pleading of facts that are in the exclusive possession of Defendants is not required at this stage. *Fleming*, 2004 WL 5278716, at *6.[11]

This Court's prior rulings in other cases on the linkage between the underlying fraud and the Company's financial statements are distinguishable from this case. For example, unlike here, the plaintiff in *Jacobowitz v. Range Res. Corp.*, No. 4:21-cv-0751-P, 2022 WL 976003 (N.D. Tex. Mar.

---

[10]   As mentioned *supra*, the CFPB has so far refused to produce documents in response to Plaintiff's FOIA request.

[11]   Defendants also incorrectly imply that the lack of a restatement of the Company's financial results means that the statements related to FirstCash's financial results cannot be considered misleading. *See* Mot. at 7; *but see Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) ("[T]the fact that the financial statements for the year in question were not restated does not end Aldridge's case when he has otherwise met the pleading requirements of the PSLRA."); *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1245 (N.D. Cal. 2008) ("[T]he lack of a restatement did not mean that LDK only engaged in legitimate conduct.").

4875-5452-8550.v1

31, 2022), failed to allege that the misclassified wells (the underlying fraud) affected the accounting figures which plaintiff claimed were misstated. *See id.* at *11. Similarly, the plaintiff in *Elec. Workers Pension Fund, Loc. 103, I.B.E.W. v. Six Flags Ent. Corp.*, 524 F. Supp. 3d 501 (N.D. Tex. 2021), failed to establish why the revenue numbers were improper under GAAP, and instead relied on assumptions (not evidence) that recorded revenue was not actually received on international licensing agreements. *See id.* at 529; *see also* Consolidated Complaint, ¶167, *In re Six Flags Ent. Corp. Sec. Litig.*, No. 4:20-cv-00201-P (N.D. Tex. July 20, 2020), ECF 50. Here, however, the Complaint alleges that FirstCash's revenues were necessarily inflated by the 3,600 MLA violating loans. In other words, if Defendants had complied with the MLA, FirstCash's revenues would have been reduced by the dollar amount of at least those 3,600 loans.[12]

Defendants also lob strawman arguments that can be easily dismissed. First, the statistics for Cash America's previous MLA violations carries no importance here. *See* Mot. at 9. Those violations concerned a different type and quantity of loans, and while Defendants note the total amount of the violations, Defendants fail to mention the $13 million worth of penalties and fees Cash America incurred. *See* ¶45. Second, Defendants assume they will be ultimately successful in the CFPB enforcement action because of the *bona fide* error defense; yet, that argument is both improper and irrelevant as Defendants have presented no evidence that they qualify for the defense in either this litigation or the one involving the CFPB. *See* Opposition Brief, *CFPB v. FirstCash, Inc.*, No. 4:21-cv-01251-P (N.D. Tex. June 1, 2022), ECF 46; ¶¶64-65. However, there is evidence the *bona fide* error defense does not apply because, as an example, FirstCash did not have proper

---

[12]  Defendants' other cases suffer from similar factual deficiencies that are not present in this litigation. *See In re Capstead Mortg. Corp. Sec. Litig.*, 258 F. Supp. 2d 533, 552 (N.D. Tex. 2003) (finding plaintiffs failed to allege facts that demonstrated that the securities were misclassified under GAAP); *Magruder v. Halliburton Co.*, 359 F. Supp. 3d 452, 466 (N.D. Tex. 2018) (finding allegations of insufficient reserves inadequate when the only allegation is that they were off by a "huge multiple" without anything further).

procedures, like checking the MLA Database, in place to avail itself of the MLA safe harbor. *See* 32 C.F.R. §232.5; ¶¶9 n.4, 64-65.

