UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

GENESEE COUNTY EMPLOYEES'
RETIREMENT SYSTEM,

Plaintiff,

v.                                          No. 4:22-CV-0033-P

FIRSTCASH HOLDINGS INC., ET AL.,

Defendants.

## OPINION & ORDER

Before the Court is Defendants' Motion to Dismiss the Amended Class Action Complaint. ECF No. 45. For the reasons stated below, the Court **GRANTS** the Motion.

## FACTUAL & PROCEDURAL BACKGROUND

FirstCash Inc. is an international pawn broker and financial lender with over 1,100 locations in the United States. Rick Wessel is the CEO and Douglas Orr is the CFO of FirstCash. ECF No. 42 at 7. FirstCash's revenue is heavily driven by short-term pawn loans, where small cash loans are made to individuals in exchange for personal property—such as jewelry or tools—where the property is posted as collateral. *Id.*

These pawn loans often have short maturity dates and command high interest rates. *Id.* As a result, they are subject to local, state, and federal regulation. *Id.* at 8–9. In 2015, Congress amended the Military Lending Act ("MLA") to also include pawn-loan transactions. 10 U.S.C. § 987. *Id.* at 9. The amended MLA prevents pawn lenders from charging annual percentage rates of more than 36% to active-duty members of the military or their dependents. *Id.* at 8–9.

In 2016, FirstCash completed a merger with Cash America—another company that dealt in financial lending and pawn loans. *Id.* At the time of the merger, Cash America was subject to a 2013 consent order with

the Consumer Financial Protection Bureau ("CFPB") over issues with its consumer loan practices. *Id.* at 8. The consent order required future compliance with the MLA and—by the nature of the agreement's text—applied to FirstCash after the merger. *Id.*

After the successful merger, FirstCash issued many Form 8-K, 10-K, and 10-Q SEC reports that touted the company's operations and controls, including its proprietary point-of-sale system, audit teams, and training programs. *Id.* at 9–14. In addition, the reports spoke of the stable and state-centric regulatory environment for pawn and plugged FirstCash's record quarterly and annual financial results. *Id.* In its 10-K reports, FirstCash also discussed risks associated with the MLA, the 2013 consent order, and a host of other regulations. *Id.* at 13.

In November 2021, the CFPB filed suit in this Court alleging that FirstCash violated the 2013 consent order and the revised MLA, and that between June 2017 to May 2021, FirstCash made 3,600 pawn loans to active-duty members of the military. ECF No. 42-1 at 1–21. In the few days that followed the news of the suit, FirstCash's stock price took a hit and tumbled more than 14%. ECF No. 42 at 80. In its answer, FirstCash denied the allegations and filed a motion for judgment on the pleadings. *See CFPB vs. FirstCash, Inc.*, 4:22-cv-1251 at ECF Nos. 53, 64. Around this time, FirstCash also filed an 8-K with the SEC denying all wrongdoing. ECF No. 42 at 79.

But just as the CFPB case was progressing, something odd happened. In an October 2022 opinion, the Fifth Circuit held that the Consumer Financial Protection Bureau's self-funding structure violated the Appropriations Clause and underlying separation of powers in the Constitution.[1] This put the CFPB into a state of administrative limbo pending an appeal to the Supreme Court. As a result, the CFPB's case against FirstCash was administratively stayed at the pleadings stage and remains so today. *CFPB*, 4:22-cv-1251 at ECF No. 67.

---

[1] *See Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 644 (5th Cir. 2022), *cert. granted sub nom. CFPB v. Com. Fin. Servs. Assn.*, No. 22-448, 2023 WL 2227658 (U.S. Feb. 27, 2023), and *cert. denied sub nom. Com. Fin. Servs. Assn. v. CFPB*, No. 22-663, 2023 WL 2227679 (U.S. Feb. 27, 2023).

In January 2022, Plaintiff—Genesee County Employees' Retirement System—sued FirstCash, Wessel, and Orr under §§ 10(b) and 20(A) of the Securities Exchange Act both individually and on behalf of all others similarly situated. *See* ECF No. 1. The Court then appointed Wayne County Employees' Retirement System—a public pension fund headquartered in Wayne County, Michigan—as Lead Plaintiff. ECF No. 26. Lead Plaintiff alleges that the previous statements made in form 8-K, 10-K, and 10-Q reports were materially misleading or omitted information that inflated the price of the stock, causing its drop when the CFPB filed suit. *See* ECF No. 45. Lead Plaintiff later amended the complaint, and Defendants' moved to dismiss.

## LEGAL STANDARD

### A. Motion to Dismiss

Ordinarily, defeating a motion to dismiss under Rule 12(b)(6) is not difficult. A plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court, in turn, must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). If there are well-pleaded factual allegations, the Court assumes their veracity and then determines whether they plausibly give rise to an entitlement to relief. *Id.*

### B. Pleading Standards: Rule 9(b) and the PSLRA

When a plaintiff pleads fraud, Federal Rule of Civil Procedure 9(b) imposes a higher standard on the complainant, requiring that he plead with "particularity the circumstances constituting fraud." FED. R. CIV. P. 9(b). To do so, a plaintiff must identify "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what that person obtained thereby." *Owens v. Jastrow*, 789 F.3d 529, 535 (5th Cir. 2015) (quoting *Tuchman v. DSC Commc'ns Corp.,* 14 F.3d 1061, 1068 (5th Cir. 1994)). Because fraud—in the form of scienter—is a required element of Plaintiff's claims, Rule 9(b)'s heightened pleading standard applies.

The PSLRA raises the standard for pleading fraud even higher for securities claims. *See* 15 U.S.C. § 78u-4. Under the Act, private securities complaints that allege false or misleading statements must: (1) specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading; and (2) state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) (cleaned up) (emphasis added). Because Plaintiff brings claims under §§ 10(b) and 20(A) of the Securities Exchange Act, the PSLRA's heightened pleading standard applies.

## ANALYSIS

## A. Section 10b-5

To state a claim under § 10(b) of the Securities Exchange Act and SEC Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *See Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imps., Inc.*, 935 F.3d 424, 429 (5th Cir. 2019).

Defendant contends that Plaintiff has failed to meet these elements: (1) misrepresentation or omission; (2) scienter; and (6) loss causation. The Court addresses each of these arguments in turn.

### 1. <u>"Discounting" Confidential Witnesses</u>

Because the testimony of five confidential witnesses back Plaintiff's claims, the Court must first determine the appropriate "discount" to apply to each witness and their individual allegations.

Under the PSLRA's heightened pleading standard, the process for weighing inferences is "obstructed when the witness is anonymous." *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 208 (5th Cir. 2023). Thus, the Fifth Circuit has long held that "courts *must* discount allegations from confidential sources." *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 535

(5th Cir. 2008) (emphasis added). The "degree" of discounting depends on the circumstances involved. *Id.* Courts may rely on confidential sources if the person is "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Six Flags*, 58 F.4th at 208.

While this makes sense in theory, both the definition of "discount" and the process for "applying a discount" are unclear. On the one hand, courts "must" apply a discount of some sort to confidential witnesses. *Shaw Grp.*, 537 F.3d at 535. On the other, courts may rely on discounted statements if they are not discounted enough. *Six Flags*, 58 F.4th at 208. This puts courts into the position of a landlocked shrimp consumer—it's always good to get a discount, but at a certain point, heavily discounted shrimp at the local market in Rising Star, Texas becomes too suspicious to warrant a purchase.

To simplify this matter, as best this Court can tell, courts functionally apply three levels of discount: slight, moderate, and heavy. Slightly discounted allegations are given substantial weight by courts.[2] Moderately discounted allegations are considered with caution and reduced weight.[3] And heavily discounted allegations are minimally considered and given little to no weight.[4]

The Court will thus analyze the "particular job descriptions" and "individual responsibilities" of the confidential witnesses in comparison

---

[2] Relying largely on out-of-circuit cases, the Fifth Circuit in *Six Flags* applied a "slight discount" and then adopted everything a confidential witness said—including statements about the financial health of a company that the witness did not work for. 58 F.4th at 208–15. The Court thus interprets "slight discount" in line with Fifth Circuit precedent as the functional equivalent of no discount.