### 4.  Defendants' Item 303 Violations Are Actionable

Item 303 requires companies like FirstCash to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." ¶195.[13]  Defendants' sole argument is that Item 303 does not create a duty to disclose and therefore does not create an actionable securities fraud claim. Mot. at 13. However, because the Complaint "adequately explained the reason or reasons 'why' [Defendants'] alleged violation of Item 303 is misleading or fraudulent," these allegations are actionable. *Walker v. Rent-A-Ctr.*, No. 5:02-CV-3-DF, 2005 WL 8161388, at *14 (E.D. Tex. July 25, 2005). In violation of Item 303, Defendants failed to disclose both the Company's deficient internal controls concerning MLA compliance and the widespread and systemic violations of the MLA, which when discovered by the CFPB were reasonably likely to have a material unfavorable impact on the Company's revenues. Failing to publicly disclose either the MLA violations or the likelihood that they were occurring, made these omissions materially misleading and Defendants' Item 303 violations actionable.

### B.  The Complaint Sufficiently Pleads Scienter for Each Defendant

In the Fifth Circuit, "'[t]he required state of mind for scienter is an intent to deceive, manipulate, or defraud or severe recklessness.'" *Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 684 (5th Cir. 2014). The Complaint's scienter allegations must be assessed "holistically," and cannot be scrutinized in isolation. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23, 326 (2007); *see also Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 845 (N.D. Tex. 2018) ("In determining whether the plaintiff alleged a strong inference of scienter, the court must consider the

---

[13]  The Complaint also alleges violations of Item 105, which Defendants do not challenge.

complaint in its entirety . . . .").  Thus, the Motion's repetitive arguments that, standing alone or out of context, certain facts alleged in the Complaint are insufficient for scienter, must fail.  *See* Mot. at 16-18, 20.  In fact, the inference of scienter "'need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences.'"  *Lormand*, 565 F.3d at 251.  Rather, it need only be "'cogent and at least as compelling as any opposing inference one could draw from the facts alleged'" and, if both sets of inferences are compelling, "'a tie favors the plaintiff.'"  *Spitzberg*, 758 F.3d at 684, 686; *see also Lormand*, 565 F.3d at 254.

Scienter may be pled through "allegations of circumstantial evidence of conscious misbehavior or recklessness."  *Fleming*, 2004 WL 5278716, at *11 ("there will rarely be direct evidence of intent to defraud"); *see also Lormand*, 565 F.3d at 251 ("'Allegations of circumstantial evidence justifying a strong inference of scienter will suffice.'"); *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 410 (5th Cir. 2001) (there is not "any question . . . circumstantial evidence can support a strong inference of scienter").  Thus, contrary to Defendants' assertions, the sufficient pleading of scienter does not require "'smoking gun' documents," communications between CWs and the Individual Defendants, accounting restatements, or insider stock sales.  Mot. at 23; *see also Rougier v. Applied Optoelectronics, Inc.*, No. 4:17-CV-2399, 2019 WL 6111516, at *13 (S.D. Tex. Mar. 28, 2019) ("While Defendants have shown that Plaintiff has not alleged any smoking gun facts showing that Murry and Lin acted with scienter, Plaintiff need not plead these facts to withstand dismissal at this stage."); *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1191 n.12 (10th Cir. 2003) ("We will not, as defendants request, infer from the fact that they did not sell their Novell stock that they lacked motive to defraud investors.").[14]  The Complaint pleads circumstantial evidence that, when added up and reviewed holistically, create a cogent and compelling inference of scienter for each defendant.

---

[14]  Defendants' cases do not stand for the proposition that insider stock sales are required.  *See Gamboa v. Citizens, Inc.*, No. A-17-CV-241-RP, 2018 WL 2107205, at *4 (W.D. Tex. May 7, 2018)