[3] *See, e.g., Elec. Workers Pension Fund, Loc. 103, I.B.E.W. v. Six Flags Ent. Corp.*, 524 F. Supp. 3d 501, 524 (N.D. Tex. 2021), *rev'd and remanded sub nom. Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195 (5th Cir. 2023) ("FE1's witness allegations should be considered but discounted generally.").

[4] *See e.g. Shaw Grp.*, 537 F.3d 527, 539 (5th Cir. 2008) ("Both confidential sources are insufficiently identified to determine whether someone in their positions would have access to the information alleged.").

with the allegations they make. *Id.* The Court will then follow the lead of the Fifth Circuit and assign an indefinite adjective—in this case, slight, moderate, or heavy—to show how much of a discount is present.

### i. Confidential Witness #1 (CW-1)

CW-1 is a former FirstCash District Manager in the Midwest whose job description involved the management of ten locations and between forty and fifty employees. ECF No. 42 at 17. CW-1's responsibilities are detailed in Plaintiff's complaint as (1) hiring and training employees, (2) conducting profit and loss analysis, (3) conducting and responding to audits, (4) enforcing company policies, and (5) generally supervising stores. *Id.*

CW-1 alleges the following:

| CW-1 Allegations |
|---|
| 1. Management took minimal steps to be in compliance and made little effort to enforce compliance.[5] |
| 2. Compliance with the MLA, or other issues under the CFPB's oversight, were not high on the list of the Company's priorities compared to his past work experience at similar businesses.[6] |
| 3. FirstCash's field auditors who visited the store locations did not focus on MLA compliance, but that the auditors' focus was on inventory, accounting, and related controls.[7] |

---

[5] ECF No. 42 at 30.

[6] *Id.*

[7] *Id.* at 33.

6

4. It was not until sometime in 2020 that he received a memo from "Corporate Communications" explaining how the Company's POS software would prompt a series of four questions pertaining to military service at the start of each loan transaction. CW-1 recalled that the memo explained MLA and its restrictions generally and instructed employees to watch an online training course about MLA. CW-1 characterized the focus of the training as simply checking off the boxes and getting it done. CW-1 stated that employees were instructed to ask customers applying for loans if they were active military or a dependent of active military and directed to input those answers into the POS system by checking boxes before the transaction could continue.[8]

5. On more than one occasion, he had to tell his employees not to simply check "no" in the POS system for the MLA related questions in an effort to skip over them, but rather to actually ask the customer the required questions.[9]

6. FirstCash's Legal department was almost wiped out in 2021.[10]

**Allegation #1**: Because CW-1 was a District Manager and tasked with enforcing company policies, CW-1 is likely competent to possess the information alleged about the managerial culture of the company—at least in the Midwest Division of the company. The Court thus only applies a slight discount to this allegation.

**Allegation #2**: CW-1's statement compares the compliance priorities of his old workplace and FirstCash. Because CW-1's responsibilities dealt with compliance, this comparative statement between his workplaces—though not very informative—falls within CW-1's competence. A diminutive discount is thus applied to this allegation.

**Allegation #3**: Because CW-1 conducted and responded to audits that are presumably the same type he discusses here; he is competent

---

[8] *Id.* at 34.

[9] *Id.*

[10] *Id.* at 30–31

to testify about the focus of the Midwest Division audits. Thus, only a slight discount applies to this allegation.

**Allegation #4**: CW-1 was tasked with training employees and enforcing company policies. Because this likely includes receiving new policies and training employees, CW-1 is competent to speak to this issue about the Midwest Division of the company. Thus, only a slight discount applies to this allegation.

**Allegation #5**: CW-1 was responsible for training employees, generally supervising stores, and enforcing company policies. So CW-1 is competent to recount his personal recollection of the instructions given to employees on complying with company policy. Only a slight discount applies to this allegation.

**Allegation #6**: CW-1's connection to the legal department is rather shaky compared to his responsibilities listed in the complaint. CW-1 alleges that the legal department was "wiped out" because "whenever he tried to communicate with Compliance or Legal during that time, he was informed that those employees were no longer there." ECF No. 42 at 30. Though CW-1's responsibilities imply a relationship and communication with the legal department, his competence to speak to the viability of the entire department based on mere communications diminishes the viability of this allegation. A slight discount applies to this allegation.

### *ii. Confidential Witness #2 (CW-2)*

CW-2 is a former Cash America employee who worked as a District Manager in Seattle, Washington, from 1998 to 2019. ECF No. 42 at 17–18. Plaintiff lists CW-2's responsibilities as "personally conducting audits" on all stores under his supervision for (1) state and local regulations, (2) proper documentation, and (3) inventory status of items. *Id*. CW-2 alleges the following:

| CW-2 Allegations |
| --- |
| 1. Field auditors did not focus on MLA compliance.[11] |
| 2. Military loan applications were not part of the audit process and were not a requirement on the Company's audit checklist.[12] |
| 3. He personally reviewed the [audit] results and never observed any violations of the MLA.[13] |
| 4. He does not ever recall denying any loans for active military personnel.[14] |
| 5. Employees were not required to check any internal or external databases for military status, and if the applicant did not identify as an active military employee, no additional information was required.[15] |
| 6. The application process, in his opinion, was something akin to, "[d]on't tell – don't ask."[16] |

**Allegations #1, 2, 3**: CW-2 was tasked with personally conducting audits on "state and local regulations." Taking the words of the complaint as true, CW-2 is competent to speak on the focus of the audits he personally conducted regarding only state and local regulations. Thus, any statements from CW-2 over compliance and audits that exceed the scope of his responsibilities are logically outside of his area of competence. The MLA is a federal regulation and outside his area of

---

[11] ECF No. 42 at 30.

[12] *Id.*

[13] *Id.*

[14] *Id.* at 27.

[15] *Id.*

[16] *Id.* at 28.

responsibility. His audit results would obviously never show any violations of the MLA because they were entirely concerned with state and local regulations. The first three allegations by CW-2 are thus subject to a substantial discount.

**Allegation #4**: Because the complaint never identifies approving or denying loans as a part of CW-2's job description or responsibilities as a District Manager, the Court treats this as an area outside of CW-2's competence. As a result, this allegation is also subject to a sizable discount.

**Allegation #5**: CW-2's job description of "conducting audits" on "state and local regulations" does not logically involve checking MLA requirements. Yet his other audit responsibility of "documentation" might entail some review of checking databases or other processes. Because it is unclear what "documentation" entails, this allegation is subject to a medium discount.

**Allegation #6**: CW-2 makes an opinion statement about the application process surrounding customers' military status. This also falls outside of his stated area of responsibility of "conducting audits" on (1) state and local regulations, (2) proper documentation, and (3) the inventory status of items. Because CW-2's opinion on the matter is not an authoritative one as to MLA compliance procedures, this allegation is subject to a considerable discount.

### iii.   Confidential Witness #3 ("CW-3")

CW-3 was an Assistant Manager and Shop Manager at one Cash America outlet in Haltom City, Texas, from May 2017 to March 2020. ECF No. 42 at 18. His responsibilities included managing[17] the single outlet and personally handling loan transactions for customers and members of the military. *Id.* CW-3 alleges the following:

---

[17] Plaintiff does not state what "managing" entails of in the context of CW-3's duties. The Court will not infer meaning where none is provided, especially where each confidential witness appears to have completely different "management" roles and responsibilities based on the face of Plaintiff's Amended Complaint.

| CW-3 Allegations |
|---|
| 1. CW-3 never received any training or directives, and he was not aware of any internal or external databases to check for military service.[18] |
| 2. At CW-3's store, if an individual did not disclose that they were actively in the military or a military dependent, their information was not checked through any databases or system. CW-3 described his view of the process as "[i]f they don't tell, don't ask."[19] |
| 3. CW-3 confirmed that if an active military member insisted on a personal loan (i.e., after showing a military ID), he would process the loan application and check "no" in the internal database application for active military.[20] |

**Allegation #1**: CW-3's job responsibility of handling loan transactions implies that he was aware of the process for approving or denying loans. So he is competent to testify on the type of training or directives he received under his position and responsibilities. Thus, only a slight discount applies to this allegation.

**Allegation #2**: CW-3 testifies about "his store" and "his view." Given that he was a shop manager and handled customer loan transactions, he is likely competent to testify on his store's procedures. Only a slight discount applies to this allegation.