- 16 -

4875-5452-8550.v1

To begin with, Defendants admitted in FirstCash's SEC filings that the Company's "proprietary computer information system" allowed management to "to continuously monitor store transactions, assets, loans, and operating results." *See, e.g.*, ¶172. The case law Defendants rely on makes clear that internal corporate reports may support the inference of scienter. *See* Mot. at 16 (citing *Neiman v. Bulmahn*, 854 F.3d 741, 748 (5th Cir. 2017)). Logically, having access to this information demonstrates that the Individual Defendants turned a blind eye to – or at the very least were severely reckless in not knowing about – the widespread violations of both the MLA and the 2013 Consent Order for ***at least five years***. ¶214; *see also In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, No. 17-341, 2020 WL 1479128, at *13 (E.D. Pa. Mar. 25, 2020) ("Indeed, 'allowing recklessness to serve as a sufficient basis for liability "promotes the policy objective[] of discouraging deliberate ignorance."'"). Defendants wrongly claim that the Complaint failed to identify the "who, what, and when" of the information received by the Individual Defendants. *See* Mot. at 15-16. It is clear that the Individual Defendants are included in the Complaint reference to "management," meaning they had "continuous" access to "store transactions" and "operating results" allowing the Individual Defendants access to the numerous loans that violated the MLA.[15]

---

(noting that insider stock sales "are not required"), *report and recommendation adopted*, No. 1:17-CV-241-RP, 2018 WL 2422764 (W.D. Tex. May 29, 2018); *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1253 n.3 (11th Cir. 2008) ("emphasiz[ing] that suspicious stock sales are not ***necessary*** to create a strong inference of scienter") (emphasis in original); *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008) (stating that insider trading could "support scienter" if it is alleged to be suspicious); *Plumbers Loc. #200 Pension Fund v. Wash. Post Co.*, 930 F. Supp. 2d 222, 227 (D.D.C. 2013) (stating "lack of stock sales during the class period is not dispositive"); *ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198-99 (2d Cir. 2009) (agreeing scienter can be established either through motive or "strong circumstantial evidence of conscious misbehavior or recklessness").

[15]   These are also not simply allegations claiming "defendants must have known of the fraud given their positions." Mot. at 17. Defendants themselves admitted that because of their positions, they had access to such information and thus should have known of the MLA violations. ¶172.

4875-5452-8550.v1

But the fact that the Individual Defendants had the ability to continuously monitor store transactions and operating results is not the sole scienter allegation present in the Complaint. Indeed, the magnitude and time-span of the alleged fraud bolsters the strong inference of scienter. *See In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 722 (W.D. Tex. 2010) (finding that "the magnitude of the [accounting fraud], the fact it occurred over a substantial period of time [of four years], [and] the relative simplicity of the issues involved . . . significantly contribute to a finding of scienter on the part of the Individual Defendants"). FirstCash's *at least* 3,600 MLA violations from only four of the 25 states FirstCash operated pawn stores in have been occurring for *at least* five years. ¶¶199-201. There are likely to be more MLA violations in the other 21 states. *Id.* According to the CFPB Director, Defendants were "repeat offenders" that were "engaged in large-scale harm." ¶74. This was no small mishap, but rather was a widespread and persistent failure to comply with the MLA and 2013 Consent Order – which, in turn, strongly suggests that the Individual Defendants knew or, at the very least, were severely reckless in not knowing, about the fraud.

Moreover, as certified by the Individual Defendants in FirstCash's quarterly and annual filings with the SEC, they were responsible for implementing *effective* internal controls, training, and education, which they recklessly failed to do. ¶216. Having at least 3,600 non-compliant loans (in just four states) demonstrates the widespread ineffectiveness of the controls and training programs Defendants supposedly had in place. Corroborating CW allegations confirm that Defendants' supposed policies, training, and controls departed from the standards of ordinary care required to prevent MLA violations.[16]

For example, CW-1 and CW-2 explained that MLA compliance, based on their experience, was not a priority for FirstCash. ¶¶59-60. In fact, the Company's audit checklist did not require

---

[16]  As confirmed *supra*, because the CWs are sufficiently identified, the CW allegations in the Complaint should be considered for purposes of establishing scienter.