**Allegation #3**: CW-3 testifies on his process for approving loans for military members. Because his responsibilities included approving or denying loans, he is competent to testify on his process for doing so. Thus, only a slight discount applies to this allegation.

### iv. Confidential Witness #4 ("CW-4")

CW-4 was an Assistant Regional Manager for Cash America in Everett, Washington, from February 2020 to January 2021. ECF No. 42

---

[18] ECF No. 42 at 32.

[19] *Id.*

[20] *Id.*

at 18. CW-4's only listed job responsibility is traveling to two Cash America stores in Everett, Washington. *Id.* CW-4 alleges the following:

| CW-4 Allegations |
|---|
| 1. CW-4 never received any training or instructions, and he was not aware of any databases to check for military service.[21] |
| 2. To his knowledge and based on his experiences and observations, if an individual did not disclose that he or she was military and presented a local identification, his or her information was not checked through any databases or system and that person could receive a loan.[22] |

**Allegation #1**: It is unclear whether training and instructions on the MLA were a part of CW-4's position. And because Plaintiff did not provide CW-4's job description or responsibilities, the Court cannot determine his level of competence to testify on this fact. As a result, this allegation is subject to a heavy discount.

**Allegation #2**: It is also unclear whether CW-4 was involved with the loan approval process or auditing the loan approval process. As Plaintiff provides no detail of CW-4's job description or responsibilities, the Court cannot determine the veracity of this allegation. This allegation is also subject to a heavy discount.

### v. Confidential Witness #5 (CW-5)

CW-5 is a former "Regional Director of Operations" for FirstCash who started in 2003 and left the company in 2018. ECF No. 42 at 18. He reported to the Division Vice President, who then reported to the President and Chief Operating Officer. *Id.*

CW-5's job description included overseeing "operations for approximately twenty-four store locations in and around Las Vegas, Nevada, Phoenix, Arizona, and Yuma, Arizona, with a total of approximately 250 employees." *Id.* His responsibilities included

---

[21] ECF No. 42 at 32.

[22] *Id.*

supervising the following items: (1) budgets; (2) sales; (3) performance; (4) loan balances; and (5) employee compliance with company policies and procedures. *Id.* Eight District Managers reported to CW-5. *Id.* CW-5 alleges the following:

| CW-5 Allegations |
| --- |
| 1. When FirstCash acquired Cash America, the Company provided some basic training or instructions to employees regarding the MLA. However, CW-5 added that management's communications on this issue were vague and did not provide real guidance.[23] |
| 2. CW-5 also recalled attending meetings regarding MLA-related procedures in the new POS system, including prompts for questions when processing pawn loans. Management provided some training and communications at the store level to new employees to familiarize them with the new system and related compliance requirements, but, in CW-5's view, those communications failed to make the MLA requirements clear.[24] |

**Allegation #1:** Because supervising employee compliance with company policies and procedures was part of CW-5's job responsibilities, CW-5 is likely competent to testify on his knowledge of the basic MLA compliance training and instructions given to employees. As a result, this allegation is subject to only a slight discount.

**Allegation #2:** CW-5's job description and responsibilities both point to a substantial level of competence on the compliance systems and employee training methods. This allegation thus only receives a slight discount.

### vi.  Summary of Discounts

Before proceeding to the next section, the Court pauses to summarize the discount process exhaustively discussed above. In the chart below, allegations marked green are slightly discounted and will be considered and given substantial weight by the Court. Allegations marked yellow

---

[23] ECF No. 42 at 33.

[24] *Id.* at 34.

are moderately discounted and will be considered with caution and given reduced weight. Allegations marked red are heavily discounted and will be minimally considered and given little to no weight.

| Confidential Witness Discount Summary | | | | | | |
|---|---|---|---|---|---|---|
| | | CW-1 | CW-2 | CW-3 | CW-4 | CW-5 |
| **Allegation #** | | 1 | 1 | 1 | 1 | 1 |
| | | 2 | 2 | 2 | 2 | 2 |
| | | 3 | 3 | 3 | | |
| | | 4 | 4 | | | |
| | | 5 | 5 | | | |
| | | 6 | 6 | | | |

## 2. **Misrepresentation or Omission**

To be actionable as securities fraud, a misrepresentation or omission of a fact, must be material. *Basic Inc. v. Levinson,* 485 U.S. 224, 231 (1988). A misrepresentation is "material" if there is "a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision." *Id.* An omission is "material" if there is "a substantial likelihood that disclosure would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Id.* at 231–32. The "total mix" of information "includes information that is and has been in the readily available general public domain and facts known or reasonably available to the shareholders." *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 216 (5th Cir. 2004).

A technically false statement does not automatically equate to a material misrepresentation, however. Two types of statements—even where partially false—are non-actionable: (1) opinion statements, and (2) mere puffery. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015); *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004).

To allege a material misrepresentation or omission with sufficient particularity under the PSLRA, the complaint must: (1) specify each misleading statement, and (2) explain why it is misleading. *Lormand*,

565 F.3d at 239; 15 U.S.C. § 78u–4(b)(1). When a plaintiff's allegations are made on "information and belief," they must state with particularity all facts on which that belief is formed—setting forth a factual basis for such belief. § 78u–4(b)(1).

Plaintiff alleges that FirstCash, Orr, and Wessel made multiple misrepresentations. These misrepresentations fall into three general categories: (1) statements on company operations and training; (2) statements on the regulatory environment; and (3) statements on financial performance. FirstCash and the Individual Officers in turn assert that many of these statements are non-actionable as either opinion statements or mere puffery.

The Court addresses each category of statements in turn.

### i.  Statements on Company Operations and Training

Plaintiff alleges that FirstCash made multiple misrepresentations about company operations and training in separate company investor presentations filed as Form 10-Ks, 8-Ks, and 10-Qs from 2017 to 2021. The Court thus analyzes each statement and the reason explained by Plaintiff as to why it was misleading.[25] Due to the many repeated statements and the slight variations present in the first catagory, the Court breaks the statements into three sub-categories: (1) Point-of-Sale System; (2) Audit Staff; and (3) Employee Training.

The Court first analyzes the O.T. #1 statements involving FirstCash's point-of-sale system:

| O.T. #1 – Point-of-Sale System |
|---|
| 1. "As of year-end [2017], all Cash America stores have been converted to the proprietary FirstPawn point of sale and loan management platform."[26] |

---

[25] For organizational purposes, statements made under this category will be labeled "O.T. #1" followed by the corresponding number of the statement (e.g., O.T. #1.1).

[26] This statement was made in FirstCash's February 2018 Form 8-K. ECF No 42. at 38.

2. "The Company utilizes a proprietary computer information system that provides fully integrated functionality to support . . . customer relationship management . . . [and] compliance and control systems."[27]

3. "The information system provides management with the ability to continuously monitor store transactions, assets, loans, and operating results."[28]

Plaintiff alleges that the three statements under O.T. #1 are misleading because confidential witness testimony evidences that many employees, including high-ranking compliance staff, "did not know about the MLA Database for active-duty service members and their dependents" or were introduced to the system much later than represented by FirstCash. It is important to note, however, that the MLA database is a different system than the point-of-sale system touted by FirstCash in its statements. The MLA Database is an optional system that affords safe harbor under the MLA if used when conducting transactions. ECF No. 42 at 12.

The Court thus summarizes the CW allegations surrounding the point-of-sale and external MLA database system below in the descending order of discount applied.

**Slight Discount**: CW-1, a Cash America employee who stayed on during the acquisition, states that FirstCash did not explain how the point-of-sale system worked in relation to MLA compliance until 2020. CW-1 does not claim that the point-of-sale system was not in place prior to 2020. This allegation encompasses ten stores in the Midwest.

**Slight Discount**: CW-3, another Cash America employee who stayed on during the acquisition, states in allegations #1-2 that he was unaware of any internal or external databases to check for military service and individuals were not checked through any databases or system. In allegation #3 however, CW-3 contradicts his own statement

---

[27] This statement was made in FirstCash's 2017 and 2018 Form 10-Ks. ECF No. 42 at 10.

[28] This Statement was made in FirstCash's 2019 and 2020 Form 10-Ks. ECF No 42 at 58, 62.

and states that "if an active military member insisted on a personal loan, he would check no in the internal database." ECF No. 42 at 32. Based on this contradictory statement, the Court must regard his other statements with heavier skepticism.[29] This allegation involves a single store in Haltom City, Texas.