- 18 -

4875-5452-8550.v1

auditing military loan applications. ¶60. Multiple former employees confirmed that the Company did not educate, train, or even inform employees about the free and easy-to-use MLA Database. ¶64. As a result, employees did not check the MLA Database to ensure loans were being made to eligible customers and instead employed a "[d]on't tell – don't ask" process for checking military status. ¶65. Tellingly, Defendants do not claim that the Company did require checking the MLA Database but instead state it is not mandatory. Mot. at 21. But checking the MLA Database was effectively the only means by which the Company could invoke the MLA's safe harbor protection, making the methods for liability protections identified in the Motion inapplicable. *See* Mot. at 21-22 n.17; *see also* 32 C.F.R. §232.5; ¶9 n.4. Ultimately, the fact that employees were not even aware of the existence of the MLA Database demonstrates a clear failure to provide sufficient training and education on MLA compliance, which rises to the level of severe recklessness necessary to plead scienter. *See SolarWinds*, 2022 WL 958385, at *7 (finding that CW statements that they were unaware of security policies and did not receive training aided the inference of scienter).

Similarly, Defendants' argument that the Complaint admits that FirstCash did provide MLA training misses the point. Mot. at 22. According to CW-5, the training provided was vague, did not provide practical guidance, and failed to make the MLA requirements clear. ¶¶67-68. CW-1 confirmed that the focus of the limited MLA training he received, which occurred years after the MLA violations started, was simply checking off boxes. ¶67. Those bare minimum trainings were clearly ineffective as employees would skip over the MLA-related questions in the loan administration process and would even continue to process the loan despite the prospective borrower presenting military ID. ¶69. Defendants' failure to implement *effective* training, education, and controls to prevent violations of the MLA and the 2013 Consent Order is a strong indication of reckless behavior. *See City of Omaha Police & Fire Ret. Sys. v. LHC Grp., Inc.*, No. 6:12-1609, 2013 WL 1100819, at *4-*5 (W.D. La. Mar. 15, 2013) (crediting allegations of insufficient internal

- 19 -

controls as adding to the strong plausible inference of scienter).  Defendants' cited case law does not state otherwise.  *See Oughtred v. E\*Trade Fin. Corp.*, No. 08 Civ. 3295(SHS), 2011 WL 1210198, at \*10 (S.D.N.Y. Mar. 31, 2011) (dismissing vague allegations concerning training because they lacked particularity, not because insufficient training did not support an indication of reckless behavior); *Budde v. Glob. Power Equip. Grp., Inc.*, No. 3:15-cv-1679-M, 2017 WL 6621540, at \*3 (N.D. Tex. Dec. 27, 2017) (dismissing case where scienter was based on vague allegations that did not indicate when the defendants were aware of the accounting errors).

The Complaint's allegations based on statements from CWs amount to observations of what actually occurred at the Company, not opinions.  *See* Mot. at 18.  Additionally, their observations confirm the deficient controls, policies, and training programs in place at the Company.  In short, Defendants' reliance on *In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822 (S.D. Tex. 2016) (*see* Mot. at 19), is misplaced because there, it was alleged that defendants violated the Foreign Corrupt Practices Act, which bans bribery of foreign officials to gain business opportunities, but did not have any evidence of the violations.  166 F. Supp. 3d at 863.  Here, the CFPB filed a complaint after collecting evidence of over 3,600 loans that violated the MLA.  The underlying fraudulent activity alleged here is simple and pervasive, and, unlike in *Key Energy*, easy for the Individual Defendants to track without reports from CWs as both Individual Defendants had continuous access to store transactions.  Defendants cannot simply "ignore the elephant in the room" and claim they were not severely reckless just because "no one **told** them it was there."  *In re Paincare Holdings Sec. Litig.*, 541 F. Supp. 2d 1283, 1293 (M.D. Fla. 2008) (emphasis in original). Defendants' reliance on other cases is similarly ineffective.  The court in *Budde v. Glob. Power Equip. Grp., Inc.*, No. 3:15-cv-1679-M, 2018 WL 4623108, at \*7 (N.D. Tex. Sept. 26, 2018), *aff'd*, 775 F. App'x 770 (5th Cir. 2019), recognized that defendants remedied internal audit concerns by hiring outside consultants prior to receiving the external auditor's opinion.  Here, there is no

4875-5452-8550.v1

evidence FirstCash hired external consultants to assist with store audits or other internal controls related to MLA compliance. And unlike in *Gamboa*, where the defendants "***did*** disclose negative information," the Defendants here did not disclose ***any*** negative information concerning their MLA compliance prior to November 2021. 2018 WL 2107205, at *3 (emphasis in original).