**Slight Discount**: CW-5, states that he attended multiple meetings on the point-of-sale system and that management provided training and communications at the store level about its use for MLA compliance.[30] This allegation involves twenty-four store locations in the Southwest.

**Moderate Discount**: CW-2 allegation #5, states that employers were not required to check any internal or external databases for military status. Even so, CW-2 makes no allegations about the lack of a point-of-sale system and only makes allegations regarding military status checks—an area likely outside of his stated responsibilities. It is unknown how many stores CW-2 supervised.

**Heavy Discount**: CW-4 allegations #1-2 state that he was unaware of any databases to check for military service and that military status was not check through any databases or systems. Because no job responsibilities were listed, these allegations are given little to no weight.

Plaintiff's lengthy complaint provides no statement from FirstCash about its use of the external MLA Database. The only statements alleged by Plaintiff tout the internal point-of-sale system. None of the CW allegations implicate that FirstCash did not have a point-of-sale system and only point to a failure to use the external MLA Database. CW-1 and CW-3 both state that MLA questions were a part of the internal database system. CW-5 states that MLA compliance was a part of the

---

[29] *See Six* Flags, 58 F.4th at 209, n.11 (stating "[i]n the case of confidential witness allegations, we apply [the particularity] requirement by evaluating the 'detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia. If anonymous source allegations are found wanting with respect to these criteria, then we must discount them steeply." (cleaned up) (citations omitted)).

[30] CW-5 Allegation # 2, ECF No.

internal point-of-sale system as well. The fact that FirstCash did not notify investors of its alleged decision to not check an optional external database does not rise to the level of a material omission, especially where it already had an internal system in place that generated questions on military status according to multiple CW statements. Contrary to Plaintiff's assertion, corporations have no duty to disclose a fact "merely because a reasonable investor might really like to know that fact," especially where the requested disclosure is of an optional practice. *Berger v. Beletic*, 248 F. Supp. 2d 597, 603 (N.D. Tex. 2003).

Thus, the statements under O.T. #1 do not constitute material misstatements or omissions.

| O.T. #2 – Audit Staff |
|---|
| 1. "The Company maintains a well-trained internal audit staff that conducts regular store visits to test compliance of financial and operational controls."[31] |
| 2. "The Company maintains a well-trained audit and loss prevention staff which conducts regular store visits to verify assets, loans and collateral and test compliance with regulatory, financial and operational controls."[32] |

Plaintiff alleges that the statements under O.T. #3 are misleading because multiple CW allegations show that the audit process was severely lacking in detail and in part led to the 3,600 MLA violations alleged by the CFPB.

**Slight Discount:** CW-1 allegation #3 states that FirstCash's field auditors "did not focus on MLA compliance, but that the auditors' focus was on inventory, accounting, and related controls." ECF No. 42 at 33.

**Heavy Discount:** CW-2 allegations #1-3 state that field auditors did not focus on MLA compliance, military loan applications were not on the company's audit checklist, and that he reviewed audit results and never saw violations of the MLA.

---

[31] O.T. #2.1 appears in FirstCash's 2017 and 2018 Form 10-Ks. ECF No. 42 at 10.

[32] O.T. #2.2 appears in FirstCash's 2017 Form 10-K. ECF No. 42 at 10.

CW-1 does not dispute that there was an audit staff that conducted regular visits. He only contends that they did not "focus" on MLA compliance. Importantly, CW-1 does not say that the auditors ignored MLA. It is possible that they performed some MLA compliance procedures, but it was not their primary focus. Instead, their focus was on inventory, accounting, and related controls. CW-2's allegations—though they receive little to no weight—also reflect this. CW-2 allegation #3 contradicts his previous two statements by suggesting that MLA compliance was an aspect of the audit process that was reviewable, even though field auditors did not focus on it.

A reasonable investor, however, might find the auditors lack of attention to the MLA would impact an investment decision given the representations made by FirstCash. In this context, the O.T. #2 statements are material misstatements.

| O.T. #3 – Employee Training |
|---|
| 1. FirstCash runs "employee-training programs that promote customer service, productivity, and professionalism."[33] |
| 2. FirstCash "trains its employees through direct instruction and on-the-job pawn and sales experience" and that "new employees are introduced to the business through an orientation and training program that includes on-the-job training in . . . regulatory compliance and general administration of store operations"[34] |
| 3. "The Company is focused on providing . . . extensive training"[35] |

[33] ECF No. 42 at 69. This statement as made in two FirstCash Form 8-Ks starting in 2021. *See* ECF No. 47-1 at 661, 695, 731.

[34] ECF No. 42 at 10, 67. This statement was made once in FirstCash's 2020 Form 10-K. *See* ECF No 47-1 at 642.

[35] ECF No. 42 at 67. This statement was made once in FirstCash's 2020 Form 10-K. *See* ECF No 47-1 at 643.

| |
|---|
| 4. FirstCash runs "specialized skill training programs in lending practices, merchandise valuation and regulatory compliance"[36] |
| 5. FirstCash conducts "management training," which "typically involves exposure to overall financial acumen, including . . . regulatory compliance."[37] |
| 6. The Company administered "robust consumer and corporate compliance programs."[38] |

Plaintiff asserts that the O.T. #3 statements are materially misleading because multiple CW allegations show that FirstCash failed to properly train its employees on the MLA which led to the 3,600 MLA violations alleged by the CFPB.

**Slight Discount:** CW-1 recalled that the memo explained MLA and its restrictions generally and instructed employees to watch an online training course about MLA. CW-1 characterized the focus of the training as simply checking off the boxes. CW-1 stated that employees were instructed to ask customers applying for loans if they were active military or a dependent of active military and directed to input those answers into the POS system by checking boxes before the transaction could continue.

**Slight Discount:** CW-3 never received any training or directives, and he was unaware of any internal or external databases to check for military service. CW-3 described his view of the process as "[i]f they don't tell, don't ask." CW-3 confirmed that if an active military member insisted on a personal loan (i.e., after showing a military ID), he would

---

[36] ECF No. 42 at 42, 69, 71, 73. This statement was made in two FirstCash Form 8-Ks starting in 2021. *See* ECF No. 47-1 at 661, 695, 731

[37] ECF No. 42 at 67. This statement was made once in FirstCash's 2020 Form 10-K. *See* ECF No. 47-1 at 642.

[38] ECF No. 42 at 69. This statement was made three times in FirstCash's 2021 Form 8-Ks. *See* ECF 47-1 at 661, 695, 731.

process the loan application and check no in the internal database application for active military.

**Slight Discount:** CW-5 claims that **w**hen FirstCash acquired Cash America, the Company provided some basic training or instructions to employees on the MLA. Yet CW-5 added that management's communications on this issue were vague and did not provide real guidance. CW-5 also recalled attending meetings on MLA-related procedures in the new POS system, including prompts for questions when processing pawn loans. He notes that management provided some training and communications at the store level to new employees to familiarize them with the new system and related compliance requirements, but, in CW-5's view, those communications failed to make the MLA requirements clear.

**Heavy Discount:** CW-4 never received any training or instructions, and he was unaware of any databases to check for military service. To his knowledge and based on his experiences and observations, if an individual did not disclose that he or she was military and presented a local identification, his or her information was not checked through any databases or system and that person could receive a loan.

**Heavy Discount:** CW-2 states that the application process was "[d]on't tell – don't ask" and that employees were not required to check for military status.

The extensive CW allegations about training do not match the claims from O.T. #3 statements. And while Plaintiff argues that the O.T. #3 statements do not mention the MLA directly, a reasonable investor would assume that "robust consumer and corporate compliance programs" and "extensive training" in "regulatory compliance" includes MLA compliance training and procedures. At a bare minimum, they should at least mean some training for employees, and CW-3 claims he received no training.

Taken in their whole context, the O.T. #3 statements qualify as material misstatements.