Adding to the scienter inference is the rapid departure of FirstCash's General Counsel ***during*** the CFPB investigation into the Company's lending practices. *Hall*, 2017 WL 6379334, at *12 (resignations, among other allegations, supported scienter); *Fleming*, 2004 WL 5278716, at *31 (resignations supported scienter). The suspicious timing of the resignation supports an inference that it was related to the fraud, especially in light of Defendants' ineffective internal controls. Defendants' official position is that the General Counsel resigned to pursue other interests (*see* Mot. at 20-21), but because the CFPB discovered illegal activity, it is at least as compelling and plausible that the General Counsel resigned (or was fired) on account of the rampant MLA violations and CFPB investigation.[17] Where there are two plausible explanations for the resignation, the "'tie favors the plaintiff.'" *Spitzberg*, 758 F.3d at 686; *Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 514 F. Supp. 3d 942, 954 (S.D. Tex. 2021). The resignation also supports CW-1's statements that the Company's Compliance and Legal departments were "almost wiped out" near the end of the Class Period. ¶61. Thus, the immediate departure of FirstCash's General Counsel during the CFPB investigation into the Company's lending practices supports an inference of scienter.

Defendants do not argue that they had effective internal controls and education, but instead refute each allegation in isolation. Mot. at 20-22. This strategy is contrary to the law and should be

---

[17]   Defendants rely on a variety of cases for support. Mot. at 20-21. However, because none of those cases involves a resignation of an executive ***during*** a government investigation that is directly tied to the fraud they are all distinguishable and inapposite to the allegations pleaded in this case. *See generally Southland*, 365 F.3d at 353; *Abrams v. Baker Hughes Inc.*, 292 F.3d 424 (5th Cir. 2002); *Six Flags*, 524 F. Supp. 3d at 501; *Crutchfield v. Match Grp., Inc.*, 529 F. Supp. 3d 570 (N.D. Tex. 2021).

4875-5452-8550.v1

ignored.  *Tellabs*, 551 U.S. at 322-23, 326; *see also Haack v. Max Internet Commc'ns, Inc.*, No. 3:00-CV-1662-G, 2002 WL 511514, at *5 (N.D. Tex. Apr. 2, 2002) ("'The flaw in [d]efendants' argument is that it seeks to isolate an element of the circumstances alleged . . . rather than to consider them in their totality.'").  Defendants also claim this is just an instance of mismanagement (Mot. at 20), but Defendants' failure to implement effective policies, training, and controls to prevent MLA violations – especially where compliance is as simple as plugging in a prospective lender's information into a free and easy-to-use database – is an extreme departure from the standards of ordinary care, not simple mismanagement.

Despite having access to this information and control over the contents of FirstCash's Class Period public statements, the Individual Defendants misled the market by failing to attribute their "outstanding" revenue results to their fraud, stating they were in compliance with the relevant regulations, and touting their allegedly sufficient compliance measures.  Indeed, one or both of the Individual Defendants signed the misleading SEC filings and SOX Certifications averring that the information provided was accurate and not misleading.  *See, e.g.*, ¶¶77, 80, 82.  Again, the magnitude of the MLA violations supports an inference that the Individual Defendants "'had a "reason to know, or should have suspected . . . that the financial statements contained material misstatements or omissions."'"  Mot. at 17 (quoting *Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*, 935 F.3d 424, 434 (5th Cir. 2019)).  When considering the allegations as a whole, it is clear that Individual Defendants' signatures further bolster the inference of scienter.  *LHC*, 2013 WL 1100819, at *4-*5 (citing defendants' signatures on certifications as evidence of scienter).