### ii.    Statements on the Regulatory Environment

Plaintiff alleges that FirstCash made multiple misleading statements about the regulatory environment for pawn brokers. These statements and slight variations of them were made in multiple company reports and investor presentations during the class period:

| R.E. #1 |
|---|
| 1. Defendants claimed that there was a "Stable Regulatory Climate for Pawn" because "Pawn loans are different from traditional consumer loan products and not subject to the CFPB Small Dollar Loan rules because they … do not involve credit checks, collection activities, ACH transactions or negative credit reporting."[39] |
| 2. "Regulations [for pawn loans] are primarily at the state level in the U.S." and that there had been "no significant negative regulatory changes in the last 25 years."[40] |
| 3.   FirstCash had a "limited exposure to CFPB rules for payday lending" and explicitly noted that "traditional pawn loans are excluded from the scope of the new CFPB rules" slated to go into effect in July 2019.[41] |

Though Plaintiff concedes that these statements were not necessarily false, it alleges that the R.E. #1 statements were materially misleading because they were "silent as to the Company's exposure under the expanded MLA and the 2013 Consent Order." ECF No. 42 at 44. FirstCash asserts three defenses to this argument: (1) FirstCash disclosed the MLA and the Consent Order in multiple Form 10-K statements; (2) the statements are non-actionable opinion statements; and (3) the statements were mere puffery. The Court addresses all three.

Because Plaintiff alleges an omission, it must show a "substantial likelihood that disclosure would have been viewed by the reasonable investor as having significantly altered the *total mix of information*

---

[39] ECF No. 42 at 38, 43, 45, 46, 47, 51, 53, 54, 56, 60, 61, 63, 65, 69, 71, 73. The statement was made seventeen times during the class period on various Form 8-Ks.

[40] ECF No. 42 at

[41] ECF No. 42 at 39, 43. This statement made twice in investor presentations filed in Form 8-Ks.

*made available.*" *Basic,* 485 U.S. at 231 (emphasis added). So the Court does not view these statements in a vacuum, but in the context of the total mix of information available to a reasonable investor. In this regard, FirstCash asserts that it disclosed both the company's exposure to the MLA and to the CFPB's Consent Order multiple times in Form 10-K statements before, during, and after the class period. And while the Court may not consider a Defendant's evidence at the motion to dismiss stage, "[i]n ruling on a 12(b)(6) motion, documents outside of a plaintiff's complaint are . . . considered 'if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claims.'" *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 498–99 (5th Cir. 2000) (citation omitted).

Here, Plaintiff makes multiple references to parts of FirstCash's Form 10-Ks throughout its complaint. Thus, the Court may consider the totality of their contents for additional context. The annual Form 10-K statements included these disclosures from FirstCash:

- "The Company's products and services are subject to extensive regulation and supervision under various federal, state and local laws, ordinances and regulations in both the U.S. and Latin America."[42]
- "The CFPB has regulatory, supervisory and enforcement powers over providers of consumer financial products and services in the U.S., and it could exercise its enforcement powers in ways that could have a material adverse effect on the Company's business and financial results."[43]
- "The MLA Rule . . . expanded the scope of the credit products covered by the MLA to include overdraft lines of credit, pawn loans, or vehicle and certain unsecured installment loan products to the extent any such products have a military annual percentage rate greater than 36%. While the Company does not believe that active members

---

[42] This statement was made in FirstCash's Form 10-Ks from 2017-2020. ECF No. 47-1 at 96, 276, 463, 646.

[43] This statement was made in FirstCash's Form 10-Ks from 2017-2020. ECF No. 47-1 at 94, 97, 274, 277, 462–63, 645, 647,

of the U.S. military or their dependents comprise a significant percentage of the historical customer base in most locations, compliance with the MLA Rule, including its safe harbor provisions, is complex, increases compliance risks and related costs and limits the potential customer base of the Company."[44]

- "On November 20, 2013, Cash America consented to the issuance of a consent order by the CFPB pursuant to which it agreed, without admitting or denying any of the facts or conclusions made by the CFPB from its 2012 review of Cash America's consumer loan business . . . . Any noncompliance with the Consent Order, continuing obligations or similar orders or agreements from other regulators could lead to further regulatory penalties and could have a material adverse effect on the Company's business."[45]

- "The Company or its subsidiaries has been or may be involved in the future, in lawsuits, . . . consent orders, . . . [and] other actions arising in the ordinary course of business, including those related to consumer finance and protection . . . that could cause it to incur substantial expenditures and generate adverse publicity. In particular, the Company may be involved in lawsuits or regulatory actions related to consumer finance and protection, including class action lawsuits brought against it for alleged violations of . . . consumer protection, lending and other laws."[46]

- "If the CFPB or one or more state attorneys general or state regulators believe that the Company has violated any of the applicable laws or regulations or any consent orders or

---

[44] This statement was made in FirstCash's Form 10-Ks from 2017-2020. ECF No. 47-1 at 94, 97, 274, 277, 462–63, 645, 647,

[45] This statement was made in FirstCash's Form 10-K in 2017. ECF 47-1 at 100.

[46] This statement was made in FirstCash's Form 10-K from 2018 to 2021. ECF 47-1 at 100.

confidential memorandums of understanding against or with the Company, they could exercise their enforcement powers in ways that could have a material adverse effect on the Company's business and financial results."[47]

Here, the statements from the Form 10-Ks cover many of alleged omissions by First Cash. The statements repeatedly reference the company's exposure to the MLA and the CFPB's regulatory power. They are not hidden or buried deep in the Form 10-Ks. Instead, they are stated in the text of the Item 1A "Risk Factors" section. Though Plaintiff complains of a failure to mention the risk factors in multiple Form 8-K statements—these statements are reserved not for exhaustive risk analysis of an entire industry but for reporting "significant events" like investor presentations or quarterly financial statements.[48] Form 10-K statements are the proper avenue for investors to analyze industry and company specific risk and are a significant part of the "total mix" of information that investors consider. To hold otherwise and require extensive disclosures within the four corners of every Form 8-K "would transform routine disclosures into a corporate rite of confession." *Jacobowitz v. Range Res. Corp.*, 596 F. Supp. 3d 659, 678 (N.D. Tex. 2022) (Pittman, J.).

FirstCash also asserts that the R.E. statements are non-actionable opinion statements. A non-actionable opinion statement "is not an untrue statement of material fact, regardless of whether an investor can ultimately prove the belief wrong" and "does not allow investors to second-guess inherently subjective and uncertain assessments." *Omnicare*, 575 U.S. at 186. To "determine whether an opinion statement is misleading, courts 'must address the statement's context' by taking 'account of whatever facts [the defendant] did provide about legal

---

[47] This statement was made in FirstCash's Form 10-K from 2018 to 2021. ECF 47-1 at 100.

[48] *See* FORM 8-K. Current Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act 1934, (2023) https://1.next.westlaw.com/Document/Ib3a3fd212f5711da ab09080020ab8e66/View/FullText.html?originationContext=docHeader&contextData =(sc.Default)&transitionType=Document&needToInjectTerms=False&docSource=83d 7b011067a4214a3b1903f973fb94e&ppcid=8a8cf47a7295469496e65fc13b9d54f1.

compliance, as well as any other hedges, disclaimers or qualifications it included in its registration statement."' *Jacobowitz*, 2022 WL 976003, at *7 (quoting *Omnicare*, 575 U.S. at 196–97).

FirstCash's claim of a "stable regulatory environment" fits this type of inherently subjective assessment as the word "stable" is completely context and industry dependent. Likewise, FirstCash's claim of "no significant regulatory change for the last 25 years" is also a subjective assessment that appears to address state regulatory changes and not federal.[49] Either way, the word "significant" is context, industry, and company dependent and meets the standard of a non-actionable opinion statement. Taken in the context of other facts provided in the Form 10-K filings extensively discussed above, these opinion statements are not misleading.

Lastly, FirstCash asserts that the R.E. #1 statements are non-actionable as mere puffery. Statements that equate to non-actionable puffery are "of the vague and optimistic type that cannot support a securities fraud action . . . and contain no concrete factual or material misrepresentation." *Southland*, 365 F.3d at 372. As Plaintiff seemingly concedes in its briefing, FirstCash's repeated discussion of a stable and state-centric regulatory environment in the R.E. statements are not false. If the R.E. statements suffer from any defect, it is their slightly rosy outlook on the industry. But taken in the context of the company's extensive risk disclosures, the R.E. statements are mere puffery.

For these reasons, the R.E. statements do not constitute misrepresentations or omissions that rise to the standard required by § 10b-5 or the PSLRA.