The allegations in the Complaint clearly implicate each of the Individual Defendants – as well as the Company – and do not rely on group pleading or the "'"collective knowledge of *all* the corporation's officers and employees acquired in the course of their employment."'"  Mot. at 14-15. It was the responsibility of the Individual Defendants, C-Suite level executives of FirstCash, to

- 22 -

implement effective training, education, and controls. The Individual Defendants could continuously monitor store transactions, assets, loans, and operating results. The Individual Defendants turned a blind eye or recklessly disregarded the 3,600 MLA violations for *at least* five years. The Individual Defendants signed and certified the accuracy of their SEC filings. The detailed observations of the CWs merely support these findings; it is not their knowledge that is attributed to Defendants. Thus, Defendants' cited case law is inapplicable here. Finally, Defendants' assessment that "Messrs. Wessel and Orr are not even mentioned in the scienter section," clearly ignores that the defined terms "Individual Defendants" and "Defendants" both encompass each individual and is included throughout the "additional allegations of scienter" section of the Complaint. *Id.* at 15.

Assessing all the scienter allegations holistically produces a result that each of the Defendants knew or recklessly ignored the failing internal controls and the MLA violations.

## C.    The Amended Complaint Pleads Loss Causation

In this Circuit, Federal Rule of Civil Procedure 8(a)(2) "must be applied . . . to determine whether the plaintiffs pleading of loss causation is sufficient." *Lormand*, 565 F.3d at 255; *see also Spitzberg*, 758 F.3d at 683 ("[T]he PSLRA did not create heightened pleading standards" for loss causation.); *Pub. Emps. Ret. Sys. of Miss., P.R. Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 320 (5th Cir. 2014) (applying "plausibility" standard under Rule 8(a)(2) for loss causation). Thus, loss causation pleading requirements are "not burdensome." *Lormand*, 565 F.3d at 256. In securities actions, a plaintiff must simply "'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'" *Id.* Where the "trajectory of [the company's] stock price" supports a facially plausible loss causation theory, "[nothing] more is required at the pleading stage." *In re BP p.l.c. Sec. Litig.*, 922 F. Supp. 2d 600, 638 (S.D. Tex. 2013). Nevertheless, even under a heightened Rule 9(b) standard, the Complaint sufficiently pleads loss causation by

- 23 -

identifying the CFPB complaint as the "corrective disclosure that reveal[ed] the falsity of the prior misrepresentation" and "allege[d] that the stock price declined after the disclosure." *Magruder*, 359 F. Supp. 3d at 460.

Contrary to Defendants' assertion (*see* Mot. at 24), the CFPB's lawsuit – which was brought ***after*** an investigation into FirstCash's transactions – corrected the falsity of Defendants' statements. *LHC* is instructive.  *See* 2013 WL 1100819, at *6-*7.  In *LHC*, the company allegedly defrauded Medicare and violated the Social Security Act by unnecessarily increasing the number of home health therapy visits performed resulting in increased reimbursement from Medicare.  *Id.* at *1-*2. Simultaneously, the company touted to investors the company's compliance with all applicable laws, the comprehensiveness of its compliance department, and its revenues.  *Id.*  Much like here, the fraud was revealed by the announcement of a government investigation into the company's home health therapy practices and a senate report disclosing the results of that investigation.  *Id.* at *2. There, the court found that these were sufficient corrective disclosures that established loss causation at the pleading stage because they "reflect[ed] part of the relevant truth – the truth obscured by the fraudulent statements."  *Id.* at *6-*7; *see also Amedisys*, 769 F.3d at 325 (rejecting argument that government investigations cannot form the basis for loss causation as "inconsistent with . . . prior precedent" because "[r]equiring allegations that establish prior statements of compliance to be actually false is tantamount to a pleading threshold of actual fraud by showing a failure to comply"); *Ramirez*, 334 F. Supp. 3d at 859 (same).  The same result is warranted here.