### iii. Statements on Financial Performance

Plaintiff next alleges that FirstCash made multiple misleading statements about FirstCash's financial performance during the class period. Though Plaintiff integrates nearly every statement and press

---

[49] This statement is made in a bullet point that is nested under another bullet point that states, "Regulations are primarily at the state level in the U.S." followed by a list of positive state rate changes in Ohio, Washington, Arizona, and Nevada. ECF No 47-1 at 225. The context and placement of the text conveys that it is discussing state regulations.

release from FirstCash discussing their revenue and pawn operations
into its 122-page complaint, these three statements typify the repeated
financial statements that Plaintiff alleges are misleading:

| **F.P. #1** |
| --- |
| 1. FirstCash achieved "record revenue, net income and earnings per share." The Company's U.S. segment revenue for the quarter from pawn loan fees was approximately $96.2 million. The release further stated that, "as of March 31, 2018, the Company's U.S. pawn loans outstanding totaled $237 million."[50] |
| 2. "Pawn represented 96% of all of FirstCash's revenue over the preceding twelve-month period."[51] |
| 3. "We had outstanding . . . results driven by the strength of revenue growth and earnings from core pawn operations."[52] |

The Complaint alleges that FirstCash's revenues were misstated
because they included the 3,600 pawn loans that allegedly violated the
MLA.

While there are many gaps and problems with this reasoning—
including the fact that the Form 10-K and Form 10-Q statements have
never been revised or restated—taking all of Plaintiff's well-pleaded
facts as true, this likely meets the standard required at the

---

[50] ECF No. 42 at 32. Plaintiff parrots the same form income statements for each quarter until the class period closes. *Id.* at 32, 37, 41–42, 48, 52–55, 57, 61, 66, 70, 72. Though they differ in number, they do not differ in form or in the alleged misstatements attributed to them. Thus, the Court need not address each boilerplate income statement individually.

[51] ECF No. 42 at 30. Plaintiff also cites other statements stating 97% (*id.* at 46–47, 51, 53), 98% (*id.* at 55), and 99% (*id.* at 60–61). Defendants further noted at various times that "[p]awn loan fees accounted for approximately [insert %] of the Company's revenue during fiscal [insert year]." *Id.* at 44, 59, 66.

[52] ECF No. 42 at 55. Similar statements were made in each quarterly report as well, discussing the strong nature of the pawn loan segment. *Id.* at 46, 54, 57, 64, 66, 72, 74. Again, these statements differ in percentages and slightly in form, however, they do not differ materially in their role in Plaintiff's alleged misstatement argument.

misstatement stage as a reasonable investor would likely consider misstated earnings a relevant factor as it makes sense that revenue would be lower—albeit marginally—without the 3,600 additional pawn loans.

Relatedly, the Court addresses the many issues with Plaintiff's pleading of the F.P. #1 statements in the scienter section of this opinion.

### iv.   Item 303 Disclosure

Plaintiff also asserts that FirstCash's 10-K and 10-Q statements are materially misleading because it did not disclose Item 303 information under 17 C.F.R. § 229.303(b)(2)(ii). ECF No. 42 at 74–75. The Court disagrees.

The Fifth Circuit has "never held that Item 303 creates a duty to disclose under the Securities Exchange Act." *Pier 1 Imps.*, 935 F.3d at 436–37. Though Item 303 disclosures are important, they are not "a magic black box in which inadequate allegations under Rule 10b-5 are transformed, by means of broader and different SEC regulations, into adequate allegations under Rule 10b-5." *Markman v. Whole Foods Mkt., Inc.*, No. 1:15-CV-681-LY, 2016 WL 10567194, at *10 (W.D. Tex. Aug. 9, 2016) (citation omitted).

Thus, the Item 303 disclosure does not constitute a misstatement.

### v.   Summary of Remaining Statements

The Court pauses to summarize what statements remain for analysis under scienter: R.E. #2 statements, R.E. #3 statements, and F.P. #1 statements.

### 3. <u>Scienter</u>

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). A "strong inference" of scienter under the PSLRA requires that it must be "cogent and compelling"—a higher standard than the inference's being merely "reasonable." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007). In addition, the inference must be "at least as compelling as any opposing inference of nonfraudulent intent." *Id.*

When a defendant has something to gain from their misstatement or omissions—i.e., a motive—a plaintiff's inference of scienter is stronger.[53] *Pier 1*, 935 F.3d at 431.

But when a plaintiff does not allege a motive, "the strength of [the] circumstantial evidence of scienter must be correspondingly greater." *Neiman v. Bulmahn*, 854 F.3d 741, 748 (5th Cir. 2017) (citing *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 644 (5th Cir. 2005)). And this requires a plaintiff to faces the substantial burden of proving "severe recklessness." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 866 (5th Cir. 2003). Severe recklessness extends beyond "merely simple or even inexcusable negligence" and requires "an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.* (quoting *Nathenson v. Zonagen Inc.,* 267 F.3d 400, 408 (5th Cir. 2001)). To this, "Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977).

---

[53] While this seems simple, the Fifth Circuit's interpretation of what constitutes a properly pled motive is unclear. In *Six Flags*, the Fifth Circuit held that an executive bonus incentive plan for reaching $600 million in earnings before interest taxes depreciation and amortization ("EBTIDA") was a properly considered motive for scienter. *Six Flags*, 58 F.4th at 208. But this holding is perplexing and defies basic accounting principles. EBTIDA is a measure that is completely independent of stock price or shareholder sentiment. The formula for calculating it is: **Net Income + Interest Expense + Taxes + Depreciation + Amortization = EBITDA.**

None of the components that make up EBITDA have any relation to the share price or performance of a publicly traded stock. Lying to investors about the status of project sites thus does not affect an incentivized compensation plan centered on the metric. The earnings are either met or they are not—and no amount of dancing around the issue changes the metric. This leaves district courts with a rather awkward question: does the motive for scienter have to make logical sense or must district courts adopt completely nonsensical scienter assertions? According to the Fifth Circuit, at least in *Six Flags*, reality is not a necessary element. And while this Court looks to the higher court for guidance, this reasoning directly contradicts the heightened pleading standard of the PSLRA. Faced with this, district courts must either: (1) assume that this was an honest mistake by the Fifth Circuit; or (2) adopt a new motive standard that goes directly against the PSLRA's heightened pleading standard. Luckily, Plaintiff does not allege a motive here, and this Court need not choose between two bad options.

Here, Plaintiff alleges no motive and therefore it must properly allege severe recklessness in line with the stringent requirements of the PSLRA to survive.

### i.   Group Pleading

Before turning to a full scienter analysis, the Court first addresses FirstCash's assertion that Plaintiff's complaint engages in improper group pleading.

Group pleading occurs when a plaintiff fails to specify which defendants made the alleged misstatements or omissions, and attributes the wrongdoing to defendants collectively. *Indiana Elec. Workers'*, 537 F.3d at 533. This type of pleading "allows plaintiffs to rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company." *Southland*, 365 F.3d at 363 (5th Cir. 2004).

The Fifth Circuit has repeatedly rejected the "group pleading approach to scienter," and instead "focuses on the state of mind of the corporate officials who make, issue, or approve the statement rather than the collective knowledge of all the corporation's officers and employees." *Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 957 (5th Cir. 2016) (internal quotations omitted). As a result, "scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company." *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002). And "corporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles, even if their general level of day-to-day involvement in the corporation's affairs is pleaded." *Southland*, 365 F.3d at 365.

In its complaint, Plaintiff attributes misstatements against the Individual Officers[54] to three types of form filings with the SEC: 10-Ks, 10-Qs, and 8-Ks. The Court must first distinguish which Individual

---

[54] For the sake of organization and brevity, the Court refers to Wessel and Orr collectively as the "Individual Officers" in this section.

Officer was involved with each filing and statement and whether the statements was individually attributed to them or whether they were signed as a representative function of their job title. The table below provides a summary:

| | 10-Ks | 10-Qs | 8-Ks |
|---|---|---|---|
| *Orr* | Signed | Signed | Signed |
| *Wessel* | Signed | N/A | Quoted* & Signed* |

While the Form 10-K and Form 10-Q statements were merely signed by Wessel or Orr, the Form 8-K statement contained a press release that had quotes directly attributed to Wessel. *See* ECF No. 47-1 at 338. These press releases include direct quotes from Wessel.[55] As a result, the Form 8-K statements made directly by Wessel are not subject to the group-pleading doctrine. To make matters more confusing, some of the Form 8-K statement do not quote Wessel and were merely signed by Orr.