Defendants' cases are inapposite.  Mot. at 24.  Unlike *Meyer v. Greene*, 710 F.3d 1189 (11th Cir. 2013), the CFPB's complaint was not merely the commencement of an investigation that "does not indicate any allegations of wrongdoing."  *Id.* at 1201.  Rather, the CFPB's complaint contains allegations of wrongdoing based on its investigation, which uncovered FirstCash's MLA violations. Similarly, it is clear that FirstCash committed over 3,600 MLA violations, as it issued loans to

military families in excess of 36% and did not utilize the MLA Database that afforded the safe harbor protection Defendants claim they are entitled to, making *Martin v. GNC Holdings, Inc.*, No. 2:15-cv-01522, 2017 WL 3974002 (W.D. Pa. Sept. 8, 2017), *aff'd*, 757 F. App'x 151 (3d Cir. 2018), and *Sapssov v. Health Mgmt. Assocs., Inc.*, 22 F. Supp. 3d 1210 (M.D. Fla. 2014), inapplicable. *See Martin*, 2017 WL 3974002, at *3 (no indication the complaint that allegedly acted as a corrective disclosure was based on an investigation that found wrongdoing); *Sapssov*, 22 F. Supp. 3d at 1226 (allegations in the complaint were discredited by external sources). Ultimately, the CFPB's lawsuit is a proper corrective disclosure that informed the market that Defendants violated the MLA, had insufficient internal controls, education, and training to prevent MLA violations, and the Company's financial results were inflated by MLA violating loans.

### D.      Defendants' §20(a) Challenges Must Fail as a Matter of Law

Defendants' challenge to the §20(a) claims rest solely on a dispute as to whether a "primary violation" has been plead. Mot. at 25. For the reasons detailed above, the Complaint properly pleads a "primary violation." Therefore, the Court should find that the Complaint sufficiently plead that Defendants violated §20(a). Therefore, the Court should find that the Complaint sufficiently pleads that Defendants violated §20(a).

## IV.      CONCLUSION

For the forgoing reasons, the allegations in the Complaint should be upheld and Defendants' Motion denied in its entirety.

DATED:  July 13, 2022                      Respectfully submitted,

                                           KENDALL LAW GROUP, PLLC
                                           JOE KENDALL
                                           (Texas Bar No. 11260700)


                                                  */s/ Joe Kendall*
                                           ————————————————
                                                   Joe Kendall

- 25 -

4875-5452-8550.v1

3811 Turtle Creek Blvd., Suite 1450
Dallas, TX  75219
Telephone:  214/744-3000
214/744-3015 (fax)
jkendall@kendalllawgroup.com

Local Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
MATTHEW I. ALPERT (*pro hac vice*)
(Cal. Bar No. 238024)
HEATHER G. SCHLESIER (*pro hac vice*)
(Cal. Bar No. 322937)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
malpert@rgrdlaw.com
hschlesier@rgrdlaw.com

LABATON SUCHAROW LLP
CAROL C. VILLEGAS (*pro hac vice*)
(N.Y. Bar No. 4154324)
CHRISTINE M. FOX (*pro hac vice*)
(N.Y. Bar No. 2704641)
GUILLAUME BUELL
(TX Bar No. 24080813)
JAMES M. FEE (*pro hac vice*)
(N.Y. Bar No. 5426168)
140 Broadway, 34th Floor
New York, NY  10005
Telephone:  212/907-0700
212/818-0477 (fax)
cvillegas@labaton.com
cfox@labaton.com
gbuell@labaton.com
jfee@labaton.com

Lead Counsel for Lead Plaintiff

- 26 -

4875-5452-8550.v1

VANOVERBEKE, MICHAUD
  & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE (*pro hac vice*)
(Mich. Bar No. P46787)
THOMAS C. MICHAUD (*pro hac vice*)
(Mich. Bar No. P42641)
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
mvanoverbeke@vmtlaw.com
tmichaud@vmtlaw.com

Additional Counsel

4875-5452-8550.v1

CERTIFICATE OF SERVICE

I hereby certify that, on July 13, 2022, I served the foregoing on all counsel of record who have appeared in this matter via the Court's CM/ECF system.

/s/ Joe Kendall
Joe Kendall