For organizational purposes, the Court first addresses Plaintiff's arguments surrounding SOX Certifications on the Form 10-K and Form 10-Q statements.

As to the Form 10-K and Form 10-Q statements, Plaintiff argues that the SOX Certifications signed by Wessel and Orr are enough to form an individualized basis for scienter. That said, "[SOX] certifications support scienter only if there are facts establishing that the officer who signed the certification had a reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions." *Pier 1*, 935 F.3d at 434 (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006)); *see also Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 555 (5th Cir. 2007) (stating the same).

Plaintiff points to the size of the alleged 3,600 MLA violations and multi-year time horizon along with management's ability to monitor store transactions as a "red flag." ECF No. 52 at 22. However, Plaintiff

---

[55] The direct quotes are often proceeded by "Mr. Rick Wessel, chief executive officer, stated" or "Mr. Wessel further commented." ECF No. 47-1 at 338.

never mentions any actual knowledge of the violations and signs that the Individual Officers "should have suspected" the violations are weak. Despite having a point-of-sale system and training in place, multiple managers testify to employees skipping the questionnaire process and safeguards used to monitor transactions. Without a smoking gun or a whistle blower—which Plaintiff does not allege—it is understandable that the Individual Officers would not know about the MLA violations. As a result, Plaintiff's argument about the SOX certifications fail and the Form 10-K and Form 10-Q statements are thus subject to the Court's group-pleading analysis.

As the basis for its scienter allegations on the Form 10-K, 10-Q, and 8-K statements that do not directly quote Wessel, Plaintiff states:

- "The Individual Defendants, <u>because of their positions within FirstCash, possessed the power and authority to control the contents of the Company's reports to the SEC</u>, shareholder letters, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market." ECF No. 42 at 16 (emphasis added).

- "<u>Because of their positions and access to material non-public information</u>, the Individual [Officers] knew or were severely reckless in not knowing that the adverse facts specified herein had not been disclosed . . . and that the positive representations that were being made were misleading." *Id.* at 81 (emphasis added)

- "Each of the Individual [Officers], <u>by virtue of their high-level positions with the Company</u>, directly participated in the management of the Company, <u>were directly involved in the day-to-day operations of the Company at the highest levels</u> and had access to the adverse undisclosed information about the Company's business, operations, financial statements and present and future business prospects via access to internal corporate documents and systems." *Id.* at 83 (emphasis added)

- "<u>The Individual [Officers] participated in drafting, preparing, and/or approving the public statements and communications complained of herein</u> and were aware of, or were severely reckless in not knowing, the material misstatements contained therein and omissions therefrom,

and were aware of their materially misleading nature." *Id*. (emphasis added)

The complaint does not state with particularity anything besides the general job responsibilities of C-Suite executives—including signing reports. Even Plaintiff's use of the defined term "Individual Defendants" lumps together two individuals without the particularity required to plead scienter correctly. Plaintiff seeks to use the Individual Officers' positions in the company as the basis for scienter with no further allegations of knowledge or action. At bottom, this is the definition of group pleading.

At any rate, the Fifth Circuit's disdain for group pleading is not absolute.

In *Diodes*, the Fifth Circuit created a quasi-backdoor entrance to a type of group pleading. *See Diodes*, 810 F.3d at 957. The higher court held that an officer's position, taken together with "special circumstances," are sometimes sufficient to infer a culpable mental state. *Id*. In doing so, the court considered four "special circumstances" sufficient to find scienter based on position alone: (1) whether the company is small, thus making it more likely that executives are familiar with day-to-day operations; (2) whether the transaction was critical to the company's existence; (3) whether the misrepresented or omitted information was readily apparent to the speaker; and (4) whether the defendant's statements were internally inconsistent. *Id*.

FirstCash is a large company with over 17,000 employees and more than 2,800 retail pawn and consumer lending locations on two continents and twenty-five U.S. states. ECF No. 42 at 14. This cuts against the *Diodes* factor as the Individual Officers would be less familiar with day-to-day transactions of front-line employees in such a large company. *See Diodes*, 810 F.3d at 957 (finding that a company with only 4,000 employees weighed against finding scienter). And while pawn transactions are critical to the company's existence as they often account for upwards of 96% of revenue, the allegedly misrepresented information on day-to-day transactions at the store-level would not be readily apparent to C-Suite executives absent some notice from management or compliance—which Plaintiff does not allege. Lastly, the

Individual Officers' statements remained internally consistent and continue to do so. As stated before, the revenue numbers projected by the Form 10-K and Form 10-Q statements have never been revised or restated, and Plaintiff does not allege or offer any internal communications that would suggest an inconsistent number.

As a result, the Form 10-K, Form 10-Q, and Form 8-K statements that do not quote Wessel are removed from the scienter analysis due to improper group pleading.  This leaves only the Form 8-K investor presentations where Wessel was quoted as the speaker. Thus, the only statements left at this stage are the F.P. #1 statements.[56]

For the sake of appeal however, the Court will still address the O.T. #2 and #3 statements as well.

### ii.    O.T. #2 & #3 Statements on Company Operations and Training

Even assuming the O.T. statements were not subject to improper group pleading; Plaintiff's scienter allegations fall flat against the incredibly high standard of severe recklessness. And its allegations are not "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Opposing inferences paint the picture of a company that attempted to roll out an MLA compliance and training program that had holes in it—specifically, in middle management. Plaintiff's own confidential witnesses testify to this.

 CW-5's testimony that members of middle management and regular employees received training at the store level. Notably, CW-5's area of supervision was the same area subject to the CFPB complaint. CW-5 is also the closest in degrees to the C-Suit of FirstCash. Multiple CWs complained of employees skipping the internal question process for checking military status. At any rate, enforcing these policies is the ordinary job of a store manager. And despite receiving a training mandate from above, members of middle management and day-to-day

---

[56] O.T. Statements #2 and #3 were all eliminated as they either took place in Form 10-K reports or in Form 8-K reports where Wessel was not quoted and only PowerPoint slides were presented. Plaintiff's only tie to Orr or Wessel over these 8-Ks are that they were signed by Orr.

employees seemingly ignored prompts to record military status despite clear direction from the point-of-sale system. As stated earlier, this refutes Plaintiff allegation that the "continuous monitoring system" constitutes knowledge on the part of the individual defendants. To the contrary, if middle management and employees were not following the directives in the point-of-sale system, nobody would be notified of violations that took place.

This alternate inference—which is still based on the plain text of Plaintiff's pleading—is more compelling than the scant scienter analysis provided by Plaintiff based entirely on group pleading.

If FirstCash rolled out training, point-of-sale systems, and audits that were not rigorous enough, it might reach a standard of normal negligence and with a properly pled motive—scienter. But this type of incomplete rollout of a training and audit process is not "an extreme departure from the standards of ordinary care" and does not meet the standard of needed to prove scienter in this situation. *See Ho v. Flotek Indus.*, 248 F. Supp. 3d 847, 858 (S.D. Tex. 2017) ("lack of internal controls in and of itself is insufficient to give rise to the required strong inference of scienter"), *aff'd*, 915 F.3d 975 (5th Cir. 2019).

### *iii.*    Scienter - F.P. #1 Statements

The alleged circumstances of the F.P. #1 statements also cannot support scienter.

Plaintiff "make[s] no attempt to estimate by how much the earnings were inflated," and provides "no standard of comparison to what the correct numbers would have been." *See Shaw Grp.*, 537 F.3d at 536. Because the CFPB suit only presents an allegation of MLA violations, the revenue numbers are still correct as for current reporting. Whereas most event-based suits are based on a revised statement of revenue that corrects a previous misstatement, Plaintiff's complaint is a Russian-nesting-doll of allegations with nothing beyond the CFPB's vague assertions to back itself up.  A pawn loan is a small-dollar loan, and it is likely that even 3,600 additional loans over a four-year period would not materially change an income statement in the eyes of a reasonable investor or catch the eye of a busy executive—especially

35

where the system in place is not utilized due to failures in middle management. Without further detail beyond Wessel and Orr's positions in the company, and no revised statement from FirstCash, there is not requisite information present to show the "severe recklessness" necessary to establish scienter.

Plaintiff further fails to specify which specific statements from Wessel were tainted by the MLA violations and instead, pleads that every financial statement and announcement during the class period was tainted. Because none of these statements have been restated or revised, Plaintiff is scatter shot guessing as to which ones are incorrect. This falls significantly short of the standard required by Rule 9. And aside from only alleging a general number of violations within a certain date range, the CFPB provided no specific dates or instances of when and where the violations occurred.

As a result, taking all of Plaintiff's well-pleaded facts as true, the Court holds that scienter is not present for the F.P #1 statements.

### 4. **Loss Causation**

Even if Plaintiff properly pled all 10b-5 elements correctly—which it did not—its claim still fails under loss causation.

The PSLRA requires a plaintiff to prove that the alleged misrepresentation "caused the loss for which the plaintiff seeks to recover" 15 U.S.C. § 78u–4(b)(4). Loss causation under a § 10b-5 claim requires a plaintiff to "adequately allege and prove the traditional elements of causation and loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005). This requires a plaintiff to allege "a plausible causal relationship between the fraudulent statements or omissions . . . followed by the leaking out of relevant or related truth about the fraud that caused a significant part of the depreciation of the stock." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 258 (5th Cir. 2009).

Here, the analysis concerns whether there was a corrective disclosure of relevant or related truth that revealed the source of the inflated price.

### i. *Corrective Disclosures*

A corrective disclosure must be a "relevant or related truth about the fraud." *Lormand*, 565 F.3d at 258. This is because price changes "may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions or other events." *Dura*, 544 U.S. at 343. These other events result in a "tangle of factors affecting price." *Id.*

Plaintiff points to the CFPB's suit against FirstCash as a corrective disclosure. There are serious problems with this reasoning.

Plaintiff claims a corrective disclosure that is entirely based on another party's allegation in a separate suit. But a complaint is not a final finding or ruling that the defendants have violated the law. FirstCash has since denied all allegations of wrongdoing in its answer and subsequent Form 8-K filings.[57] FirstCash continues to deny any wrongdoing, and due to the CFPB's state of administrative limbo, the case has not advanced past the pleadings stage. At this stage in the litigation, the Court is wary to say that a mere allegation—no matter how specific—is a "relevant or related truth."

To this point, the Fifth Circuit clarified what constitutes "relevant or related truth." *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 231 (5th Cir. 2009). In *Flowserve*, a district court held that the partial correction of a prior earnings statement was insufficient to plead

---

[57] On November 15, 2021, FirstCash filed a Form 8-K stating the following:

> The Company intends to vigorously defend against the allegations in this case, which it understands originated from a single customer complaint from 2019, which was immediately remediated by the Company. Furthermore, the CFPB has not provided the Company with any evidence or support for its allegations, including its allegations that it has discovered approximately 3,600 transactions involving approximately 1,000 customers that may have violated the MLA. The CFPB's characterizations of the Company as a repeat offender are also based on violations committed by a former subsidiary of Cash America that was fully divested two years before the Company's acquisition of Cash America in 2016.

> While the Company remains confident in its policies and procedures to ensure compliance with the MLA and its defenses to the CFPB's allegations, the Company does not believe that an adverse outcome of this matter would have a material adverse impact on its financial condition or its business.

ECF No. 42-1 at 781.

loss causation because a full correction of the statement was issued later. *Id.* The Fifth Circuit reversed the district court and held that corrective disclosures need not be the "full truth" but "must reflect part of the relevant truth." *Id.* at 230. Importantly, the word "truth" is still required.

While Plaintiff may argue that the CFPB lawsuit reflects part of the relevant truth, the corrective disclosure alleged here is not a mirror but a police sketch. The price change alleged by Plaintiff is based entirely on the CFPB's suit—which specifies nothing besides a broad geographic area of business, time, and a round number of violations—and does not reflect a corrective disclosure of "relevant or related truth." In the complaint, the CFPB does not specify the method of its investigation or how it discovered the violations. In most § 10b-5 cases, there are smaller corrective disclosures that are verifiably true when they were made. Even with agency action, there is usually a smoking gun. Here, however, there is no verifiably true corrective disclosure and only a tangle of allegations from a lawsuit that is currently stayed at the pleadings stage. The Court is aware that FirstCash was subject to a consent order with the CFPB, and that this might make the allegations more credible. The Court, however, cannot (a) use a scant-on-facts complaint that has not cleared the motion-to-dismiss stage to (b) get another complaint through the same stage when (c) the cause of action here has a much higher pleading standard.

Beyond the implications of the PSLRA, the Court also has major concerns with Plaintiff's reasoning as applied to the historical traditions of our justice system. The historical presumption of innocence, though often brushed aside in the civil context, "is rooted in ideals of justice and liberty that have historically served to constrain the worst effects of state coercion." Hon. J. Harvie Wilkinson III, *The Presumption of Civil Innocence*, 104 VA. L. REV. 589, 631 (2018). While it is easy to ignore this presumption and see a final judgment as the only coercion in a civil lawsuit, the very effect of litigation—especially discovery—is an act of immense power and control that implicates more than mere attorneys'

fees.[58] As such, the very pleading standards required by the FRCP are—in part—grounded in a deeper concern for due process. Fourth Circuit Judge J. Harvie Wilkinson, III, speaking of the current *Twombly-Iqbal* pleading regime states:

> The Court, by inveighing against the *arbitrary* use of state authority, is speaking the language of due process . . . the deprivations denounced in *Twombly* and *Iqbal* are no less real for taking other than classic forms. They belong in the mainstream of our conception of due process even where they are nominally presented as mere renderings of Rule 8.[59]

To allow such a severe deprivation of time and money over a claim entirely predicated on early-stage and unconfirmed allegations in another civil case offends the very notion of justice that our system is founded on. Indeed, there are too many collateral consequences to take this assertion lightly. Allowing these pleadings forces companies and executives to execute Schlieffen-style litigation wars of attrition and continues to blaze a dangerous path to indirect government regulation. In the modern state of political and personal witch-hunts, it is an immensely powerful tool for a government agency or state attorney general to file a tenuous suit or hold a press conference and guarantee embroiling a company in complex shareholder suits and bad press for years.

To be clear, it is not this Court's position that a full disclosure is needed. It is this Courts position that a corrective disclosure must be verifiably true to at least some small degree. *Flowserve Corp.*, 572 F.3d

---

[58] In 2018, one out of every twelve companies were sued in a securities class action. Cornerstone Research, *Securities Class Action Filings – 2017 Year in Review*, at 5, 10 (2018). Despite this monumental volume of suits, yearly settlements for the years 2009-2018 averaged nearly $3.55 billion. *See* Cornerstone Research, *Securities Class Action Settlements: 2018 Review and Analysis*, 3, 9 (2018). And with contingency-fee awards averaging around 25% of settlement values, it's no wonder that anytime an executive sneezes a 10b-5 action gets filed. *See* Lynn A. Baker et. al., *Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions*, 115 COLUM. L. REV. 1371, 1394 (2015).

[59] Wilkinson, 104 VA. L. REV. at 645 (emphasis in original).

at 231. As a result, the CFPB complaint—devoid of anything but allegations—is not a corrective disclosure.

The Court thus holds that Plaintiff's 10b-5 claim must be **DISMISSED**.

## B.   Section 20(A)

Plaintiff also brings a claim under § 20(a). To state a claim under § 20(a), a plaintiff must plead: (1) a primary violation of the securities laws; and (2) that the defendants had an ability to control the specific circumstances or actions on which the primary violation is based. *Heck v. Triche*, 775 F.3d 265, 283 (5th Cir. 2014). In short, control person liability completely depends upon a primary violation. *See Southland*, 365 F.3d at 383; *Lovelace v. Software Spectrum*, 78 F.3d 1015, 1021 n.8 (5th Cir. 1996).

Here, as evidenced extensively above, Plaintiff fails to plead a primary violation. Because of this, its § 20(a) claim fails and is thus **DISMISSED**.

## CONCLUSION

Having considered the Motion, briefs, arguments of counsel, record, and applicable law, the Court **GRANTS** Defendants' Motion to Dismiss. ECF No. 45. Lead Plaintiff's claims are hereby **DISMISSED with prejudice.**

**SO ORDERED** on this **31st day of March 2023.**

**MARK T. PITTMAN**
UNITED STATES DISTRICT JUDGE

40